In re Rodney S. MAYO,[1] Debtor.

**MIDLANTIC NATIONAL BANK NORTH, N.A., Plaintiff,**

v.

**BORG–WARNER ACCEPTANCE CORP., Vermont National Bank, and John Larkin,[2] Defendants.**

Bankruptcy No. 86–146.
Adv. No. 86–00042.

United States Bankruptcy Court,
D. Vermont.

March 23, 1990.

---

1. Rodney S. Mayo (Mayo) was added as a party at his request on March 25, 1987.

2. See Appendix for a discussion about this Defendant.

or the groom. This adversary proceeding is similar to the Dollar Dance.

Mayo, the debtor, was a very attractive groom. As he wed himself to his various businesses creditors lined up to dance with him. Unlike the Dollar Dance, however, where money is paid only at the beginning of the dance, in this rendition each of the dancers also pays to quit dancing.

J. Anderson, and M. Burak, Goldstein, Manello, Burak & Gabel, Burlington, Vt., for Midlantic Nat. Bank North, N.A. (Midlantic).

G. Faris, and M. Schein, Hoff, Wilson, Powell & Lang, Burlington, Vt., for Vermont Nat. Bank (VNB).

D. Hill, Essex Junction, Vt., for Borg–Warner Acceptance Corp. (BWAC).

## MEMORANDUM OF DECISION ON VALIDITY, EXTENT, AND PRIORITY OF LIENS, AND EQUITABLE SUBORDINATION

FRANCIS G. CONRAD, Bankruptcy Judge.

This adversary proceeding[3] is before us on Midlantic's complaint to determine the validity, extent, and priority of conflicting security interests in a Boat. The complaint, counterclaims, and affirmative defenses allege inequitable conduct, negligence, and fraud. We hold that BWAC[4] has a first priority interest in the Boat. We do not equitably subordinate any claims because the conduct of all parties does not justify its application.

There is an old Vermont wedding reception custom called the "Dollar Dance." Wedding guests form a line with a dollar in hand and pay to dance with either the bride

### THE GROOM

Although Mayo is the converted Chapter 7 debtor in this adversary proceeding, the dance also involves a related Chapter 7 debtor, Vermont Custom Boats, Inc., a Vermont domestic corporation. Vermont Custom Boats, Inc. is wholly-owned by Mayo. Prior to its incorporation in February, 1985 (T.1236),[5] it operated as a sole proprietorship as Rodney S. Mayo, d/b/a Vermont Custom Boats. (T.1236). At the corporation's inception, assets were transferred into it from the d/b/a. The corporation operated using the d/b/a as a trade name. In this Memorandum of Decision we distinguish the corporation from the original d/b/a sole proprietorship by referring to the corporation by its corporate name.

There is some confusion in the record about what assets were transferred from the sole proprietorship to the corporation. We do know with some assurance, however, that furniture and fixtures went to the corporation (T.1332) and the inventory (boats) was left with the sole proprietorship. (T.1332). Mayo intended to transfer to the corporation the remainder of his sole proprietorship's assets in July of 1986 (T.1236–37), but his August, 1986 bankruptcy washed away his intentions.

Vermont Custom Boats, Inc. and the d/b/a proprietorship maintained several business office locations. One location was

---

**3.** We have jurisdiction to hear this adversary proceeding under 28 U.S.C. § 1334(b) and the General Reference to the Court under Part V of the Local District Court Rules for the District of Vermont. This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(K). Where the proceeding may be non-core, the parties have consented to our entry of a Final Order. This Memorandum of Decision constitutes findings of fact and conclusions of law under F.R.Civ.P.

52 as made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7052.

**4.** BWAC was reimbursed by the manufacturer of the Boat Murray Chris–Craft (Chris–Craft) under an agreement between them. The parties to this adversary proceeding agreed that BWAC would defend this action.

**5.** Indicates reference to trial transcript.

situated at Southside Lincoln–Mercury, Inc., Burlington, Vermont (T.1237), another Mayo related Chapter 7 debtor in this Court. Another business office was maintained in Shelburne, Vermont. Mayo himself lived in Colchester, Vermont. (T.1233). It is logical to conclude from the evidence that Mayo, as a d/b/a, and as Vermont Custom Boats, Inc., was in business to sell boats and accessories.

The transcript is brimming with references about Mayo's success as a boat dealer. We find this impressive considering Vermont's bountiful winter weather and the brevity of its summer season. Be that as it may, Mayo could sell boats. (T.688). Mayo was one of BWAC's largest dealers. (T–688). Mayo obtained inventory floor planning from BWAC, and working capital and long-term financing from VNB. Later, to enhance his business and possibly his self-esteem, he obtained financing from Midlantic via a boat "paper originator," Yegen Marine Company (Yegen), to purchase from his d/b/a sole proprietorship a beautiful large boat for his own personal use. The boat was a 48′ Chris–Craft known as a 480 Corinthian (the Boat). Although there are a plethora of issues to be resolved, the ultimate issue to be decided is who is entitled to the proceeds of the Boat.

### THE FIRST DANCER

BWAC is the first dancer. BWAC is a well known inventory floor financier. It has branch offices located throughout the United States, with headquarters in Chicago, Illinois. (T.847). Two of its branches that did business with Mayo are located in Bradenton, Florida (T.687; BWAC–1),[6] and Manchester, New Hampshire. (T.1139).

How BWAC and Mayo came to dance we may never know. Testimony from a BWAC employee indicates that the BWAC financing documents signed by Mayo could have been requested by Mayo, or could have been sent directly to Mayo by Chris–Craft. (T.887; BWAC–1; underscoring ours). The BWAC employee testified that

the documents in this case would have been executed outside of Vermont because BWAC did not have an office in Vermont. (T. 888). On cross-examination she testified she didn't really know where the documents were executed (T.922) but was led to admit they were actually signed in New Hampshire. (T–933). The cross-examination was skillful; however, we find she didn't know where the BWAC/Mayo documents were signed. Mayo's testimony didn't tell us where the documents were signed either. A credit file review provided by Midlantic, MB–50, p. 6, indicates Mayo was personally interviewed in Florida by a BWAC employee at a Chris–Craft show in 1984. This is the only reliable evidence about where the transaction might have occurred. It does not reveal clearly, however, if Mayo signed any documents at that time. We must conclude from the paucity of evidence, and the contradictory testimony, that the operative documents between BWAC and Mayo were signed outside of Vermont. We must also conclude, again from the scarcity of evidence, that BWAC did not solicit, in person or by mail, Mayo's business in Vermont.

On April 25, 1984, Mayo, d/b/a Vermont Custom Boats, and BWAC executed an "Inventory Security Agreement" and Power of Attorney, BWAC–1. Mayo indicated his place of business was located at U.S. Rtes. 2 & 7, Colchester, Vermont. He testified Colchester was his personal residence. BWAC indicated its office was located at Bradenton, Florida. (BWAC–1). BWAC–1 is ordinary and usual in all respects for a Security Agreement and Power of Attorney. It is BWAC's standard form used throughout the country. (T.887).

Agreement terms pertinent to this adversary proceeding indicate Mayo is in the "business of buying, selling and generally dealing in goods of various types, at retail or otherwise, [and] from time to time may desire to finance the acquisition of goods for such purpose to obtain from Secured Party [BWAC] such extensions of *credit* as

---

**6.** BWAC exhibits are referenced as BWAC–#; Midlantic exhibits are referenced as MB–#;

VNB exhibits are referenced as VNB–#.

Secured Party in its sole discretion may decide to grant." (BWAC-1; brackets supplied for clarity; emphasis ours).

Paragraph 1 of BWAC-1 does not indicate if Mayo was conducting business as a corporation, partnership, or sole proprietorship because no one struck out the inappropriate terms as the document directed. Read as a whole, however, the document shows Mayo to be operating as a d/b/a sole proprietorship at the time the Inventory Security Agreement and Power of Attorney were signed. This fact is not in dispute. Mayo agreed to notify BWAC of any change in his "principal place of business, and [any] additions or discontinuances of other locations, and any change in name, identity, form of ownership or management." (BWAC-1, paragraph 1(b); brackets supplied).

Mayo also agreed to pay BWAC the amount due on any item of inventory financed immediately upon sale. (BWAC-1, paragraph 8(d)). He further agreed that for purposes of determining the rate of charge (interest rate), notwithstanding any other agreement, the charge would accrue from the date the inventory was shipped from the manufacturer. (BWAC-1, paragraph 9(c)).

Mayo granted BWAC a Power of Attorney to sign documents in connection with BWAC-1, and both parties agreed "the validity, enforceability and the interpretation of [BWAC-1] and any promissory notes taken, charges made and sums paid in connection [with BWAC] shall be governed by the State of Illinois...." (BWAC-1, paragraph 1; brackets supplied).

Finally, the agreement contains all the other terms and conditions one expects in a security agreement, including a description of the inventory (boats, etc.), grant of a security interest, terms of default, rights of the parties, no-waiver provisions, and so on.

UCC-1's were filed with the Vermont Secretary of State on May 1, 1984, with amendments filed September 6, 1984, January 3, 1985, and August 11, 1986. UCC-1's were also filed with the Colchester, Vermont Town Clerk (BWAC-3), the town in which Mayo resided. The UCC-1's are signed by BWAC and Mayo, individually and as d/b/a Vermont Custom Boats.[7]

All BWAC's floor planning for Mayo, applicable to this adversary proceeding, is based on a single security agreement (T.689-90) and one set of UCC-1 financing statements.

After a dealer has submitted a floor plan application (MB-25), and the security agreements are executed and filed, and before any credit is extended, a credit investigation is done and prior filers are notified by letter.[8] (T.897).

In conjunction with its dealer agreements, BWAC also enters into agreements with manufacturers who want to put inventory into a dealer's showroom and warehouse. In this proceeding, the manufacturer is Murray Chris-Craft (Chris-Craft). (MB-9, MB-10).[9] The agreement between BWAC and Chris-Craft in this proceeding is entitled "Chris-Craft Inventory Finance Program" and is administered by The Marine Division of Borg-Warner Acceptance Corporation. The purpose of the Chris-Craft program is to ensure the retail dealer that inventory will be available from a wholesaler. (MB-9).

This particular program covers boats for the 1986 model year on invoices dated July 1, 1985 through June 30, 1986. The program provides that dealers would be charged a minimum rate of eight (8%) percent, with the possibility of interest reimbursement if they purchased a certain vol-

---

**7.** Some of the UCC-1's also contained references to Bayside Marine, another entity related to Mayo. Bayside Marine is not relevant to this proceeding.

**8.** *See, In re Southern Vermont Supply, Inc.,* 58 B.R. 887 (Bkrtcy.D.Vt.1986), for a discussion of compliance with 9A Vt.Stat.Ann. § 9–312(3)(c) and the notification letter required under § 312.

**9.** During the pendency of this adversary proceeding, we were informed Chris-Craft filed for bankruptcy protection in Florida. We don't believe that filing will affect the outcome of this proceeding or prevent us from rendering a judgment.

ume of boats. Dealers are placed in certain categories based upon volume. The potential reimbursement to a high volume dealer would reduce the interest rate to as little as four (4%) percent below the prime rate. Mayo was a high volume dealer and was in this latter reimbursement category. The reimbursement could come from Chris–Craft directly to the dealer, or from BWAC. We are not told how Mayo received his reimbursement, if he received any at all. (MB–9).

The program also provides for a BWAC handling fee of .00175 on each unit shipped. The fee is added to the principal balance of each trust receipt. (MB–9).

Once BWAC approves the dealer's credit line, boats are shipped on request from the manufacturer to the dealer for a given dollar amount for a specific boat. (T.898). If the request is within the credit line and other items not germane to this proceeding are satisfactory, BWAC approves the request and sends a check to the manufacturer by BWAC. Meanwhile, the boat is shipped to the dealer.

Each boat shipped to a dealer has its own trust receipt, an archaic security instrument, executed by BWAC under the Power of Attorney and its own floor plan number. The floor plan number is derived from a document on BWAC stationary called "1986 Programs, Murray Chris–Craft." Each month of the model year has a different floor plan number. The minimum rate of interest charged is eight (8%) percent, the same as the Inventory Finance Program, with prime rate plus four (4%) percent being a possible normal charge. Each month specifies a different due-in-full and curtailment date. The due-in-full date is the date a dealer must pay-off the boat if it is not sold. The curtailment date (there are usually two) is the date a dealer must pay-off a percentage (5% in this proceeding) of the amount due on the boat. The purpose of the curtailment payment is to increase the dealer's equity (reduce BWAC's risk) as the boat gets older.

Once credit is extended, BWAC conducts floor plan inspections and bills the dealer for interest, due-in-fulls, and curtailments due on a monthly basis. (T. 692; MB–22). This was done in this proceeding.

We have no doubt that the extension of credit by BWAC to Mayo, under its agreements with Mayo and the program with Chris–Craft, was a credit financing transaction typically called floor planning. *Compare, Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1259, 17 BCD 1051, 18 CBC 2d 1078, CCH BLR para. 72277 (11th Cir. 1988) (contains a succinct description of a typical floor plan). The main purpose of floor planning is to enable a wholesale dealer, and more often a retail dealer, to have inventory on the showroom floor for sale to customers.

Viewed as a financing arrangement, we find that BWAC charged in excess of twelve (12%) percent per annum for the use of funds advanced to Mayo during the period July 1, 1984 through January, 1985. We know this from BWAC's witness who testified:

Q. Now in fact the January bill, January, 1985 bill, to Vermont Custom Boats [Mayo] reflects a blended rate of about 11¾ percent; does it not?

A. Yes. (T. 739; brackets supplied)

In addition to the interest Mayo paid, Chris–Craft paid interest to BWAC:

Q. So the interest rate that Chris–Craft was paying on the January, 1985 bill was .08—was 1 percent on 80 percent of the bill or .08 percent; is that correct?

A. Yes. (T. 740).

We note the above portion of the transcript as transcribed is not mathematically correct, *i.e.* rather, 1 percent of 80 percent equals .0080 or .80 percent. If we add the rates together (11.75% + .80% = 12.55%), we arrive at a rate greater than twelve (12%) percent.

We also find from our review of the operative floor plan documents that even if the facts showed Mayo and Chris–Craft together were actually paying less that twelve (12%) percent, or we were to exclude the Chris–Craft interest payments altogether, it is clear Mayo contracted to pay a rate of interest that could exceed twelve (14%)

percent. (MB–4, –8, –9, –10, –11, –12; BWAC–1, –3).[10]

From 1984 through 1986, BWAC advanced funds for the benefit of Mayo under the Security Agreement and Power of Attorney, and the blanket UCC–1 financing statement covering Mayo's boat inventory. (BWAC–1, –3; T.898–9). The dance between Mayo and BWAC from the beginning was an unhappy one.

Mayo's security agreement with BWAC required him to pay-off any boat immediately following its sale. (MB–8, paragraph 8; T. 799). Sales receipts were to be held "In Trust" for the secured party and "separate and apart from Debtor's funds and goods" until payment was made. Non-payment of money when due represented an act of default. (MB–8, paragraph 14; T. 799–800). Despite these provisions, Mayo almost never paid-off sold boats as he was required to do. Testimony from a BWAC employee shows that from October, 1985 to May, 1986 nearly all funds from sold boats were not remitted immediately, but rather, were picked up personally by BWAC inventory floorcheckers. (T. 1145–7). Floorcheckers are BWAC personnel who count and compare inventory on the dealer floor to determine which inventory remains unsold and which inventory has been sold. Mayo's practice shows unsatisfactory performance, but as the BWAC employee testified, "it happens quite often." (T. 1147–48). We understand this testimony to mean other dealers also fail to remit sales proceeds on a timely basis. Our experience as a trial court in other floor planning proceedings has shown non-remittance of proceeds to be a common phenomena. *Compare, R.H. Davis v. AETNA Acceptance Company,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934) and *Chrysler Credit Corp. v. Rebhan, supra* (11th Cir.1988) (both cases recite facts about non-remittance of floor plan proceeds). The BWAC employee added that we must consider the fact that he (Mayo) was a boat dealer; meaning, we believe, that boat dealers are seasonal retailers and thus, have cash flow problems during the off season. The non-payment of funds due a floor planner is known in the floor planning trade as "Sold-out-of-Trust" (SOT).

It is obvious from the testimony and case law that SOT's occur all the time with any number of dealers. But a SOT is something that reflects on a dealer's credit worthiness (MB–5; MB–6) and affects credit extensions. (T.802–803). It is also something BWAC is accustomed to working with (T. 801–7) and BWAC employees will alert a dealer if he is not performing under his agreement (T. 1142). BWAC cautioned Mayo about his SOT's, and his SOT's did affect credit extensions to him on at least two occasions. (T. 794–7).

There is other testimony that shows Mayo did not make his interest payments (T. 794–8), and was late on many of his curtailments (MB–14; T. 1151) and due-in-fulls. Late payments on due-in-fulls or the failure to pay them at all represents a default under the Security Agreement (BWAC–1) and shows a dealer is not, in the financial sense, turning over his boats. A poor-turn indicates a dealer (and BWAC) is in trouble. (T. 773–4).

It is important to note that failure to pay curtailments and due-in-fulls, in BWAC's view, is a serious problem. It is so serious that, in this case, curtailment and due-in-full violations caused BWAC's Bradenton branch to cut-off Mayo's credit. (T. 757). But everyone likes to dance (T. 770) even if the music is not exactly like the agreed upon sheet music. Thus, we learn that Chris–Craft can waive curtailments and due-in-fulls. BWAC informed us that they do not enforce due-in-fulls because it would drive them out of business. (T. 770). If Chris–Craft waives the due-in-fulls, BWAC is on solid ground as far as its risk of loss is concerned (T. 756–9) because a waiver essentially provides BWAC with a Chris–Craft guarantee against loss if the dealer does not sell the boat or pay it off.

---

**10.** This finding is significant because it brings into the legal waters here Vermont's licensed lender statute which regulates lenders who charge in excess of twelve (12%) percent interest. *Infra.*

Chris–Craft enjoyed watching the dance between Mayo and BWAC, and at the time when Mayo wanted to buy the 48′ Corinthian (the *cause celebre* of this adversary proceeding), Chris–Craft was busily tapping its foot along to the rhythm of the music. Mayo apparently came upon the Boat at a boat show sponsored by Chris–Craft in the spring or early summer of 1985, and wanted it for himself. Mayo bought the Boat through his d/b/a with himself to become the ultimate retail customer. (T. 1251; T. 1336–7). The Boat was delivered to Mayo under BWAC's floor plan. (T. 1337). There was a little glitch, however, because at the time Mayo bought the Boat, he, via his d/b/a, was up to the top of his credit line with BWAC and no further credit could be extended. Apparently Chris–Craft intervened because they wanted the Boat on Lake Champlain and somehow persuaded BWAC to give a credit overline approval. (T. 857–8). A credit overline approval simply means Mayo was permitted to exceed his line of credit. Chris–Craft guaranteed this overline. The Boat was delivered to Mayo in Vermont, about August 1, 1985 (MB–14, Statement of Charges dated August 31, 1985), and docked at the Champlain Club. The Boat was added to Mayo's floor plan. We have more to say about BWAC's involvement, but while this fox trot was in full swing, Mayo took another dance partner.

## THE SECOND DANCER

VNB's dance with Mayo started shortly after the Boat was in Mayo's inventory.

Gingras, VNB's "commercial loan officer," first met Mayo on December 13, 1984. A $650,000 loan proposal was made to obtain Mayo as a VNB customer (T. 971), but it never came to fruition because, as Gingras testified, the business was too seasonal and Mayo had considerable liabilities. (T. 972).

Gingras wanted to dance, however. He suggested that Mayo change his dancing outfit by repackaging his loan proposal in a corporate entity separate and apart from Mayo's other activities. (T. 974–75). This is one of the reasons Vermont Custom Boats, Inc. came into being.

Eventually, a $650,000 loan package was configured as Gingras suggested, and money was lent by VNB to Vermont Custom Boats, Inc. on August 23, 1985. (MB–66, –68). Mayo did not sign on this loan transaction as an individual. (VNB–36, –37).

The loan was made at Gingras's recommendation (T. 977), even though VNB, as an entity, had reservations about it. (T. 976). As Gingras stated, however, Vermont Custom Boats, Inc. had good potential, and the loan was well secured. (T. 974–5). Moreover, in his opinion, Vermont Custom Boats, Inc. was Mayo's strongest entity.

From the very beginning, Vermont Custom Boats, Inc.'s loan payments were late to the extent late charges were continuously incurred. (MB–67). Vermont Custom Boats, Inc. made only one principal payment due under the note. Principal payments were waived. Gingras didn't view Mayo as being late on his payments because he wasn't late by credit bureau standards, *i.e.*, he wasn't late more than 30 days. He was regularly incurring late charges, however (T. 986–87). Also, in Gingras's view, if VNB waived principal payments the obligor wasn't late. Moreover, commencing immediately after it opened in August of 1985, Vermont Custom Boats, Inc. routinely overdrew its checking accounts. *See*, MB–43 for example of NSF checks.

The choreography of the dance was disrupted during the 1985 Thanksgiving Weekend with the return of bank drafts drawn on Vermont Federal Bank and the Chittenden Trust Company—dancers in other adversary proceedings within Mayo related bankruptcy cases.[11] (MB–61).

Gingras testified that the other banks claimed he triggered the interruption in the dance because he refused to pay $36,500 on the drafts. Before the cotillion resumed, VNB was holding a Mayo overdraft of

---

11. Related Mayo bankruptcy cases are: Rodney S. Mayo; Bayside Marine, Inc.; Vermont Custom Boats, Inc.; and, Burlington Lincoln–Mercury, Inc. All are converted Chapter 7 cases.

about $200,000, Chittenden Trust Company held about $700,000 in overdrafts, and Vermont Federal Bank—about $340,000.

About the same time as the Thanksgiving overdraft dance intermission, one of the wedding guests, a Vice–President of operations at VNB, asked the bank's internal auditor to check Mayo's finesse with his checking accounts. After observing Mayo's technique, the internal auditor concluded Mayo was doing the check kiting Jitterbug. VNB reported Mayo's check kiting activity to the FBI. (T. 616–19; MB–78). This check kiting episode ended with VNB lending money to Mayo by converting the overdraft to a time note and later to a term note. This ended the FBI investigation. Our trial notes indicate that this was the "great rationalization": check kiting can be ended by throwing money at the check kiter.

Because of the Thanksgiving overdrafts and the check kiting, VNB felt compelled to dance faster with Mayo and advanced another $500,000. (T. 678). VNB was not comfortable with the loan but it increased its exposure to protect its prior investment. (T. 989–993; MB–79). Mayo had no additional financial strength or security to support the new advances. (T. 994–95). His parents, however, provided guarantees. Mayo became personally liable on the loans. Gingras played a key role in the new loan package and was in fact in daily contact with Mayo during this dance. (T. 977; MB–61).

From December, 1985 through June, 1986, two of VNB's officers, Stephens and Beaudoer, monitored Mayo's accounts. (T. 625; T. 632; T. 651; T. 669).

The new loan did not help. The groom needed more money to keep dancing. (T. 1015). Gingras recalled that the pleas for more money stuck out in his mind. (T. 1015–16). The most obvious indication of Mayo's problem was the constant overdrawing of his checking accounts, MB–47, almost on a daily basis. Although Gingras,

in his testimony, tried to pass off Vermont Custom Boats, Inc. overdrafts as typical, we conclude they were serious enough to signify a real cash flow problem. It was so serious that Gingras and Mayo worked on it every day.[12] Despite this effort, Mayo and his corporation could not cover the drafts, and in fact, Mayo and Gingras were violating VNB's internal rules and Mayo's own agreements. (T. 595). What the facts disclose was a continuing effort by Gingras to keep Vermont Custom Boats, Inc. afloat until the summer of 1986 when the seasonal boat business would pick-up, produce revenue, and pay off or at least service the loans.

As an example of the efforts made to keep Mayo economically anchored, checks from Mayo's automobile corporation, Burlington Lincoln–Mercury, Inc., were allowed to be used to cover Vermont Custom Boats, Inc. payroll. VNB took money from in-house Mayo accounts and spread it into other Mayo related accounts to meet overdrafts. (T. 545–9; T. 602). In fact, in our view, the 1985 kiting continued right on through 1986 (T. 1002; MB–61; T. 646; T. 643) with the assistance of VNB.

We will have more to say about VNB's dance with Mayo later. Now we launch the third dancer, Midlantic Bank, in the form of its commercial paper producer, Yegen Marine Company, a division of Yegen, Incorporated.

## THE THIRD DANCER

Sometime in 1985, Yegen Marine Company (Yegen), a service company that markets, develops, and sells marine financial paper to banks nationwide, contacted Mayo/Vermont Custom Boats, Inc. Yegen is completely independent of Midlantic Bank (T. 9–10; T. 77–78; T. 80–81; T. 244–5; T. 328–9; VNB–20), but the commercial paper it produces is sometimes assigned to Midlantic. This is how Midlantic was hooked into dancing with Mayo. No

---

12. The way Gingras and Mayo worked the overdraft problem out is that Gingras gave Mayo a 36 hour banking day. Each day there was an overdraft, Mayo had another 12 hours to cover them by deposits. Such a day may be available on Jupiter, but surely it is not available on this Earth.

party objected to the regularity of the assignment.

Yegen orchestrated its desire to extend its business into the Lake Champlain region of Vermont (T. 341–2) by approaching Mayo. A Yegen employee, Findeisen, made the first contact with Mayo's businesses, talked to Mayo's salespeople, and provided Yegen credit applications for Vermont Custom Boats, Inc. and Bayside Marine.[13]

Findeisen's efforts resulted in the receipt of a number of credit applications from Vermont Custom Boats, Inc. and Bayside Marine. (T. 16; T. 290–91; T. 338). E. DeCiccio, Yegen's Boston, Massachusetts manager, personally voyaged to Vermont to close one of Yegen's first deals with Vermont Custom Boats, Inc. DeCiccio thought it was important to meet the principals of major dealerships. (T. 16; T. 83; T.139).

After the closing, DeCiccio met with Mayo at his auto dealership to "sell" Mayo on what Yegen could do for Mayo's customers. (T. 16–17). DeCiccio left the meeting wanting to dance not only with Vermont Custom Boats, Inc., but with Mayo and all his d/b/a's. He was convinced Yegen and Mayo could have a mutually beneficial business relationship, and that is was important to maintain good relations with Mayo. (T. 140–41).

Keeping time with the music, Mark DeCiccio, E. DeCiccio's son, and Findeisen attended a grand opening of Vermont Custom Boats, Inc.'s new showroom[14] on Memorial Day Weekend, 1986. (T. 347). They were present at the showroom substantially all of the weekend except for a time they were driving around with Mayo, who was showing them the Boat and his other businesses. (T. 1330–31).

Findeisen was impressed by Mayo's ability to motivate his staff and move (sell) boats. (VNB–14; T. 345–46). It was at

the open house when Mayo approached Findeisen about obtaining personal financing from Yegen to purchase the Boat for his own use from his d/b/a sole proprietorship. (T. 350).

It is at this juncture in the dance when all the dancers started squabbling over who said what and did what to the other. The facts come from recollections of three individuals who worked for the three dancers (BWAC, VNB, and Yegen, Midlantic's proxy).

First, there is W. Findeisen, a young man with moderate business experience, who is a sales representative for Yegen. Second, there is B. Bower, an experienced employee of BWAC, who handled the Vermont Custom Boats, Inc. account. Third, is M. Gingras, an experienced loan officer for VNB. We find all three witnesses credible to some extent, which does not make our job any easier. From their testimony, however, we can ferret out the events which led to three dancers claiming an interest in the groom's Boat.

### THE CREDIT REFERENCE TANGO

At the time Mayo approached Yegen, via Findeisen, Findeisen held a Bachelor's degree in economics, with no courses in credit analysis. Prior to his employment with Yegen, his only exposure to credit analysis was a position that reviewed applications for financial aid at Vermont Law School. (T. 330–33). At the time he received Mayo's loan application he was acting on a volume of approximately 25 loans a month. (T. 493). Mayo's application was one of the largest loans he ever reviewed and one that was complex. (T. 334).

As we indicated earlier, Mayo approached Findeisen about obtaining personal financing to purchase the Boat from his d/b/a sole proprietorship.[15] It was during the open house that Findeisen picked up the documentation that constituted Mayo's

---

**13.** Bayside Marine is the predecessor to Bayside Marine, Inc.

**14.** The showroom was financed by some of the VNB loans referred to, *supra*.

**15.** As we find, *infra*, the Boat was in the inventory of the d/b/a sole proprietorship, and not owned by Vermont Custom Boats, Inc. This finding moots any issue about the effect of a change of business name or a transfer of assets would have on BWAC's financing arrangement.

application to Yegen for a credit extension to purchase the Boat. (T. 293-6).

It was customary for a person who applied to Yegen for credit to fill out a "Yegen Marine Application for Secured Credit" and "Personal Financial Statement." (VNB-15; T. 351).

Findeisen asked Mayo to fill out the credit application, but Mayo declined, claiming he was too busy. (T. 293; T. 351). Instead, Mayo signed the application in blank, and later, Findeisen completed it. Mayo never saw the completed application, nor did Findeisen sent it back to him to review. (T. 351-2). Findeisen claimed it was customary and not unusual for someone in Mayo's position to submit a blank application or decline to complete it because the necessary information had already been supplied from other sources. (T. 353).[16] We find, however, that by taking a blank application, and not having Mayo review it after its completion, Findeisen, and thus Yegen, did not obtain Mayo's certification that the information on the secured credit application was true and correct. (See, VNB-13; VNB-15).

While at the open house, Findeisen made notes of some of the events he observed and conversations he had with people. Findeisen then returned to his Boston office to work on Mayo's loan application.

On May 29, 1986, while working on the application, Findeisen telephoned or spoke to the following persons to obtain credit references:

| C. Poulin | Bank of Vermont | Time: 11:19 |
| M. Gingras | VNB | Time: 11:24 |
| A. Whiton | Chittenden Trust | Time: 11:35 |
| B. Bower | BWAC | Time: 11:57 |

(MB-54). He did not speak to each of these persons (Whiton and Poulin, specifically) when he first called, but may have had some call backs to him. (T. 441-4). In what order, or whether they called him back, is inconsequential to this proceeding. What is essential is that he talked to them, and we so find. What we find they said to him, or what he understood they said to him, is another matter.

Findeisen testified that he kept a handwritten log, and that after each phone conversation he precisely transcribed the discussion into his log. The substance of the May 29, 1986 conversations were typed on June 10, 1986 onto what we received into evidence as MB-1. (T. 445-46). MB-1 is produced here because it is a salient element to our understanding of what has happened in this proceeding. We analyze only the references on MB-1 (Findeisen's memo) to Betty Bower of BWAC and Mike Gingras of VNB. The other references are cumulative at best, and most likely immaterial.

# Yegen Marine

### INTER-OFFICE MEMORANDUM

To _____ Subject Rodney S. Mayo

From Walter J. Findeisen -- Boston Office Date June 10, 1986

BORG-WARNER ACCEPTANCE CORP.
Braidington Beach, FL
—Betty Bower -
813-753-6754

 Betty stated that B-W Acceptance Corp is in the process of approving VT Custom Boats for a $3 million floor plan. In fact, Betty commented that the application has been approved and that it is just waiting for some final signatures at B-W. Betty further stated that Rod and Vermont Custom Boats have always handled past obligations very satisfactorily. She recommends Rodney Mayo very highly.

16. We believe Findeisen was inaccurate here. We believe he meant to say the information could be supplied from other sources.

VERMONT NATIONAL BANK
Burlington, VT
Mike Gingrass, VP
802-863-8900

Mike stated that Vermont National has the first mortgage on the building and property of Vermont Custom Boats. The mortgage balance is currently $725,000.00 and will be increased to $875,000.00 to cover final construction costs. There is also a corporate loan outstanding for $225,000.00 as well as a line of credit for Vermont Custom Boats for $150,000.00. Mike has recently allowed Vermont Custom Boats a temporary $75,000.00 "overdraft" on the line of credit until they receive the insurance money due from the fire at the old location of Vermont Custom Boats. Mike went on to state that Rodney and Vermont Custom Boats have always handled their accounts as agreed; his experience has been that Rodney always lives up to his agreements, both verbal and written. Highly recommends.

CHITTENDEN BANK
Burlington, VT
Alfred Whiton, VP
802-658-4000

Mr. Whiton stated that Mr. Mayo has loans totaling a low seven (7) figure balance (see attached letter). Mr. Mayo has always paid as agreed and currently all loans are up to date. Mr. Whiton went on to say that the bank's relationship with Mr. Mayo has always been satisfactory and that he recommends him a good credit risk.

BANK OF VERMONT
Burlington, VT
Charlie Poulin
802-658-1810

Charlie stated that there are two commercial loans outstanding on Rodney's Dairy Queen operation that total $700,000.00. One loan uses the property as collateral while the other is collateralized by the inventory and equipment. Both these loans are fairly recent having been opened since December of 1985. They are both being handled as agreed.

Mr. Poulin went on to say that the bank holds the mortgage on Mr. Mayo's home in the amount of $226,000.00. This loan has always been paid as agreed. Highly recommends.

---

There is no doubt that Findeisen talked to BWAC's Bower. We have the phone records and what we perceive as credible testimony from Findeisen. Bower never denied she talked to Findeisen. She claimed she would have remembered such a phone call, but ultimately, she testified only that she did not recall talking to him. (T. 837). What Bower challenges is what Findeisen wrote down. We believe her and find that Findeisen confused conversations he had with Mayo and others on Memorial Day Weekend (open house) when Mayo told him he was trying to increase his BWAC floor plan. (T. 1269; T. 1373). We make this finding in spite of Findeisen's supervisor, E. DeCiccio, who testified that *verbatim* notes are required to be taken of conversations (T. 33; T. 91–2), and contrary to Findeisen's testimony that he took *verba-tim* notes. (T. 346; MB–1, MB–86). Quite frankly, his notes (memo) are too sketchy to be *verbatim*. Specifically, we know Bower had no knowledge of a $3 million floor plan application. (T. 914). This directly contradicts Findeisen's testimony that he got the 3 million dollar line of credit information from her. (T. 1373). She did know about a $2.4 million application, however. She knew that two signatures had been obtained, but that 3 to 4 more "higher up" approvals needed to be obtained. (T. 846–52). Finally, we believe her testimony that she would not have said Mayo handled his obligations *very satisfactorily,* or "recommend[s] Rodney Mayo *very highly.*" We had the opportunity to hear about a credit reference Bower gave to VNB about Mayo, and it parallelled what she said she would say; namely, the credit line amount

and if it was satisfactory. We find she told Findeisen the line was handled satisfactorily. Moreover, we can see no reason for Findeisen to write "satisfactorily" if in fact Bower said nothing. It is conceivable that he may have embellished "satisfactorily" to a "very satisfactorily," but it is very unlikely he would have changed a negative or no comment to a "satisfactorily." Quite simply, he would have no reason to change it. On the other hand, he had reason to embellish because he thought Mayo would produce paper (promissory notes) for Yegen from Mayo's boat sales. Throughout the trial, Bower rarely referred to Mayo as "Rodney Mayo," but rather throughout used his business names. We don't believe she would have referred to Mayo as Findeisen claims in MB–1. Thus again, we do not find his memo a *verbatim* account. Finally, we believe Bower's testimony, which assumes she talked to Findeisen, that if she had had any derogatory comments about Mayo, she wouldn't have given a credit reference at all. This is not to say that we do not have a problem with her statement that the credit line was satisfactory at the end of May, 1986 and early June, 1986 because that was not the state of affairs. We must step back to the start of BWAC's dance with Mayo.

Bower gave a satisfactory credit reference when in fact she knew Mayo was in serious trouble. Bower questioned Mayo's creditworthiness from the beginning of their dealings in 1984. (T. 1176). The record is fraught with illustrations of how Mayo was in default.

We summarize a few of them here:

1) Mayo was constantly selling boats out of trust. And although Bower testified that a fifty (50%) percent SOT situation was not uncommon (T. 946–47), in Mayo's final months his SOT's exceeded eighty-five (85%) percent of his inventory. SOT's reflect on creditworthiness, and Bower knew this. (T. 1147–49; T. 802–03; MB–50, page 8).

2) Mayo defaulted on his BWAC loan by paying monthly charges late. Initially, Mayo paid his monthly charges, but about November, 1985, the month of his check kiting, he stopped paying them. (T. 794–6). BWAC made frequent calls to get their payments. A point was reached when BWAC floor plan inspectors collected them personally. (T. 798).

3) Mayo failed to make curtailment payments. A curtailment is a payment due on older boats. Non-payment of curtailments is a default under the BWAC security agreement. (MB–8; T. 757). Failure to pay a curtailment affects BWAC's assessment of a dealer's creditworthiness. Bower cut off Mayo's credit in October, 1985 when his curtailment payment was only seven days overdue. (MB–2). On May 29, 1986, curtailments were overdue on almost sixty-five (65%) percent of Mayo's inventory. (MB–14).

4) Mayo was not paying his due-in-fulls (DIF). A DIF is a payment due on a boat on the earlier of the first anniversary of its entry into inventory or December 31st of the boat's model year. (MB–9, –10). The failure to pay DIF's represents a default. (T. 770). BWAC routinely examines DIF's to determine a dealer's credit-worthiness. (MB–5, –6, –23, –15). Failure to pay DIF's indicates a poor inventory turnover and indicates BWAC may have a problem dealer. (T. 773–4). Mayo had several DIF's, and in May, 1986, thirty (30%) percent of his inventory was DIF. (T. 771–2; MB–14, –64, –50).

Mayo's poor inventory turnover was very important to Bower. More than a year before her credit reference to Findeisen, she sought to cut off Mayo's credit due to "poor (inventory) turn." (T. 1155).

5) BWAC was worried about Mayo because of the factors previously listed and took nine months (October, 1985 to June, 1986) to complete a dealer file review and consider Mayo's application for a $2.4 million line of credit. In fact, stringent financial security demands were being made by BWAC. They were so demanding, DeNambro, another credit manager for BWAC, doubted Mayo would be able to meet them. (T. 1176–82).

Thus, at the time Bower gave her "satisfactory" reference, she knew or should have known Mayo was a poor credit risk. We will have more to say about her possible motives for providing a "satisfactory" credit reference later.

Like Bower, VNB's Gingras does not recall receiving Findeisen's phone call. (T. 1065). He has no notes of the conversation. (T. 1066). This does not mean a conversation never took place. MB–54 lists a phone number that belongs to VNB, on the date Findeisen claims he called Gingras. Mayo acknowledged that Gingras told him the Yegen people seemed satisfied about his (Mayo's) affairs. We find Findeisen talked to Gingras. Again, like Bower's so-called recommendation, we don't believe that Findeisen provided a *verbatim* transcript of what Gingras said.

We have had the opportunity to observe Gingras testify. He is an experienced loan officer. His philosophy about credit inquiries was aptly summarized on redirect:

Q. Would you agree with me, Mr. Gingras, that a part of the truth can be worse than no truth at all?

A. I really don't know. Depends on what it pertains to.

Q. Would you agree with me that if you give somebody some information about an account, that you have got to tell the bitter with the sweet?

A. It's our opinion that whatever you ask for, you get, Mr. Burak. (T. 1110).[17]

Based on this statement of philosophy, we find the first three lines of Findeisen's memo about Gingras' recommendation accurately reflect what Gingras told Findeisen on May 29, 1986. The balances reported on the memo coincide with testimony we heard during a portion of Gingras' direct examination. The memo's recitation about the $75,000 "overdraft" on the line of credit is not a term Gingras would use when the correct term would be "overline." "Overdraft" commonly refers to checking accounts, not to lines of credit. Findeisen explained that "overdraft" on the line of credit is the terminology Mayo used when he told Findeisen that he had an overline at the Memorial Day Weekend open house, and that Findeisen then asked Gingras in Mayo's words, and Gingras confirmed it. (T. 294; T. 320–21; T. 1346–7). This fact is collaborated by Mayo's testimony that he is quite sure that, at the open house, he (Mayo) told Findeisen and Mark DeCiccio that he had an arrangement with VNB to run overdrafts on his checking accounts as an accommodation while they were working on his loans. (T. 1248–9). We find Findeisen garbled Mayo's information with Gingras' information.

Finally, we come to the part about "Rodney [Mayo] always lives up to his agreements" and Gingras' "highly recommends" recommendation. (MB–1). But for the word "highly," we find Gingras told Findeisen in those or similar words that Mayo handled his accounts as agreed and that he recommended him.

Like Bower's recommendation, we can see no reason why Findeisen would have recorded a favorable credit reference if in fact none was given. Similarly, like Bower's recommendation, we are troubled by Gingras' favorable recommendation when none was due. We summarize the facts Gingras knew about Mayo which lead us to conclude that Mayo was a very poor credit risk:

1) VNB questioned Mayo's credit-worthiness from the very beginning of their relationship. (T. 970–72).

2) Once a loan was made, Vermont Custom Boats, Inc. was late on every loan payment. It routinely incurred late payments and missed principal payments. (MB–67, –68, –66).

3) Vermont Custom Boats, Inc. routinely overdrew its checking account. (MB–43, –47; T. 528).

4) On Thanksgiving Weekend, 1985, Mayo and all his related entities were

---

**17.** This philosophy troubles us. It leads us to conclude from the overall evidence that Gingras would deceive a prospective lender. A failure to state a material fact in a circumstances which imposes a duty to speak puts the other party on an unequal footing. "Omissions are not accidents." Marianne Moore, "Complete Poems" (1967) Author's Note.

overdrawn $1.46 million. This overdraft may have been triggered by Gingras' refusal to honor an overdraft. (MB–61).

5) Mayo was reported to the FBI for check kiting by VNB. (T. 616).

6) VNB was forced to write-up Mayo's loan to cover the November, 1985 overdrafts without any real additional security. (T. 628; MB–61; T. 990–95). VNB was not comfortable with Mayo's loan situation. (MB–79).

7) By December 31, 1985, and only a month after the overdraft incident, VNB's internal auditor reported Mayo to VNB's Examining Committee and VNB's Board of Directors. The internal auditor and another officer monitored Mayo from December, 1985 through June, 1986. (T. 625).

8) Mayo was constantly asking for more money. In fact, Mayo's pleas for money stuck out in Gingras' mind. (T.1015–16).

9) As Mayo's situation deteriorated, Gingras engaged in questionable practices to keep Mayo afloat. For example, he allowed to Mayo use large checks drawn on Burlington Lincoln–Mercury, Inc. to cover his overdrafts. (MB–58, –59; T. 538–40). In fact, Mayo met normal and payroll expenses during May, 1986 entirely through checks from Burlington Lincoln–Mercury, Inc. (T. 543; T. 601–02). These checks were accepted for deposit despite the fact that VNB decided not to accept Burlington Lincoln–Mercury, Inc. checks. Gingras testified that he found it amazing that Burlington Lincoln–Mercury could do this because he considered the car dealership the "weak business" but, "it is not my business to worry about," he said.

As another example of a very questionable practice, Mayo was allowed to use funds from other VNB accounts to cover overdrafts in other accounts. (T. 547–9; T. 602; T. 566–7). The method used was simply to spread the funds around until overdrafts were covered. This didn't always work.

10) Lastly, Gingras was not candid with himself or his bank. Thus, in his loan continuing history sheets he stated, "in no instance do we pay overdrafts, they are covered on the day of the overdrafts or he realizes they will be sent back." (MB–61 at 4; T. 1055). This was simply not reality. Mayo was constantly overdrawn, almost on a daily basis. (VNB–26, –28).

The record is replete with evidence that Mayo was a poor credit risk, and despite being presented with such clear and unrefutable evidence, Gingras persisted throughout his testimony that Mayo was acceptable. We find Gingras knew or should have known Mayo was a poor credit risk at the time he spoke to Findeisen. We now come to the time when all the dancers are on the floor together.

## THE CONSUMMATION PROMENADE

As the wedding wound its way towards consummation, each of the dancers was busy doing their part to engage or disengage with the groom.

As part of Yegen's review of the Mayo loan application, Yegen needed to analyze Mayo's ability to repay the prospective Boat loan. (T. 102; T. 105–6). We received testimony about how Yegen went about studying and investigating Mayo's income, assets, and liabilities.

According to Findeisen, he did a calculation of Mayo's income. We are, however, unable to arrive at the alleged calculation contained in MB–87 and VNB–14. (T. 368). We find Findeisen was incapable of calculating Mayo's income. Instead, we find he relied on Mayo's representation about his income, which was verified orally by Mayo's accountant. (T. 371).

To do a proper analysis of Mayo's ability to pay the loan, an examination of Mayo's various businesses would have been necessary. Nonetheless, no such calculation was made by Yegen. If such a calculation had been made, they would have found Mayo, after depreciation, had overall negative profit, and a net cash loss of $115,804.

We calculate the net cash loss as follows:

| ENTITIES | NET PROFIT (LOSS) DEPRECIATION ADDED BACK, BUT BEFORE SOLE PROPRIETORSHIP DRAW |
|---|---|
| Vermont Custom Boats (d/b/a) | $174,330.00 |
| Bayside Marine (d/b/a) | 45,050.00 |
| Dairy Queen, Inc. (includes depreciation) | <193,898.00> |
| VT. Trophy (includes depreciation) | <2,599.00> |
| Vermont Import Auto and Vermont Custom Cars | <29,708.00> |
| Burlington Lincoln–Mercury, Inc. (includes depreciation) | <331,736.00> |
| PLUS depreciation from rentals | 222,757.00 |
| LOSS | <$115,804.00> |

This calculation is conservative because we did not have all the data available necessary to do a complete analysis, that is complete information on some of the other corporate entities. We believe the information lacking may decrease Mayo's loss to a positive position, but in no event would it provide him with the income necessary to service the debt on the Yegen loan let alone even live financially. Had Yegen performed this calculation, it would have been put on notice that Mayo could not service their loan. Moreover, we were not impressed with Findeisen's supervisor, E. De-Ciccio. When questioned by the Court about his knowledge of the 26 U.S.C. § 1239 gain on Mayo's tax return, he candidly testified he did not know what a § 1239 gain was. Furthermore, he acknowledged he did not account for any real cash losses of Mayo's businesses. Nor was he able to reconcile the interest payments on Mayo's Form 1040 Schedule "A" with the Credit Bureau Reports. Quite frankly, Yegen was over its head attempting to analyze Mayo's loan application.

Yegen's analysis of Mayo's expenses was equally inadequate. Yegen reported to Midlantic that Mayo had monthly expenses of $5,580.30 per month. This figure contained debt service on Mayo's home mortgage and the proposed Boat loan. Subtracting these two items, Mayo was left with $185.00 for other monthly expenses. (MB–87; T.114–17; VNB–13; VNB–14). Yegen felt the $185.00 was appropriate because Findeisen asked Mayo whether he had any personal expenses and Mayo said that aside from his mortgage, he did not. Findeisen buttressed his testimony by saying he had verified this information with Mayo's accountant. A cursory look at Mayo's 1985 Federal Income Tax Return, Form 1040, Schedule A, shows non-mortgage interest paid in 1985 of $29,071, or $2,422.58 per month paid in personal interest alone. (VNB–13, p. 003651; T.404–08). This amount greatly exceeds personal expenses Mayo claimed he did not have. Findeisen claims he had a specific recollection of talking to Mayo's accountant about the personal obligations:

> Findeisen: That's true. He [Mayo] was restructuring the loans he had and they were being taken care of by his businesses at the time. That was because he was starting to incorporate his businesses at the time; everything was personal and his [Mayo's] accountant felt it was better showing it as a personal expense. (T.405, brackets supplied).

While we believe Findeisen talked to Mayo's accountant, we find he mixed up information Mayo provided with information others provided, because:

> Q. (to Findeisen) Now, in fast (sic) you asked Mr. Mayo whether he had any personal expenses, correct?
> A. Yes sir.
> Q. And he said he did not, aside from the mortgage, right?
> A. That is correct. (T.405).

Like other people in this adversary proceeding, Findeisen trusted Mayo and relied excessively on him. Based on this reliance, Yegen failed to understand Mayo's personal financial position. In accounting parlance, Yegen failed to "tic & tie" the numbers. This reliance was unprofessional and unreasonable. They conducted little in the way of debt investigation. They wanted Mayo's business so much they choose to ignore gaping deficiencies. We also find Yegen dealt almost exclusively in consumer loans and that Mayo's loan was not of this type, despite its appearance or structure as one. The loan was a commercial loan being used by Mayo to buoy his sinking enterpris-

es. Both E. DeCiccio and Findeisen lacked experience to properly evaluate Mayo. Findeisen candidly admitted he had no prior dealings with floor planners. The euphoria of the wedding continues, however.

There is no doubt the overall testimony indicates Mayo could sell boats. There is also no doubt Mayo looked like a good prospect to generate potential customers for Yegen. It is not difficult to understand Yegen's desire, via Findeisen and DeCiccio, to assist Mayo in the purchase of the Boat.

In its hunger to dance with Mayo, Yegen recommended to Midlantic an eighty-nine (89%) percent loan to value ratio loan.[18] A loan to value ratio of eighty-nine (89%) percent would be unusual in the boat lending business. Midlantic lowered the loan to value ratio to eighty (80%) percent, a more usual loan to value ratio.

Finally we come to what all the witnesses considered a most important part of all loan applications—credit analysis or review, and Yegen's review or verification, or lack thereof, including its failure to verify Mayo's cash balances.

In making a credit investigation, both Findeisen and DeCiccio agreed that if Yegen wanted specific information on checking account balances Yegen needed to ask specifically about them. (T.103–05; T.365–6; T.416). Both declared that it is not sufficient to rely on what Mayo or his accountant told them (T.102; T.366), but, in fact, they did rely on Mayo and/or his accountant for this information.

As part of its credit analysis or review, the Yegen Marine Personal Finance Statement has a space for "cash on hand—uninvested," "account no.," "amount," and "total of all cash accounts." This was on part of the blank form signed by Mayo and was information which Findeisen failed to obtain. (T.417–8; VNB–13, p. 003629).

The Yegen document also contains a space to place the balance information verified. Findeisen never independently obtained it, in fact, he didn't ask for it. (T.413–18). Instead, he relied upon Mayo. Had he asked Gingras, he may[19] have found out that on May 5, 1985 Vermont Custom Boats, Inc.'s payroll account had an overdraft balance of $2,090.96 (MB–42; T.1104) and that Vermont Custom Boats, Inc.'s Special Account was overdrawn by $1,185.50. (MB–43; T.1105).

Yegen's proclivity to dance with Mayo shows up with the rapidity of events leading towards the closing on the Boat. Even though this was one of Yegen's biggest loans, at least for Findeisen, E. DeCiccio allowed an inexperienced person, his son, Mark DeCiccio, to close the loan. (T.468; T.40–41). The closing occurred without an original master builder's certificate[20] (T.42; T. 149; T. 180; T. 468; T. 505; T. 1254). No verification was obtained that BWAC's lien had been paid off—only Mayo's word that it had been paid (T.143; T.478). No insurance policy, or insurance binder, as requested, naming Midlantic as loss payee was produced at closing (although it was produced later). There was no Uniform Commercial Code (UCC) search. And finally, no original invoice was produced. Instead, what was produced was a Mayo created invoice which substantially increased the value of the Boat.

Accordingly, we have to raise some questions about this closing. Would a UCC search have revealed BWAC was not paid off? Would a check to BWAC in the

---

18. Loan to value ratio is the percentage a loan is to the value of the collateral.

19. We would like to find that if he had asked Gingras about the account balances, Gingras would have told him. But when asked a hypothetical question about the balances at trial, Gingras responded:

Q. I would have given out the balances only if I had Mr. Mayo's permission; if not, I would probably have said Mr. Mayo runs an overdraft but covers it on a daily basis. (T.1104).

We are not sure what Gingras would have told Findeisen in actuality because the testimony does not reveal if Mayo ever authorized the release of such information.

20. In VNB's request for findings, they described this certificate as a boat's "birth certificate." Only one original certificate is issued per boat. Closing without an original certificate is like buying a car but not getting a manufacturer's certificate of origin. A large boat cannot be licensed by the Coast Guard without the certificate.

amount of its lien, as is customary at closings, and which Yegen knew about, instead of trusting Mayo, have saved Midlantic from this litigation? Would an independent verification of the Boat's value have shown it to be worth less? Would a verification with BWAC have exposed Mayo's lie about the original builder's certificate being lost in a fire,[21] and instead revealed that Bower held the original certificate as security. (T.903–04; BWAC–10).[22] What our questions show is that Yegen did not handle this closing in a reasonably commercial manner. Nor did Midlantic behave well itself.

Although Midlantic reduced the proposed loan to value ratio to eighty (80%) percent, it blindly accepted Yegen's work with little or no independent analysis. In fact, a Midlantic witness, and employee, admitted he was incompetent and incapable of reviewing Mayo's application. (T.258). Some of the blame here must also be docked at Midlantic's wharf.

After the consummation, Mayo quickly ditched Yegen and started dancing again with VNB, waving Yegen's $250,000 company check made out to Mayo d/b/a Vermont Custom Boats (MB–38; T.568) in front of VNB's eyes.[23] Most of the findings here come from Mayo's testimony, but Gingras' testimony offers enlightenment about how VNB and its employee handled the proceeds from the Yegen closing.

■ Although the Yegen check was an uncertified third party check (it was not even a bank check) drawn on an out-of-state bank (MB–38), Gingras allowed the check to be converted to four (4) VNB bank checks—three (3) for $50,000 each and one (1) for $100,000. One hundred thousand dollars went to Vermont Custom Boats, Inc.'s account; Pets for Less (a friend of Mayo's) received $50,000; and, Burlington Lincoln–Mercury, Inc. received $100,000.[24] (T. 570–73; VNB–29, –34; T.1066–70).

The best way to understand how the bank checks were purchased by Mayo is to review Gingras' testimony.

Q. Did you know at the time whether or not the Corinthian 480 was a significant part—was a significant boat in terms of the boats that Mr. Mayo had?

A. I didn't know anything about the boat. I never saw it; never set foot on it. [I] {r}eally didn't know anything about it other than it was Rod's [Mayo's] boat.

Q. Rod's boat? Did you learn that Yegen Associates had financed the boat?

A. No idea. Obviously, when the check was cashed at our bank [VNB].

Q. Okay, when was that?

A. June 25, 1986.

Q. Want to tell me the details of that?

A. Well, I have a very general knowledge of it. I had to see everything that—really, I just remember someone coming (the Court's trial notes indicate someone called Gingras; they did not come to him) from our Shelburne office asking if we would cash a check for Rod Mayo.

Q. Do you remember the amount? [A] {q}uarter of a million dollars is not something—

A. Oh, obviously, the dollar amount jingles your mind, and I said, I assure you, I said, "Are you sure it's Rod Mayo?" And they probably said,

---

21. The testimony shows that Mayo lied to Yegen about the master builder's certificate, and that he probably lied to Chris–Craft also. He obtained a certified copy of the master builder's certificate from Chris–Craft by fabricating a story that the original was lost in a fire that destroyed one of his buildings.

We are not sure of Chris–Craft's role in this dance. Our overall feeling is that it was desperate to sell boats. Its later bankruptcy filing is a certain indication of this desperation.

22. Although Findeisen testified he had no experience with floor planners, he knew they kept the original builders certificate until the floor planner's liens were paid off. (T.505).

23. Gingras testified that this is the first time he knew of the Yegen connection. Mayo's testimony contradicts him.

24. Assuming *arguendo* and without so finding that Vermont Custom Boats, Inc. owned the Boat, these facts alone show Vermont Custom Boats, Inc. failed to receive reasonable value. This would be enough to avoid any alleged security interest that VNB may claim arising from the sale.

"Yes." And I said, "Okay." And I probably asked where the check was drawn.

Q. Why did you ask where the check was drawn?

A. To make sure that the check was a good check, or use my discretion to ascertain whether it was a good check.

Q. So you figured a Yegen check had to be good check; right?

A. Yes.

Q. Did you think at the time that the check might have been a bank check or certified funds?

A. I think I asked if it was an official check and I don't remember the answer. She might have said yes, and if she did, she was mistaken because it wasn't an official check. It was drawn on some bank in New Jersey, I think.

Q. It was a plain old out-of-state check for a quarter of a million dollars?

A. It was a company check. It was a company check; not a plain old check. It was a company check on a service company that was in the industry.

Q. I thought you didn't really know very much about Yegen at the time?

A. I knew enough that I had met them at the open house.

Q. You met a couple of guys at the open house and you authorized the issuance of funds drawn on $250,000?

A. Yes. I knew the borrower very well though.

Q. You did that on the strength of Rod Mayo?

A. And my trust of Rod Mayo, yes. (T.1066–67)

. . . . .

Q. At this time were you still monitoring Mr. Mayo's funds to see where the funds were coming from?

A. Not every day, no.

Q. Prior to Mr. Mayo showing up at the Shelburne Branch with a check for a quarter of a million dollars, did he tell you that he had financed his boat?

A. He could have. I really don't remember.

Q. Did he say anything about Yegen personnel?

A. I don't remember.

Q. Did you do any homework over and above what you testified to?

A. On Yegen finance? No.

. . . . .

Q. You have testified when you were talking about your knowledge of Yegen, that Yegen was a service company. Would you tell me what, to your mind, a service company does?

A. I think, to my mind, a service company generates retail paper for sale to other financial institutions such as banks like ourselves. I have dealt with mobile home service companies before and they will generate the paper; service it if it's repossession, *et cetera*, and for that they have a fee.

Q. So that when you deal with a service company you know you are talking to someone who is in the—which is in the business of placing these kind of loans with another kind of financial institution; is that right?

A. I think that's a fair statement. (T.1066–70)

From Gingras' testimony we can reach some conclusions, many of which are indirect, but nevertheless, supported conclusions. We know Gingras knew Mayo was in financial trouble. We can recognize that the payment or receipt of $250,000 was a significant financial "shot" in the arm. Gingras must have known this. We believe Gingras knew or should have known about BWAC's floor plan and its security interest in the Boat. Gingras never questioned Mayo about whether BWAC had been paid off. Like Yegen, he trusted Mayo too much. Or maybe he ignored too much. Perhaps he thought it was better not to ask or know too much. He did not operate as a reasonably prudent and experienced loan officer. As to his credibility, we don't believe he didn't know anything about Yegen having financed the Boat. He was in daily contact with Mayo. We have had the opportunity to observe Mayo and there is no doubt that Mayo kept Gingras

informed about the sale,[25] and thus we can only raise a doubt about Gingras' motives. Specifically, the $250,000 would have reduced VNB's financial exposure and shortened its dance considerably.

## THE UCC MASQUERADE

One of the claims in this case relates to the propriety of the various UCC filings and whether Mayo was a buyer in the ordinary course of business. We refloat the facts to cover this issue.

Mayo kept the Boat at a private marina which had, as Mayo testified, by-laws prohibiting sales of boats inside the marina. Mayo confirmed that he knew about the by-laws when he wrote to the marina on May 8, 1986 and confirmed:

Referencing my personal boat the 480 Chris–Craft Corinthian.

This boat is my own personal boat for my own personal use. This boat is not for sale and will not be sold out of this marina at anytime. (T.1298; MB–53).

The evidence is not clear whether the Boat was a consumer good or an inventory item. DeCiccio tells us that BWAC simply "accommodated" Mayo by letting him finance a consumer good on his floor plan. (T.153–54). Mayo's behavior, and testimony, while showing he intended to purchase the Boat for his personal use is contradicted by other testimony that the Boat was used for business purposes. Additional evidence shows: BWAC was treating the Boat as being in Mayo's inventory because the Boat caused BWAC to approve a temporary credit overline of about $250,000 (MB–5); the Boat was used for display purposes to customers (T.1273–74); and, BWAC kept track of the Boat under its floor plan by physically checking the Boat

at the private marina. The overall sense we receive from the evidence is the Boat was part of Mayo's business inventory. Mayo wanted to purchase it for his own personal use, but used it to sell other boats.

All of BWAC's UCC filings, security agreements, and dealings with Mayo were with Mayo, d/b/a Vermont Custom Boats. All the BWAC floor planning was based on a single set of documents. (T.689–90; T.898; T.691; BWAC–3, –7).

The evidence is clear and convincing that BWAC did not know about the formation of Vermont Custom Boats, Inc.[26] until the summer of 1986. (T.1197). Further, Mayo never transferred the d/b/a inventory, including the Boat, to his new corporation. (T.1337; T.1236–7).[27] It is manifestly clear he intended to transfer the inventory, but his bankruptcy petition ultimately prevented the transfer. (T.1266).

On the other hand, VNB knew about the incorporation of the sole proprietorship. (VNB–1, –8). It also knew about BWAC's security interest in the inventory because VNB's first security agreements excluded its lien from any boats financed by BWAC. (T.1075–6; VNB–1, –8).

On each occasion that VNB advanced funds to Vermont Custom Boats, Inc., security agreements and UCC–1 financing statements were prepared. (VNB–1–12, –36, –37, –38). The August, 1985 security agreement was signed only by Vermont Custom Boats, Inc., but later security agreements, in December, 1985 and June, 1986, were signed by both Vermont Custom Boats, Inc. and Mayo, as an individual. The June, 1986 financing statements contained a line for a corporate signature and an individual signatory. The UCC–1 filed

---

**25.** Although not relevant to this proceeding, Mayo kept BWAC stowed in the dark about the Boat until shortly before his August, 1986 bankruptcy filing. In July, 1986, Bower was told the Yegen deal would go through in a few more weeks, when in fact it had closed on June 25, 1986. BWAC never had the opportunity to collect its lien.

**26.** Even as we make our findings we are still amazed that the Vermont Secretary of State allowed Vermont Custom Boats, Inc. to be formed when a d/b/a with an identical trade-

name still existed. We can only guess why this occurred. Perhaps the evidence has not been presented to us. We make no finding on the issue because it is not germane to our holding, but point it out as another one of those pieces in this adversary proceeding which might complete the puzzle if all the facts were known.

**27.** Some furniture and fixtures were transferred to the corporation. (T.1236; T.1332). They are not relevant to this adversary proceeding.

with the Vermont Secretary of State on July 1, 1986 was signed by Mayo in both a corporate and an individual capacity. (VNB–36; T.1085; T.1240). The UCC–1 filed with the Colchester Town Clerk on June 6, 1986 contained only a corporate signature. (VNB–39). Testimony shows Mayo intended to sign the UCC–1 in both his corporate and individual capacities, (T.1242–44), and his failure to sign the Colchester UCC–1 was purely an oversight. (T.1083).

The Boat was in Mayo's inventory prior to August of 1985. Vermont Custom Boats, Inc. never owned the Boat because the inventory was never transferred to the corporation by the sole proprietorship. Thus, VNB's first financing statement, dated August, 1985, could not cover the Boat. The second set of financing documents, dated January, 1986, specifically excluded BWAC's floor plan lien, and the third set of financing documents lacked an individual signature on the UCC–1 filed in Colchester, Vermont.

Before we discuss the claims of the parties, we summarize our findings about Mayo. Each of the parties here, BWAC, Yegen/Midlantic, and VNB all trusted Mayo. There is no doubt he lied to each and every one of them. He lied about his line of credit. He lied about his finances. He lied about the master builder's certificate. He lied about BWAC's lien payoff. He created a false sales invoice for the Boat. He lied to Yegen about his cash balances. And at the very end, with all VNB had done for him, he didn't even give them all the money. He lied to BWAC even after the Yegen loan was made because BWAC continued the Boat on its floor plan as if no sale had taken place. His lies continued almost up to the Bankruptcy filings. He lied and lied and lied. But you cannot sell a crooked deal to an honest man. You can, however, sell a crooked deal to a greedy or desperate person. We are not sure what motives inspired the events in this proceeding. A trial judge rarely receives direct evidence on motives. While greed may be the extreme, desperation is not. Each employee of the dancers, as well as others outside the matter, had a motive or motives to do what they did. Chris–Craft wanted to sell boats, so it bent the rules to get boats into Mayo's inventory. BWAC had a problem dealer. Mayo is one of its biggest bankruptcies. Accordingly, he had to have been one of their biggest financial headaches. Letting Yegen finance the Boat would have resulted in a marked reduction of BWAC's financial exposure. Yegen wanted to finance paper. Doing Mayo the singular favor of financing *his Boat* would have almost certainly predisposed him towards Yegen. VNB had a bad loan. While the Yegen transaction was going on VNB was agreeing, or had agreed, to put more money into Mayo's leaking financial sloop. Receiving the $250,000 would have put alot of caulking around those drips.

Alas, through the dawn of Bankruptcy the Dollar Dance was a swan song. The groom and his various business marriages uncoupled before dawn. And the dancers were left shipwrecked holding only their parched memories of the promise of a beautiful voyage.

### CLAIMS OF THE PARTIES

We have issued previously a Memorandum Decision, dated March 1, 1989, denying post-trial motions of BWAC and VNB to amend their pleadings to add the affirmative defense of statute of frauds in opposition to Midlantic's claim for equitable subordination under 11 U.S.C. § 510(c). Rather than repeat the procedural posture and extensively recite their claims, we have attached the March 1, 1989 Memorandum Decision and merely summarize those claims necessary for adjudication by us.

All parties claim they have a valid enforceable and perfected security interest in the inventory and the proceeds of the Boat. BWAC claims its interest is in the Boat via security agreements and financing statements it had with Rodney S. Mayo, d/b/a Vermont Custom Boats. VNB claims its interest arises not only against Rodney S. Mayo, d/b/a Vermont Custom Boats, but also in Vermont Custom Boats, Inc. Midlantic claims via Yegen its interest arises

through its financing of the Boat for Rodney S. Mayo.

VNB does not deny BWAC has a first priority interest under the Uniform Commercial Code of Vermont, but rather, claims BWAC did not have a license to lend money under 8 Vt.Stat.Ann., chapter 73, and therefore its loans to Mayo are unenforceable. If BWAC's loans are unenforceable, then according to VNB it is in first place. BWAC of course, contends it did not need a license to lend money in the State of Vermont.

Midlantic asserts that BWAC is not entitled to priority because it has been fully paid on the Boat and also because it failed to obtain the requisite lender's license under Vermont law. It also asserts VNB is not entitled to priority because its financing statement is defective. Finally, Midlantic claims, the evidence at trial demonstrates the Boat was not covered by either of the security agreements belonging to BWAC and VNB because the Boat was not an inventory item. Lastly, Midlantic alleges both BWAC and VNB knowingly misrepresented the credit-worthiness of Mayo in the course of credit checks by its assignor, Yegen Marine, and accordingly, the interests of BWAC and VNB in the Boat should be subordinated to that of Midlantic.

## ISSUES TO BE DECIDED

I. Is BWAC, an out-of-state commercial floor plan financier, required to be licensed under Vermont's licensed lender statute, 8 Vt.Stat.Ann. §§ 2201, et seq.?

II. If BWAC is not required to be licensed under Vermont's licensed lender statute, was the Boat included within the security agreements it had with Rodney S. Mayo, d/b/a Vermont Custom Boats?

III. Is VNB secured by the Boat under its security agreements with Rodney S. Mayo, d/b/a Vermont Custom Boats or Vermont Custom Boats, Inc., or both entities?

IV. Is Midlantic secured by the Boat under its security agreements with Rodney S. Mayo?

V. Did the credit references provided by BWAC or VNB or both provide a basis for equitable subordination of their claims to Midlantic's claim?

Within the major issues there are numerous sub-issues which must be answered to arrive at a holding on the primary issues. There are several technical procedural issues about discovery sanctions, and damages which will be addressed at the conclusion of this decision.

I. Is BWAC, an out-of-state commercial floor plan financier, required to be licensed under Vermont's licensed lender statute, 8 Vt.Stat.Ann. §§ 2201, et seq.?

The licensed lender issue so-called has become the issue-of-the moment for every debtor and creditor who desires to avoid a security interest in Vermont since this Court issued its decision in *Burke Mountain Recreation, Inc. v. Vermont Development Credit Corporation (In re Burke Mountain Recreation, Inc.)*, 64 B.R. 799 (Bkrtcy.D.Vt.1986). In *Burke*, we voided the loan and security interest of a secured lender who had not obtained the needed license. We decided the issue with a very narrow holding. Many debtors and some creditors have tried to expand our holding ever since *Burke* was issued, but due to settlement of many of these adversary proceedings we have not had to rule on this issue since *Burke*. Unfortunately, we cannot avoid it any longer. But again, as in *Burke*, we decide the issue on a very narrow ground.

Midlantic raised several arguments about Vermont's license lender statute during the trial and in the memoranda it submitted. The licensed lender statute prohibits unlicensed lenders from charging, receiving, or contracting for interest in excess of twelve (12%) percent per year.[28] This rate is cal-

28. 8 Vt.Stat.Ann. § 2201, **Loan business; license required,** provides:

No person, partnership, association, or corporation other than a bank, savings and loan association, credit union, pawnbroker, insurance

culated under the actuarial method.[29] If an unlicensed and non-exempt lender charges, contracts, or receives interest at a rate greater than twelve (12%) percent, the entire loan is unenforceable and void. BWAC, in Midlantic's view, is an unlicensed and non-exempt lender; a Delaware corporation based in Chicago that engages in the business of lending money to Vermont borrowers. Midlantic claims the rate of twelve (12%) percent was charged whether we view the Boat transaction as a single event, or view it and BWAC's financing of Mayo's inventory as a total transaction. Midlantic asks that we find BWAC's loan on the Boat void because the statute voids all loans in excess of twelve (12%) percent by non-licensed lenders. 8 Vt.Stat. Ann. § 2233.[30] Midlantic calls to our attention that not all States void usurious loans, but those that do generally void the entire loan, including security agreements. If BWAC's note is void due to illegal charges on the Boat, BWAC also loses it security and thus its priority in the Boat.

VNB took a somewhat different tack about voiding BWAC's loans and making the entire transaction unenforceable. In VNB's portrait of the license lender statute, VNB asserts that BWAC not only failed to obtain a license, it also violated 8 Vt.Stat.Ann. § 2224(a) by its failure to have its loan repaid in substantially equal consecutive monthly installments of principal and interest.

BWAC's claimed interest in the Boat, as well as its interest in all of Mayo's and Vermont Custom Boats, Inc.'s assets, arises from a claimed security interest claimed by BWAC under Vermont's UCC. For a security interest to attach, the creditor claiming such interest must have given value. 9A Vt.Stat.Ann. § 9–204(1).[31] VNB claims no value could have been given by BWAC because its loans are void, therefore no security interest attached. If we were to hold otherwise, asserts VNB, BWAC would thwart the licensed lender statute and its penalties. VNB counsels us that when a Court has two interpretations, one of which would render the statute invalid or ineffective, a Court is required to choose the interpretation that will carry out the intent and effect of the statute. *Audette v. Greer*, 134 Vt. 300, 360 A.2d 66 (1976); *Delaware and Hudson Railway Company v. Central Vermont Public Service Corporation*, 134 Vt. 322, 360 A.2d 86 (1976). Thus, VNB asks that we find BWAC in violation of the license lender statute.

BWAC contends that it cannot comply with § 2224(a), and moreover, customary floor planning would be impossible in Vermont.

BWAC puts forth several arguments about why it is exempt from 8 Vt.Stat.Ann. § 2201:

company or seller of the merchandise or service financed shall engage in the business of making loans of money, credit, goods or things in action and charge, contract for or receive on any such loan a rate of interest, finance charge, discount or consideration therefor greater than twelve percent per annum without first obtaining a license under this section, section 7002 of this title, or sections 2352 and 2402 of Title 9 from the commissioner. (Amended 1985, No. 38, § 2).

29. "Actuarial method" is the method of allocating payments made on a debt between the principal and finance charge or other charges to which a payment is applied first to the accumulated finance or other charges and any deficiency is added to the unpaid principal balance of the amount financed.

30. 8 Vt.Stat.Ann. § 2233, **Penalties,** provides:
Any person, partnership, association or corporation and the several members, officers, directors, agents and employees thereof, who

shall violate or participate in the violation of any of the provisions of this chapter shall be imprisoned not more than two years or fined not more than $500.00, or both. Any contract of loan not invalid for any other reason, in the making or collection of which any act shall have been done which constitutes an offense under this section, shall be void and the lender shall have no right to collect or receive any principal, interest, or charges whatsoever. Id.

31. 9A Vt.Stat.Ann. § 9–204(1), **When security interest attaches; after-acquired property; future advances,** provides:
(1) A security interest cannot attach until there is agreement (subsec. (3) of § 1–201) that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching.

1. The statute's "service financed" exception applies because its credit extension (service) enabled Mayo to place products (boats) on his retail floor for sale. This service is not a consumer transaction.

2. Vermont's licensed lender statute applies only to in-state consumer loans and not to an out-of-state commercial floor plan lender.

3. 8 Vt.Stat.Ann. § 2224(a) [32] mandates equal monthly payments of principal and interest that make it impossible to floor plan under normal business practices and customs.

4. It would be unconstitutional to void [33] the property rights BWAC has in the Boat because as a secured creditor they cannot collect a deficiency, but certainly they are entitled to the value of their security.

5. The extension of credit on the Boat ought to be considered a separate transaction because the Boat received separate approval for credit; had its own trust receipt and promissory note; was kept separate on the books and records of both BWAC and Mayo; and, at no time was any service charge assessed in excess of twelve (12%) percent. Accordingly, all the foregoing takes the transaction out of the statute.

6. When viewing the statute as a whole, we should conclude the legislative intent was not to include entities such as BWAC.

7. In the event we are inclined to look beyond the four corners of the licensed lender statute, the legislative history pertaining to both the 1979 and 1983 amendments establishes that the legislation intended the statute to operate only as a consumer protection bill, i.e., to protect low income Vermonters from unscrupulous loan companies. It was never intended to apply to a commercial floor planner.

Midlantic and VNB each responded with post-trial memoranda opposing BWAC's application of the statute, both raising similar points. We merge and summarize their arguments for ease of understanding:

1. BWAC misinterprets the "service financed" exception of 8 Vt.Stat.Ann. § 2201.

2. The plain language of 8 Vt.Stat.Ann. § 2201a [34] and § 2230(b) [35] contemplates that foreign licensed lenders may operate by mail without maintaining an in-state office, and, in practice, over 33 of 58 licensed lenders are principally located and do business from a

---

32. 8 Vt.Stat.Ann. § 2224(a), **Contracts to be repayable in monthly installments; maximum term; additional charges prohibited; invalidity of loan contract,** provides:

(a) Except for loans made pursuant to section 2201a(6) of this title, all loan contracts made under the provisions of this chapter shall require repayment in substantially equal consecutive monthly installments of principal and interest combined except for licensees who financed only insurance premiums.

33. *See,* 8 Vt.Stat.Ann. § 2230(a), **Unauthorized loans prohibited,** which provides in pertinent part:

(a) ... However, any loan legally made in any state which then had in effect a regulatory loan law similar in principle to this chapter may be enforced in this state only to the extent of collecting the principal amount owed and interest thereon at a rate not greater than that authorized by section 41a or 46 of Title 9. *See also,* 8 Vt.Stat.Ann. § 2233 *supra.*

34. 8 Vt.Stat.Ann. § 2201a, **Mortgage lending; specific requirements; exceptions,** provides in part:

Every licensee engaging in the making of loans secured by a lien against real estate located in this state, whether conducting its affairs as an agent or principal and whether operating from facilities within the state or by mail, shall comply with the general provisions of this chapter unless exempted herein....

35. 8 Vt.Stat.Ann. § 2230(b), **Unauthorized loans prohibited,** provides:

(b) A loan solicited and made by mail to a Vermont resident shall be subject to the provisions of this chapter notwithstanding where the loan was legally made. A person, partnership, association or corporation wishing to engage in the business of soliciting and making loans by mail to residents of this state shall file an application for a license pursuant to section 2202 of this title but shall not be required to have or maintain a place of business in the state.

foreign state.[36]

3. BWAC failed to produce evidence that normal commercial loan practices involve something other than equal monthly payments of principal and interest.

4. Point four (4) of BWAC's constitutional argument was not briefed by VNB or Midlantic.

5. Repeating their earlier argument, Midlantic asserts that BWAC charged, contracted for, and received a rate of interest in excess of twelve (12%) percent.

6. There is no ambiguity in the statute.

7. The legislative history is at best inconclusive.

 BWAC's argument that the extension of credit to Rodney S. Mayo, d/b/a Vermont Custom Boats falls within the statute's "service financed" exception of 8 Vt.Stat.Ann. § 2201 stretches our credulity. The statute inexplicably exempts purchase money lenders who finance either merchandise or service sold by them. It does not exempt lenders whose only service is financing. Assuming, *arguendo*, we were willing to read an ambiguity into the statute's "service financed" exemption, on the ground of statutory construction, we cannot accept BWAC's interpretation. Furthermore, we must reject BWAC's "service financed" argument on evidentiary grounds. Simply put, BWAC failed to produce a scintilla of evidence to support its interpretation. Such an expansive reading

would render the statute impotent because all lenders would be exempt if their only service was financing. We will not construe a statute's express exemption that results in rendering the statute's non-exempt portion ineffective and thereby thwart the statute's plain policy. *See e.g., In re Roberts*, 111 Vt. 91, 93, 10 A.2d 1, 2 (1940) ("a presumption obtains against a construction that would render a statute ineffective or inefficient, or which would cause grave public injury or even inconvenience."); *Battick v. Stoneman*, 421 F.Supp. 213, 231 (D.Vt.1976) ("The construction proposed by the plaintiff would render the later statute ineffective and defeat its very purpose. The court, in applying the law of Vermont, is constrained against an interpretation of the statute which will produce such a consequence.").

 Failing to satisfy the statute's § 2201 exemptions, BWAC claims the statute, f/k/a "Small loans," applies only to in-state consumer loans and not to an out-of-state commercial floor plan lenders, and that if the statute does apply to out-of-state loans, then it is unconstitutional.

By its introduction of its foreign corporate "Certificate of Authority," BWAC has conceded that it is a Delaware foreign corporation doing business in this State. 11 Vt.Stat.Ann. § 2101(a).[37]

 In addition to Vermont's requirement that foreign corporations doing business in Vermont obtain a Certificate of Authority from Vermont's Secretary of

---

**36.** *See,* List of Licensed Lenders in Vermont from the Annual Report of the Bank Commissioner for 1986.

**37.** 11 Vt.Stat.Ann. § 2101(a), **Admission of foreign corporation,** provides:

(a) No foreign corporation shall have the right to transact business in this state until it shall have procured a certificate of authority so to do from the secretary of state, and shall have complied with any other requirements of law respecting corporations subject to regulation of the public service board, the commissioner of banking and insurance, or other agencies of the state. No foreign corporation shall be entitled to procure a certificate of authority under this chapter to transact in this state any business which a corporation organized under this chapter is not permitted to transact. A foreign corporation shall not be denied a certificate of

authority by reason of the fact that the laws of the state or country under which such corporation is organized governing its organization and internal affairs differ from the laws of this state, and nothing in this chapter contained shall be construed to authorize this state to regulate the organization or the internal affairs of such corporation. The provisions of this chapter shall be deemed to be in addition to, and not in derogation of, other provisions of laws respecting such regulated foreign corporations.

Except as otherwise provided, "doing business" shall mean and include each and every act, power or privilege exercised or enjoyed in this state by a foreign corporation except the mere ownership of real property which is not producing any income, or which is not used in the performance of a corporate function.

**634**

State, 11 Vt.Stat.Ann. § 2101(a) requires a foreign corporation: "... shall have complied with any other requirements of law respecting corporations subject to regulation of ... the commissioner of banking and insurance." *Id. See, Pennconn Enterprises, LTD. v. Huntington,* 148 Vt. 603, 538 A.2d 673 (1987) (The import of 11 Vt.Stat.Ann. §§ 2120(a) and 2101(a) is that a foreign corporation doing business in Vermont at the time it makes a contract is precluded from enforcing the contract unless it had procured a certificate of authority before it entered into the contract. The question of whether a corporation is doing business in Vermont is essentially one of fact. The definition of doing business is extremely broad—it includes each act, power, or privilege exercised or enjoyed in this State. The ownership of real property is excluded but only if the property does not produce income or is not used in the performance of a corporate function). Based on Vermont decisional law and chapter 73 of Vermont Statutes, we hold non-exempt foreign lenders doing business with a Vermont resident by mail are required to be licensed in Vermont under the statute notwithstanding where the loan was legally made. 8 Vt.Stat.Ann. § 2230(b).

■ We do not perceive BWAC's perfunctory claim of the statute's unconstitutionality running afoul of the Commerce Clause, U.S.C.A. Const. Art. 1, § 8, cl. 3, as meritorious. *See, People v. Fairfax Family Fund, Inc.,* 235 Cal.App.2d 881, 47 Cal. Rptr. 812 (1965) (Commerce Clause does not preclude State from giving needful protection to its citizens in course of their mail contracts with foreign lenders. California's small loan statute does not discriminate between interstate and intrastate lenders. The charges imposed by the licensing procedure are no larger than is reasonably necessary to defray administrative expenses for investigation of facts that are necessary and proper in reviewing a licensee's application), *appeal dismissed, Fairfax Family Fund, Inc. v. California,* 382 U.S. 1, 86 S.Ct. 34, 15 L.Ed.2d 6 (1965).

■ BWAC's argument that 8 Vt.Stat. Ann. § 2224(a) mandate of equal payments of principal and interest makes it impossible to floor plan in Vermont must also be rejected. Stated another way, BWAC argues that § 2224 cannot mean what it says regarding substantially equal consecutive monthly installments of combined principal and interest. Such a requirement would be "absurd" according to BWAC.

While this argument attracts the practical side of our mind we reject it for several reasons. As we said in *Burke,* in the absence of inadvertence, lack of clarity, or statutory conflict, we must find the Vermont legislature deliberately produced the result. *In re Burke Mountain Recreation, Inc., supra,* 64 B.R. at 805. Moreover, the Vermont legislature appears to have provided a way of avoiding the level payment problem when it enacted § 2201a(6).[38] Under this provision, a floor planner could secure its payment with a real estate mortgage if it so chose.

We are aware from testimony that BWAC considered a real estate mortgage from Mayo as a prerequisite to increasing his line of credit. While we view the alternative provided by the statute as difficult, if not impractical where floor planners are involved. It is also not impossible, and it is certainly not "absurd."

We may not legislate under the guise of judicial fiat and create an exception that does not exist. The Vermont legislature had ample time and opportunity to review and amend 8 Vt.Stat.Ann. §§ 2201, *et seq.*

**38.** 8 Vt.Stat.Ann. § 2201a(6), **Mortgage lending; specific requirements; exceptions,** provides:
Every licensee engaging in the making of loans secured by a lien against real estate located in this state, whether conducting its affairs as an agent or principal and whether operating from facilities within the state or by mail, shall comply with the general provisions of this chapter unless exempted herein, and shall also be subject to the following specific limitations:

(6) Any loan secured by a lien on real estate which does not contain a fixed rate or substantially equal payments for full amortization within the repayment period shall conform to the provisions of the commissioner's rules promulgated under section 1256 of this title, or to federal regulations where applicable by reason of federal law or action of the commissioner. Added 1983, No. 35, § 1.

at the time BWAC made its loan to Mayo. It did not. Although we are aware that it did add new § 2236 in 1987, effective April 11, 1988, to prospectively exclude floor planners from chapter 73.

■ We also find that BWAC lacks standing to even bring this argument. It failed to obtain a lender's license in the first place, and therefore, it should not be heard to complain its requirements are too rigorous.

■ BWAC next puts forth that it would be unconstitutional to void the property rights it has in the Boat because as a secured creditor it cannot collect a deficiency, but certainly it is entitled to the value of its security.

VNB and Midlantic must have considered this a "throw away" argument because neither adequately responded to it. We also give it short shrift. Generally, statutes regulating loan making have been sustained against various objections of infringement of Federal and State constitutional provisions as being within the power of the State. The regulating must be done in a reasonable manner and within constitutional limitations. We are not sure if BWAC is making a due process argument here, but if it is, it is without merit.. Vermont's licensed lender statute does not discriminate against domestic and foreign lenders. The investigation fee at the time BWAC could have applied for a license was $100, § 2202, and the annual renewal fee was $100, § 2209. It has since been raised to $1,000 and $900 respectively by the 1987 legislative amendments. Moreover, the majority of lenders licensed in Vermont are foreign corporations, without offices in the State of Vermont. Finally, this argument is raised in the Bankruptcy Court, the equitable sea monster of many lienholders. Although we are a Federal Court, we faithfully apply State law when it involves property transactions. On numerous occasions we have avoided liens leaving a creditor with nothing but an unsecured, and often valueless, claim. In this instance, we perceive a regulatory scheme to govern lenders. If they do not comply, the penalties are severe. We see no affirmities to the statute at issue. We hold then, the licensed lender scheme in Vermont is constitutional.

■ BWAC argues that each transaction under its extension of credit to Mayo ought to be considered as a separate transaction. It advances several reasons for this position. The Boat received separate credit approval, had its own trust receipts, its own promissory note, and it was kept separately on the books and records of both BWAC and Mayo. If viewed as a separate transaction, then at no time was any service charge assessed in excess of twelve (12%) percent. Viewed in this manner, says BWAC, the Boat transaction is taken out of the statute.

This argument is without merit. For completeness of the record we set forth our several reasons why we hold the argument is invalid. First, this transaction cannot be viewed as a single transaction. The financing agreement between BWAC and Mayo is analogous to a line of credit at a bank. While each draw on the line may be subject to an approval, the entire agreement is one continuous event. It is an integrated floor plan arrangement for the following reasons:

— There was a single integrated set of loan approval cards.
— BWAC reviewed Mayo's credit-worthiness annually, and on a branch affiliated basis.
— BWAC's turn (inventory turnover) analysis and correspondence considered Mayo one entity.
— All terms were negotiated with set parameters, albeit each boat could have separate charges and rates of interest.
— Mayo guaranteed the entire arrangement (MB–5).
— Bills were generated for the entire floor plan (MB–14).
— Floor plan inspections were performed for the inventory, not separate boats.
— There was only one inventory security agreement and power of attorney.
— The financing statements covered the inventory as a whole.

Second, and most likely, the paramount reason for rejecting BWAC is the agreement itself, and its relationship to the statute. 8 Vt.Stat.Ann. § 2201 provides in part:

> No ... corporation ... shall engage in the business of making ... credit ... [and] *contract for* or receive on any such loan a rate of interest, finance charge, discount or consideration ... greater than twelve percent per annum without first obtaining a license....

*Id.* (Amended 1985, No. 38, § 2) (emphasis ours; brackets supplied for clarity). The underlying agreements clearly provide for the possibility of an interest rate in excess of twelve (12%) percent. The only way an agreement would not have even the remotest possibility of being in excess of twelve (12%) percent would be to fix the rate of interest at a set amount. One of the interesting things about the arrangement between BWAC and Mayo was the umbrella arrangement between BWAC and Chris–Craft and the circularness of the interest payments. Chris–Craft was also charged interest by BWAC. Chris–Craft, however, would also refund interest charges to the dealer if the dealer reached a certain sales level. Based upon the claims of the parties, our holding only encompasses the arrangement between BWAC and Mayo. Whether the Chris–Craft arrangement could be or should be included is reserved for another day.

Our third reason which refutes BWAC's argument pertains to the actual finance charges assessed. When BWAC first advanced funds on the Boat, it contracted at an interest rate of thirteen and one-half (13½%) percent after a year. This rate is calculated by adding the then current prime rate of nine and one-half (9½%) percent plus a four (4%) percent kicker. (MB–10; T.730).

Perhaps the best way to understand how the rate on the Boat exceeded twelve (12%) percent is to calculate the actual interest BWAC charged when the Boat entered Mayo's inventory. It is quite interesting how BWAC did this. Interest was charged on the Boat from July 23, 1985 (MB–14; T.712) although no funds were actually advanced until August 7, 1985. (T.713–14). We did not include this in our calculation because we are not sure if BWAC charged Mayo for fifteen days or forty days interest in this regard. In any event, if the earlier charge (the additional fifteen days) was added to the interest calculation below, it would increase the annual interest rate. The calculation of interest without the extra days looks like this:

$$\frac{\text{Interest} \quad \$\ 2{,}173.21}{\text{Principal} \quad \$212{,}745.65} \times \frac{365}{25} = 14.9\%$$

This calculation (T.716) reflects BWAC's testimony that it billed interest for any part of a day it could. (T.715–16). Mercifully, the linear equation of principal times rate times time easily points out that BWAC charged greater than twelve (12%) percent on this transaction.

We conclude that BWAC is within the licensed lender statute by two prongs of this proceeding. First, it contracted for a rate that would exceed twelve (12%) percent, and second, it actually charged a rate greater that twelve (12%) percent.

■ BWAC argues that we ought to conclude the legislative intent was not to include entities such as BWAC when 8 Vt. Stat.Ann. § 2201 is viewed in connection with the following sections of the statute:

(i). The $2,500 liquid assets amount required by a licensee in 8 Vt.Stat.Ann. § 2202(c) [39] is appropriate only for small consumer loans not large commercial loans, because the only rationale for this requirement is to meet small claims advanced by consumer borrower. Similarly, the $10,000 bond limit in 8 Vt.Stat.Ann. § 2203 [40] is

---

**39.** 8 Vt.Stat.Ann. § 2202(c), **Application for license; fees; assets required,** provides:

(c) Every applicant shall also prove, in form satisfactory to the commissioner, that he or it has available for the operation of such business at the location specified in the application, liquid assets of at least $2,500.00. (This section

was not affected by the 1987 legislative change.).

**40.** 8 Vt.Stat.Ann. § 2203, **Bond,** provides in part:

The applicant shall also at the same time file with the commissioner a bond to be approved

inadequate protection for large commercial borrowers.[41]

(ii). 8 Vt.Stat.Ann. § 2204 [42] gives rise to a presumption by the legislature that this statute was designed to regulate domestic or in-state lenders with offices within this State and not foreign lenders with only out-of-state offices. Similarly, 8 Vt. Stat.Ann. § 2206,[43] requiring a licensee to post its license, would only make sense and be effective if it applied to an in-state licensee where consumers and investigators

may inspect the license. Likewise, 8 Vt. Stat.Ann. § 2208(b)'s [44] requirement of one license for each place of business can only be rationally interpreted as pertaining to more than one office located within Vermont, and not to a lender with a place of business out-of-state desirous of moving to another out-of-state office.

BWAC tells us that a logical reading of 8 Vt.Stat.Ann. § 2214 [45] would not envision an investigator being sent to a lender's out-of-state office where the "Vermont De-

by him in which the applicant shall be the obligor, in such sum as the commissioner may require, not more than $10,000.00 nor less than $1,000.00, ... The bond shall run to the state for the use of the state and of any person or persons who may have a cause of action against the obligor of such bond under the provisions of this chapter.... (Amended 1983, No. 35, § 2) (No amendment made in 1987).

**41.** BWAC ignores 8 Vt.Stat.Ann. § 2207, **Additional bond; minimum assets,** which allows the commissioner to request an additional bond from an applicant:

If the commissioner shall find at any time that the bond is insecure or exhausted or otherwise doubtful, an additional bond ... of not more than $10,000.00 shall be filed by the licensee within ten days after written demand.... Every licensee shall maintain at all times assets of at least $2,500.00 either in liquid form ... at the location specified in the license. (Amended 1983, No. 35, § 3) (No amendment was made in 1987).

**42.** 8 Vt.Stat.Ann. § 2204, **Approval of application and issuance of license,** provides in part:

Upon the filing of such application and the payment of such fees and the approval of such bond, if the commissioner shall find upon investigation (a) that the financial responsibility, experience, character and fitness of the applicant ... are such as to command the confidence of the community and to warrant belief that the business will be operated honestly, fairly, and efficiently within the purposes of this chapter, and (b) that allowing such applicant to engage in business will promote the convenience and advantage of the community ... and (c) that the applicant has available for the operation of such business at the specified location liquid assets of at least $2,500.00, he or she shall thereupon issue and a deliver a license to the applicant.... (Amended 1987, No. 117 § 4: Inserted "or she" following "$2,500.00, he" in the first sentence and inserted "or she" following "so find he" and deleted "he" preceding "shall notify" and "$150.00" following "retaining the" in the second sentence).

**43.** 8 Vt.Stat.Ann. § 2206, **Contents of license; transferability,** provides:

Such license shall state the address at which the business is to be conducted and shall state fully the name of the licensee.... Such license shall be kept conspicuously posted in the place of business of the licensee and shall not be transferable or assignable.

**44.** 8 Vt.Stat.Ann. § 2208(b), **Additional places of business; change of place of business,** provides in part:

(b) Whenever a licensee shall change his place of business to another location within the same city or town, he shall at once give written notice thereof to the commissioner, who shall attach to the license in writing his record of the change and the date thereof, which shall be authority for the operation of such business under such license at such new location. No change in the location outside of the original city or town shall be permitted under the same license. (V.S.1947, § 8993) (Section 2208(b) was amended in 1987, No. 117, § 5, with the following changes: Inserted "or her" preceding "place," substituted "state, he or she" for "city or town, he" following "within the same" and inserted "together with a fee of $100.00" following "commissioner" and "or her" following "writing his" in the first sentence and substituted "state" for "city or town" following "original" in the second sentence).

**45.** 8 Vt.Stat.Ann. § 2214, **Examinations by the commissioner,** provides in part:

For the purpose of discovering violations of this chapter or securing information lawfully required by him hereunder, the commissioner may at any time, either personally or by a person or persons duly designated by him, investigate the loans and business and examine the books, accounts, records and files used therein, of every licensee and of every person ... who or which shall be engaged in the business described in section 2201 of this title.... The commissioner shall make an examination of the affairs, business, office, and records of each licensee at least once every two years.... (Amended 1979, No. 157 (Adj.Sess.), § 6). 8 Vt.Stat.Ann. § 2214 was amended in 1987, No. 119, § 6, which substituted, *inter alia,* "three" for "two" preceding "years."

partment of Banking and Insurance would have no authority in any state other than Vermont," rather, "a more logical reading clearly shows that the legislative intent was to limit this statute to lenders with offices in the State of Vermont." (BWAC's Pre–Trial Memorandum, p. 11). Arguing further, BWAC asserts that 8 Vt. Stat.Ann. § 2216[46] unequivocally states that only in-state lenders are required to file annual reports. 8 Vt.Stat.Ann. § 2220[47] and 8 Vt.Stat.Ann. § 2231[48] demonstrate this statute was designed to protect Vermont consumers who could walk into the lender's place of business in their home town. The statute cannot be read to permit regulation of the internal procedures of an out-of-state lender with no ties to Vermont: "To argue that this section of the statute could cross state lines and infringe upon the regulatory authority of a sister state would be a direction (sic) violation of the commerce clause of the United States Constitution." (BWAC's Pre–Trial Memorandum, p. 12).

Finally, BWAC says that by requiring any Vermont borrower who has a claim against the lender to bring a lawsuit against the lender in the Vermont county where the lender has its place of business, 8 Vt.Stat.Ann. § 2232[49] must apply only to either domestic lenders or foreign lenders with an in-state place of business.

BWAC concludes that a fair reading of the entire statute demonstrates that the Vermont legislature intended to reach only lenders making consumer loans to Vermonters from business offices located within Vermont and not to foreign lenders, such as BWAC, who make large commercial loans throughout the country and do not maintain a place of business within Vermont.

Both VNB and Midlantic provided their own thoughts about the legislative intent of the Vermont legislature. No one should be surprised to learn their view was in opposition to BWAC's. We weave their arguments and BWAC's into our discussion of legislative intent.

■ Our search for legislative intent in every case involving statutory construction begins with its actual language. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539, 561 (1975) *reh'g denied* 423 U.S. 884, 96 S.Ct. 157, 46 L.Ed.2d 114 (1975) (Powell, J., concurring: "The starting point in every case involving construction of a statute is the language itself."). *Accord, Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685, 105 S.Ct. 2297, 2301–02, 85 L.Ed.2d 692, 696–97 (1985); *Burke Mountain Recreation, Inc. v. Ver-*

**46.** 8 Vt.Stat.Ann. § 2216, **Annual report,** provides:

Annually, on or before March 15, each licensee shall file a report with the commissioner giving such relevant information as the commissioner reasonably may require concerning the business and operations during the preceding calendar year of each licensed place of business conducted by such licensee within the state. Such report shall be made under oath and shall be in the form prescribed by the commissioner, who shall make and publish annually an analysis and recapitulation of such reports.

**47.** 8 Vt.Stat.Ann. § 2220, **Conduct of unrelated business,** provides:

No licensee shall conduct the business of making loans under this chapter within any office, room, or place of business in which any other business is solicited or engage in, or in association or conjunction therewith, except as may be authorized in writing by the commissioner upon his finding that the character of such other business is such that the granting of such authority would not facilitate evasions of

this chapter or of the rules and regulations lawfully made hereunder.

**48.** 8 Vt.Stat.Ann. § 2231, **Regulations,** provides:

The commissioner is hereby authorized and empowered to make such general rules and regulations and such specific rulings, demands, and findings as may be necessary for the proper conduct of such business and the enforcement of this chapter, in addition hereto and not inconsistent herewith.

**49.** 8 Vt.Stat.Ann. § 2232, **Review of commissioner's actions,** provides:

Any finding, decision or determination of the commissioner made under the provisions of this chapter or in accordance with any rule, regulation or requirement made thereunder, shall be open to review by a superior court upon action brought in the usual form by an aggrieved party, within fifteen days after the filing thereof, to the superior court within and for the county where the applicant resides or has his principal place of business.

mont Development Credit Corporation (In re Burke Mountain Recreation, Inc.), 64 B.R. 799, 802 (Bkrtcy.D.Vt.1986) (citing, *Medor v. Lamb (In re Lamb)*, 47 B.R. 79, 81, 12 CBC.2d 475 (Bkrtcy.D.Vt.1985)).

The judicial determination of the literal meaning of a statute's language is known as the "plain meaning rule" which provides:

Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.

*Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442, 453 (1917). *Accord, Cavanaugh v. Abbott Laboratories*, 145 Vt. 516, 529–30, 496 A.2d 154 (1985) (*citing, Heisse v. State*, 143 Vt. 87, 89, 460 A.2d 444, 445 (1983)).

Although the mandates of both the United States Supreme Court and the Vermont Supreme Court are clear that we must determine and give effect to the legislative intent, they send us contradictory signals on how far we may proceed beyond a statute's unambiguous and plain meaning.

One line of reasoning suggests that even if the literal terms of the statute are unambiguous, Courts need not end their inquiry with a statute's plain meaning. Rather, under appropriate circumstances, they ought to test the statute's plain meaning with its legislative history, policy, and overall statutory scheme. *See, Watt v. Alaska*, 451 U.S. 259, 265–66, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80, 88 (1981) ("{a}scertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain meaning rule is 'rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists.' ") (citations and footnote omitted) (quoting, *Boston Sand and Grain Company v. United States*, 278 U.S. 41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170 (1928) (Holmes, J.)); *Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 9–10, 96 S.Ct 1938, 1942, 48 L.Ed.2d 434, 441 (1976) ("To the extent that the Court of Appeals excluded reference to the legislative history of the [Act] in discerning its meaning, the Court was in error. As we have noted before: 'When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no "rule of law" which forbids its use, however clear the words may appear on "superficial examination." ' ''). (citation omitted) (quoting, *United States v. American Trucking Assns.*, 310 U.S. 534, 543–44, 60 S.Ct. 1059 [1063–64], 84 L.Ed. 1345, [1350–51] (1940)). *See also*, N. Singer, *Sutherland Statutory Construction*, § 48.01, at 278 (Rev. 4th Ed.1984) ("{t}he plain meaning rule ... is not to be used to thwart or distort the intent of Congress by excluding from consideration enlightening material from the legislative files.").

A contrary line suggests that once we ascertain the statute's meaning is plain, then our inquiry into its intent is at end. *See, Gemsco, Inc. v. Walling*, 324 U.S. 244, 260, 65 S.Ct. 605, 614–15, 89 L.Ed. 921, 933 (1945) ("The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."); *Cavanaugh v. Abbott Laboratories*, 145 Vt. 516, 530, 496 A.2d 154 (1985) (refused to go beyond the plain meaning of a statute to consider minutes of legislative committees as legislative history for additional indicia of legislative intent: "Where statutory language is clear and unambiguous in its meaning, as in the present case, we will look no further in an effort to determine a contrary legislative intent.") (footnote omitted); *Burke Mountain Recreation, Inc. v. Vermont Development Credit Corporation (In re Burke Mountain Recreation, Inc.)*, 64 B.R. 799, 802 (Bkrtcy.D.Vt.1986) ("When interpreting statutes, the Court is to give effect to the intent of the legislature.... It is this intent that constitutes the law.... If the language is plain, the intent must be ascertained from the language itself....") (citations omitted); *In re Keinath Brothers Dairy Farm*, 71 B.R. 993, 16 BCD 53, CCH BLR para. 71775 (Bkrtcy.E.D.Mich.1987) (excellent case for analysis of conflicting United States Supreme Court and federal cases represent-

ing both lines of reasoning, i.e., those which permit further inquiry and those which do not when plain meaning rule is applicable; held plain language would be given effect notwithstanding contrary language in legislative history).

■ Even if the literal reading of the statute is unambiguous, Courts will seek extrinsic evidence of its legislative intent where its literal terms produce an interpretation which makes little sense, *Chemical Mfrs. Ass'n v. Natural Res. Defense Coun.*, 470 U.S. 116, 125–26, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90, 98–99 (1985), renders the statute ineffective or leads to irrational consequences, *In re G.F.*, 142 Vt. 273, 279, 455 A.2d 805, 808 (1982) (quoting, *Audette v. Greer*, 134 Vt. 300, 302, 360 A.2d 66, 68 (1976)), leads to an absurd consequence, *Russell v. Lund*, 114 Vt. 16, 22, 39 A.2d 337 (1944), or is otherwise demonstrably at odds with the true intentions of the statute's drafters, *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973, 981 (1982).

The proper application of the plain meaning rule has recently been described by the Vermont Supreme Court as:

> The first recourse in applying a statute is to examine the plain meaning of the language used in light of the statute's legislative purpose and in terms of its impact on the factual circumstances under consideration. If that plain language resolves the conflict without doing violence to the legislative scheme, there is no need to go further, always bearing in mind that the paramount function of the court is to give effect to the legislative intent.... This concern is so fundamental that, although application according to the plain language is preferred when possible, the letter of a statute or its literal sense must yield where it conflicts with legislative purpose....
>
> Thus it is apparent that all rules of construction rely on a determination of legislative intent or purpose. That intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its

reason, purpose and consequences.... Only with such examination can an interpretation be carried out that avoids unreasonable or unjust results, or that avoids dilution or defeat of legislative objectives.... Even the very words used by the legislature in the enactment must yield to a construction consistent with legislative purpose.

*Lubinsky v. Fair Haven Zoning Board*, 148 Vt. 47, 49–50, 527 A.2d 227 (1987) (citations omitted). *See, Arizona Governing Comm. for Tax Deferred Annuity & Deferred Compensation Plans v. Norris*, 463 U.S. 1073, 1108, 103 S.Ct. 3492, 3511, 77 L.Ed.2d 1236, 1264 (1983) (O'Connor, J., concurring) ("Our polestar ... must be the intent of Congress, and the guiding lights are the language, structure, and legislative history of [the Act].");

Though the signals sent by the higher Courts concerning the proper procedure for statutory construction are mixed, we need not confine ourselves to either camp in the proceeding *sub judice* because we have already considered the plain meaning of 8 Vt.Stat.Ann. §§ 2201, *et seq.* in a previous decision, *Burke Mountain Recreation, Inc. v. Vermont Development Credit Corporation (In re Burke Mountain Recreation, Inc.), supra*, 64 B.R. 799 (Bkrtcy.D. Vt.1986), and determined that Vermont's licensed lender statute, as applied in that case, was unambiguous:

> We find no ambiguity in 8 Vt.Stat.Ann. §§ 2201, *et seq.* Its express provisions are clear and unequivocal. We arrive at this conclusion reading the statute in its entirety.

*Id. Burke*, 64 B.R. at 802.

In *Burke* we were confronted with the narrow issue of who the statute intended to be within the expressed class of lenders required to be licensed, and determined:

> A reading of 8 Vt.Stat.Ann. § 2201 reveals that 'a bank, savings and loan association, credit union, pawnbroker, insurance company or seller of the merchandise or service financed' is exempted from the section.

The maxim of statutory construction, *expressio unius est exclusio alterius*,

teaches us that the expression or the inclusion of one thing is the exclusion of others. *Ford v. United States*, 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927). This maxim applies to enumerated exceptions. Where there is an express exception, it comprises the only limitation of the statute an no other exception will be implied. *Andrus v. Glover Construction Co.*, 446 U.S. 608, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980). *See also, Fairbanks, Morse & Company v. Commissioner of Taxes*, 114 Vt. 425, 47 A.2d 123 (1946) (an exception in a statute amounts to an affirmation of the application of its provisions to all other exceptions). Since VDCC [commercial mortgage lender] is not included within the exceptions, we can only infer that the legislature intended VDCC to obtain a license to lend money. We are not at liberty to supply what the lawmakers have omitted. *State v. Fox*, 122 Vt. 251, 255, 169 A.2d 356 (1961).

*In re Burke Mountain Recreation, Inc., supra*, 64 B.R. at 802 (brackets supplied for clarity).

From the evidence, we know BWAC provided the floor plan financing for the Boat and Mayo's boat inventory. Floor planning involves a dealer executing and delivering a trust receipt to a finance company. The finance company delivers money or credit to the article's manufacturer/distributor or to the dealer of the article who, in turn, uses this money to acquire articles from the manufacturer/distributor. Upon the dealer's acquisition of title to the articles, the articles become subject to the security interest of the finance company while on the dealer's floor. As the articles are sold to buyers in the ordinary course of the dealers business, the dealer repays the finance company and the loan is gradually reduced. *See e.g., Crane v. Tambourine (In re Glenview Imports, LTD.)*, 27 B.R. 496, 501 (Bkrtcy.N.D.Ill.1983) ("This type of transaction [floor plan financing] is distinguishable from a transaction where an automobile dealer in the normal course of business sells an automobile to a consumer, with a security interest being given to a third party who financed the consumer's

purchase.") (brackets supplied for clarity); *Harlan v. United States*, 312 F.2d 402, 406, 160 Ct.Cl. 209 (1963) ("Floor plan financing is the lending of money to an automotive dealer (or other supplier of goods) so that he may purchase cars (or other articles) to include in his inventory; the loan is secured by the automobile while in the dealer's possession, and is gradually reduced as the cars are sold.") (parentheticals in original); *G.F.C. Corporation v. Nesser*, 273 S.W.2d 264, 266 (Mo.1954); *Volusia Discount Co. v. Alexander K–F Motors*, 88 So.2d 302, 305 (Fla.1956); *Associates Discount Corporation v. Haynes Garage, Inc.*, 304 Mass. 526, 24 N.E.2d 685, 686 (1939). If a dealer sells the floor planned article without paying its loan with the finance company "[t]his result[s] in ... a situation known in the trade as 'out of trust.'" *Fayette v. Ford Motor Credit Company*, 129 Vt. 505, 508, 282 A.2d 840 (1971).

We conclude, as we did in *Burke*, that Vermont's licensed lender statute, 8 Vt. Stat.Ann. §§ 2201, *et seq.* is clear on its face and that it snares floor planners like BWAC in its almost unflinching prerogative. But the statute, like many other statutes, has exceptions. The facts of this case, as we discuss them below, allows BWAC that last sailing tack which avoids the statute's visible net.

■ 8 Vt.Stat.Ann. §§ 2201, *et seq.* unequivocally and unambiguously provides that no entity, with certain entity exceptions, shall engage in the business of making loans in the State of Vermont without first obtaining a license. BWAC admitted it did not have the required license, nor did it show it came within any of the entity exceptions. If the meaning of a statute is plain on its face, it must be enforced according to its terms. *See, i.e., Caminetti v. United States, supra*, 242 U.S. 470, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

Even if a statute is plain on its face, some Courts look behind a statute at the legislative intent to see if there is an intent not obvious from the statute's plain meaning. Surely laymen would perceive the last

statement as legal gobbleleegook, but we look behind the statute's word to ensure BWAC of its due process rights. The policy of 8 Vt.Stat.Ann. is well stated at § 1:

The legislative policy of this state is to promote and maintain the solvency and liquidity of financial institutions doing business in this state, to regulate their affairs in the interests of financial order and stability, to encourage competition among them, and to protect the public against unfair and unconscionable lending and insuring policies.

As VNB says in its Post–Trial Memorandum of Law, at page 4:

This Court must note that the legislature did not indicate its interest in protecting only consumers (as BWAC urges), but rather, extended the scope of its protection to the "public."

*Id.*, at 4 (parentheticals supplied).

The statute shows a scheme to regulate all lenders. Those who are exempted under 8 Vt.Stat.Ann. § 2201 are regulated elsewhere. If BWAC is to be exempted, it must be exempted by something other than the entity exception.

One of BWAC's principal arguments is that the licensed lender statute is really small loan legislation and that floor planners were never intended to be governed by it.

There is some merit to its argument but not enough to inveigle us to intellectually purchase it. Small loan statutes generally have a cap on the dollar amount of a loan for purposes of determining the scope of regulation. Vermont had a cap of $1,500 from 1969 through 1979, but when § 2201 was amended in 1979 the cap was eliminated and the name of the chapter was changed from "Small loans" to "Licensed lender." Amendments in 1983 and 1987 showed no intent on the part of the Vermont legislation to distinguish small consumer loans and commercial loans. Finally, we must conclude that the Vermont legislature was aware of our *In re Burke Mountain Recreation, Inc.* decision, issued in 1986, when they amended the statute in 1987, effective 1988, to exclude floor planners.

BWAC raised other arguments about out-of-state lenders being excepted from the statute because of resident office requirements. Section 2230(b) clearly addresses that issue. We dismiss the argument.

We have reviewed the extensive "legislative history" of 8 Vt.Stat.Ann. § 2201. The legislative history is comprised of witnesses testifying about proposed amendments to the Act and their view on them. At best, the legislative history is inconclusive. At worst, it does not support any position at all, especially BWAC's.

We think VNB captures our view about this statute when, in its memorandum, it says:

Borg–Warner's [BWAC] remedy is not to have this Court redraw Chapter 73 that Borg–Warner [BWAC] is exempt from regulation in Vermont, but rather, Borg–Warner [BWAC] must petition the Vermont legislature for amendment of the statute to allow floor plan lending by licensed lenders.

VNB's Post–Trial Memorandum, p. 11.

BWAC, or someone else, did exactly what VNB suggested, and as we indicated earlier, the Vermont legislation added § 2236 in 1987. This new section excludes inventory financiers from the effects of the statute.

Much to our dismay, none of the parties briefed 8 Vt.Stat.Ann § 2230(a) which applies to foreign lenders. 8 Vt.Stat.Ann. § 2230(a) provides in pertinent part:

(a) ... However, any loan legally made in any state which then had in effect a regulatory loan law similar in principle to this chapter may be enforced in this state only to the extent of collecting the principal amount owed and interest thereon at a rate not greater than that authorized by section 41a or 46 of Title 9.

A Vermont lender required to be licensed under the statute will not be entitled to enforce its loan, principal, and interest in the event it "directly or indirectly charge[s], contract[s] for, or receive[s] any interest, discount, consideration or charge greater than is authorized by section 41a or 46 of Title 9." 8 Vt.Stat.Ann. § 2230(a).

*Compare,* 8 Vt.Stat.Ann. § 2233. Section 2230(a), in effect, exempts a foreign lender, whose loans are not solicited and made by mail to a Vermont resident, 8 Vt.Stat.Ann. § 2230(b), from the statute's licensing requirement when the foreign lender seeks to enforce its out-of-state loan in Vermont.

■ The plain meaning of 8 Vt.Stat. Ann. § 2230(a) is that a nonexempt foreign lender seeking to enforce its out-of-state loan in Vermont is excused from compliance with Vermont's license requirement if: the foreign lender did not solicit and make the loan by mail to a Vermont resident, 8 Vt.Stat.Ann. § 2230(b);[50] the loan was made in a State other than Vermont; the loan was made to either a Vermont resident who entered into a loan contract out-of-state or a non-Vermont resident who became a Vermont resident at the time of foreign lender's enforcement action in Vermont; or, the out-of-state loan was legally made in a foreign State which then had a similar licensed lender law as Vermont.[51] The foreign lender may enforce its out-of-state loan in Vermont Court against a borrower (who is a resident of Vermont either at the time of the enforcement action or at the time the loan was made out-of-state), for the full principal amount owed and interest only to the extent permitted by Vermont law.

■ BWAC's argument that because the law of Illinois was the expressed choice of law within its security agreement with Mayo, d/b/a Vermont Custom Boats it is excused from compliance with the statute's licensing requirements regardless of where and how the loan was made.

While we do not question the basic premise that parties may agree under Vermont's UCC's choice of law provision 9A Vt.Stat. Ann. § 1–105, that the substantive law of a different State bearing a "reasonable relation" to the security transaction will govern the rights and duties of the contracting parties, this will not permit the contracting away or the excuse of noncompliance with the applicable non-chosen State's licensing requirements.

■ Vermont's UCC, 9A Vt.Stat.Ann. §§ 1–101, *et seq.,* acknowledges the limitations of contracting parties to evade such requirements. 9A Vt.Stat.Ann. § 9–201, **General validity of security agreement,** provides in part:

Nothing in this article validates any charge or practice illegal under *any statute* or regulation thereunder governing usury, *small loans ... or the like,* or extends the application of any such statute or regulation to any transaction not otherwise subject thereto.

*Id.* (emphasis added). Although not binding on our interpretation, the Comment to § 9–201 supports this limitation:

As pointed out in the Note to Section 9–102, there is no intention that the enactment of this Article should repeal ... small loan acts.... These are mentioned in the text of Section 9–201 as examples of applicable laws, outside this Code entirely, which might invalidate the terms of a security agreement.

---

**50.** To hold otherwise would render 8 Vt.Stat. Ann. § 2230(b)'s requirement of a license for foreign mail lenders lending to Vermont resident "notwithstanding where the loan was legally made" meaningless.

**51.** Although not briefed we will take judicial notice of the law of Illinois as the evidence shows BWAC's principal place of business in this transaction was conducted from its Illinois offices. We use Vermont procedure on this issue because the issue is state based. Vt.R.Civ. Proc.Rule 44.1 permits us to consider foreign State law "whether or not submitted by a party or admissible under the Federal Rules of Evidence."

Illinois approved its "Small Loans Act" on July 10, 1935. (Ill.Rev.Stat.1945, ch. 74). In 1957, Illinois amended its "Small Loans Act" and renamed it as the "Consumer Finance Act."

(Ill.Rev.Stat. Vol. 1, p. 2387). Effective November 1, 1985, the "Consumer Finance Act" was repealed by section 10 of Illinois Public Act 84–1004 and all licensees under the former "Consumer Finance Act" became subject to the Illinois "Consumer Installment Loan Act." (Illinois Public Act 84–1004, § 7; Ill.Rev.Stat.1985 ch. 17, par. 5404.1). The transactions of the proceeding sub judice occurred prior to the November 1, 1985 effective date of section 10 of Illinois Public Act 84–1004. In *Clouse v. Heights Finance Corp.,* 156 Ill.App.3d 975, 109 Ill.Dec. 380, 381–82, 510 N.E.2d 1, 2–3 (1987), the Court held an amendment to the remedy of Illinois's Consumer Installment Loan Act, effective January 1, 1984, applied retroactively to plaintiff's 1981 complaint. Thus, BWAC is subject to Illinois law.

9A Vt.Stat.Ann. § 9–203(2), **Enforceability of security interest; proceeds, formal requisites,** provides in part:

> (2) A transaction, although subject to this article, is also subject to Title 8, sections 3002–3035 (Small Loans) [52] ... *and in the case of conflict between the provisions of this article and any such statute, the provisions of such statute control.* Failure to comply with any applicable statute has only the effect which is specified therein.

*Id.* (parentheticals in original; emphasis and footnote added). *Accord,* Ill.Rev.Stat., ch. 26, § 9–203(4) (UCCRS, *State Correlation Tables,* Ill. page 7, Dec.1987). Although not binding on our interpretation, Comment 6 to 9A Vt.Stat.Ann. § 9–203(2) explains:

> Subsection (2) states that the provisions of regulatory statutes covering the field of consumer [53] finance prevail over the provisions of this Article in case of conflict. The second sentence of the subsection is added to make clear that no doctrine of total voidness for illegality is intended: failure to comply with the applicable regulatory statute has whatever effect may be specified in that statute, but no more.

*Id.* (Footnote added).

Thus, our determination of whether BWAC is required to have a license under 8 Vt.Stat.Ann. § 2201 as a foreign lender is dependent upon whether the evidence adduced at trial places this transaction within 8 Vt.Stat.Ann. § 2230(b) (in-state) or § 2230(a) (out-of-state).

The Vermont Supreme Court offers the following guidance in a case which involved a question about whether the usury law of Massachusetts or Vermont applied:

> The significant factors involved in the choice of law applicable, according to this doctrine are: '(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.' Restatement, Conflict of laws § 188 (Proposed Draft, Part II, May 1, 1968). In evaluating the relative importance of these contact points of the contract, the place of making and he place of performance are entitled to substantial weight in the choice of the applicable law. *Haag v. Barnes,* 9 NY.2d 554, 216 NYS.2d 65 [69], 175 NE.2d 441, 444, 87 ALR.2d 1301.

*Pioneer Credit Corp. v. Carden,* 127 Vt. 229, 233, 245 A.2d 891 (1968) (failure of party to plead or prove Massachusetts law required the application of Vermont law by

---

**52.** The Vermont Legislature changed the statute's name from "Small Loans" to "Licensed Lenders," and sections 3002–3035 were renumbered and placed in a new chapter. *See,* Title 8, chapter 73, *History, Revision* note:

> *Revision note.* This chapter was originally codified as chapter 35 of this title. In the 1970 replacement edition, the chapter was redesignated as chapter 73, and internal references were revised, as necessary, for conformity with the numbering of the redesignated chapter.
> *Amendments*–1979 (Adj.Sess.). 1979, No. 173 (Adj.Sess.), § 21, eff. April 30, 1980, changed the chapter heading from "Small Loans" to "Licensed Lenders."

*Id.,* page 188.

**53.** Although not necessary for our disposition of the proceeding *sub judice,* BWAC's claim that Vermont's licensed lender statute applies only to consumer loans and not to commercial loans is not supported by either the text or the legislative history of 8 Vt.Stat.Ann. §§ 2201, *et seq.* Although the Comments in Vermont's UCC are not considered binding, we note that Comment 6 to 9A Vt.Stat.Ann. § 9–203(2) errs in its use of the word "consumer" in its description of what the text of § 9–203(2) states. The error no doubt was based on the author's assumption that "small loans" meant consumer loans. While that may have been the original unexpressed and unsubstantiated legislative intent for the enactment of Vermont's small loans statute, the Vermont legislature has since changed its name to "licensed lenders" and in 1983 removed its $3,000.00 cap. Moreover, 8 Vt.Stat.Ann. §§ 2201, *et seq.* neither uses nor distinguishes the terms "consumer" or "commercial" anywhere in its text. Lastly, although a witnesses' reflection before a legislative committee considering an amendment to this statute cannot be treated as legislative history, it further supports the nonexistence of a consumer-commercial dichotomy given the sparse condition of available information from the legislature on this subject.

default); *accord, Crocker v. Brandt,* 130 Vt. 349, 351–52, 293 A.2d 541 (1972) (same); *see, United States v. Cardinal,* 452 F.Supp. 542, 547 (D.Vt.1978) (the absence of any evidence of the law of any other State required the application of Vermont law of contracts as the applicable choice of law); *compare, In re Estate of Mary Jane Holbrook,* 138 Vt. 597, 600, 420 A.2d 110 (1980) (prior to the 1982 amendment to Vt.R.Civ.Proc. 44.1, the Vermont Supreme Court held that even a probate court may take judicial notice of a foreign State law under 12 Vt.Stat.Ann. § 1699 although the then Rule 44.1 did not apply).

The evidence conclusively shows that Vermont was the place of performance, location of the contract's subject matter (the Boat), Mayo's residence and place of business of the floor planner, and that BWAC does business in Vermont under its foreign corporate "Certificate of Authority." The evidence also establishes that Delaware is BWAC's place of incorporation and Illinois is its principal place of business. While we do know that Mayo mailed the executed loan agreement to BWAC, the evidence adduced at trial for licensing purposes is at best inconclusive as to whether the loan was both "solicited and made by mail" to Mayo, d/b/a Vermont Custom Boats in Vermont by BWAC, or if Mayo was solicited orally and the loan was mailed to him in Vermont for execution. We are not sure which State Mayo was in when the loan agreement was made or executed. Thus, we can only speculate whether the place of either the contracting or the negotiation of the contract was in-state or out-of-state.

The absence of the critical evidence needed for our determination of whether the loan was made in-state or out-of-state for purposes of the statute's licensing require-

ment places us in a dilemma. We regretfully resort to resolving this issue based by on whose shoulders this evidentiary failure of the burden of proof falls.[54]

Our January 27, 1987 Pre–Trial Order, para. 7(a) states:

> Measure and burden of proof:
>
> Each party must make a prima facie showing that its asserted security interest is valid and perfected under Art. 9 of the Vermont UCC.

*Id.* page 2. As we discussed earlier, 9A Vt.Stat.Ann. §§ 9–201; 9–203(2) acknowledge that a resolution of the validity and perfection under Art. 9 of Vermont's UCC does not determine the validity of the loan for purposes of the statute's licensing requirements. Thus, our January 27, 1987 Pre–Trial Order allocation of the burden of proof will not help us.

Instead, we review the relevant procedural posture of the licensed lender issue. This adversary proceeding was initiated by Midlantic's complaint against BWAC and VNB. Midlantic alleged it was the only creditor with a valid perfected security interest in the Boat and the purported security interest of the defendants in the Boat were invalid, unperfected, or inapplicable to the Boat. BWAC's answer denied Midlantic's allegation and contained an affirmative defense and counterclaim alleging that it had a perfected purchase money security interest in the Boat. VNB's answer sided with Midlantic's complaint and alleged in its counterclaim that it had a superior valid perfected security interest in the Boat. Midlantic denied both BWAC's and VNB's counterclaim allegations concerning their respective claimed priority to the Boat.

We hold that the burden of proof fell upon Midlantic and VNB, to establish to our satisfaction by a preponderance of the

---

**54.** We note that the annotation of 29 ALR.4th 884, *Failure of Money Lender or Creditor Engaged in Business of Making Loans to Procure License or Permit as Affecting the Validity or Enforceability of Contract,* (1984), contains a collection of cases, § 3[b] Georgia cases, which suggests that to state a cause of action for recovery on a loan it may be necessary for the lender to plead the existence of a license. This does not help us because the author notes: "It is

assumed that the person or entity involved was required by statute or regulation to have a license to lend, and thus, beyond the scope of this annotation are cases in which the defense of failure to procure a license was held to be without merit because the alleged offender either did not fall within the statute or was exempt from the license requirement under the statute." *Id.,* at 885.

evidence that the transaction fell either within 8 Vt.Stat.Ann. § 2230(b) (in-state) or § 2230(a) (out-of-state). Both Midlantic and VNB failed to present sufficient competent evidence of where and how BWAC's transactions with Mayo, d/b/a Vermont Custom Boats took place. Thus, they failed to carry their burden of proof on the issue of whether BWAC, as a foreign lender, is required to have a license under 8 Vt.Stat.Ann. §§ 2201, *et seq.* Accordingly, we hold that Midlantic's and VNB's claim that BWAC violated 8 Vt.Stat.Ann. §§ 2201, *et seq.* sinks.

II. If BWAC is not required to be licensed under Vermont's licensed lender statute, was the Boat included within the security agreements it had with Rodney S. Mayo, d/b/a Vermont Custom Boats?

Having found, by reason of failure of proof and the narrowest of exceptions, that BWAC is not required to be licensed under Vermont's licensed lender statute we now turn to a more mundane bankruptcy issue.

██ No party disputes the adequacy and efficacy of BWAC's financing documents and that the Boat was in Mayo's inventory prior to any incorporation of the sole proprietorship. What is in dispute, this point being promoted by Midlantic, is that the Boat is not an inventory item because it was for Mayo's personal use. Dilating on this theme they point to several factors we should consider:

—Mayo intended and wanted the Boat for his personal use. (T.1272).
—Mayo planned to finance the Boat immediately when he received it. (T.1273).

—BWAC extended the normal interval of computer entry on its inventory by six (6) days. (T.712–14; MB–14).
—Mayo testified the Boat was not for sale for over a year. (T.1273–74).
—Everybody at BWAC, including Bower, knew the Boat was for Mayo. (T.1274).
—BWAC accommodated Mayo by letting him finance the Boat, a consumer good, on his floor plan. (T.153–54).
—The Boat was kept at a private marina that prohibited boat sales. (T.1298).
—The Boat was unusually large in size compared to the other inventory kept by Mayo as stock in trade. (T.830–33).
—Gingras, VNB's loan officer, always understood the Boat to be "Rod's boat." (T.1066).

9A Vt.Stat.Ann. § 9–312(5) [55] sets out the priorities between two Article 9 secured creditors when their security interests are claimed in the same collateral. Subsection (5) is the quintessence of § 9–312's priority scheme. Its language translates to a rule of first in time, first in right. No party here denies that BWAC was the first to dance with Mayo. What Midlantic questions is whether the Boat was inventory and carried by Mayo as the "Business Groom" or by Mayo as the "consumer groom."

Section 9–109(4) defines inventory if it is "held by a person who holds them for sale ... in a business. Inventory of a person is not to be classified as his equipment." "Each thing is what it is," said the poet, T.S. Eliot, "and not some other thing." T.S. Eliot never envisioned the Uniform Commercial Code, however. A boat could be an inventory item, a consumer item, or some combination of both. The UCC cau-

---

55. 9A Vt.Stat.Ann. § 9–312(5), **Priorities among conflicting security interests in the same collateral,** provides:

(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsecs. (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined as follows:
(a) in the order of filing if both are perfected by filing, regardless of which security interest

attached first under section 9–204(1) and whether it attached before or after filing;
(b) in the order of perfection unless both are perfected by filing, regardless of which security interest attached first under section 9–204(1) and, in the case of a filed security interest, whether it attached before or after filing; and
(c) in the order of attachment under section 9–204(1) so long as neither is perfected.

tions that classes of goods are mutually exclusive, and in borderline cases, the principal use to which the property is put should be determined.

The evidence presented to us shows the Boat was inventory, and we so find. To support our finding we suggest several facts:

—Our observation of Mayo during his testimony tells us he would do anything to obtain what he wants.[56]

—The Boat was always maintained as an inventory item by BWAC and under normal floor plan arrangements. (T.1337; T.1220).

—Mayo himself acknowledges the Boat was for sale. (Trial notes).

—Chris–Craft wanted the Boat on Lake Champlain for commercial purposes. (T.857–8).

—Carrying the Boat in his inventory caused Mayo to be over his credit line approval with BWAC. (Trial notes).

—Chris–Craft obtained a credit overline approval for Mayo. (T.857–8).

—Mayo conducted the Yegen transaction as if he was buying from his inventory.

Thus, we find BWAC has a valid perfected security interest in the Boat, which is a first priority position compared to all other secured lenders in this proceeding. The facts satisfy 9–312(5).

III. Is VNB secured by the Boat under its security agreements with Rodney S. Mayo, d/b/a Vermont Custom Boats or Vermont Custom Boats, Inc., or both?

VNB, but for the licensed lender issue, virtually conceded that BWAC was in first place. It strenuously argues, however, that it is in second place. We disagree, and not for the reason put forth by Midlantic, namely, that the Boat was a consumer good and therefore was not covered by the financing documents. The "consumer v. inventory" discussion we set forth in Issue II. is equally applicable to VNB. VNB is

not secured because it is unperfected. The evidence shows that its security interest never floated when it was launched. Two attempts to refloat resulted in their priority remaining at the bottom of the unsecured creditor pool.

VNB claims a security interest in the Boat based on various security agreements and financing statements. (VNB–1–12; –36–39). All financing statements were filed in the Town of Colchester, Vermont and with the Secretary of State. The documents are illustrative, however, of VNB's dilemma in proving it has a security interest in the Boat.

■ The August 23, 1985 security agreement is with Vermont Custom Boats, Inc., not the sole proprietorship. The UCC–1's are properly recorded. This set of documents cannot snare the Boat within's VNB's security net because the Boat was inventory acquired by Mayo as an individual, and no transfer of the inventory was ever made to the corporation, Vermont Custom Boats, Inc.

■ A second set of documents were signed on December 31, 1985. These documents relate to the November, 1985 overdraft and other VNB loans to Vermont Custom Boats, Inc. and Rodney S., Mayo, d/b/a Vermont Custom Boats. The security agreement was signed by Mayo in both his corporate and individual capacities. The security agreement and financing statements, however, exclude new inventory covered by BWAC floor plans. We are not sure what the term "new inventory" means. It could mean "new" inventory as opposed to "used" inventory, or it could mean "new inventory" acquired after this security agreement was signed. The document is equivocal. Its obvious intent was to exclude some BWAC inventory from its coverage. VNB wanted to dance with Mayo. A triangle it did not want, a pillory it got. We construe the document to exclude all of BWAC's inventory from its

---

**56.** We believe Mayo lied when he wrote the marina on May 8, 1986 (MB–53) and informed them the Boat was not for sale and was for his personal use. There are any number of instanc-

es in his testimony that support our conclusion including using the Boat as bait to snare more customers.

reach. Thus, we find that the Boat is not in VNB's port.

■ The third set of documents by which VNB claims a security interest were signed in June, 1986. The security agreement was signed by Mayo in both his corporate and individual capacities, but the financing statement filed with the Town of Colchester, Vermont was signed by Mayo in his corporate capacity only. The line for Mayo's individual signature is conspicuously left blank.

VNB argued and produced testimony that all parties to the agreements, i.e., VNB and Mayo, intended Mayo to sign in both his corporate and individual capacities.

A financing statement is sufficient if it is *signed* by the debtor and the secured party. 9A Vt.Stat.Ann. § 9–402. "§ 9–402(5) does provide that a financing statement substantially complying with the requirements of this section (§ 402) is effective even though it contains minor errors which are not seriously misleading. The key words in this subsection are 'substantially complying with the requirements of this section.' Without the debtor's signature on the financing statement there is a failure of substantial compliance." *Robinson v. Small Business Administration (In re Garrow)*, 50 B.R. 799, 800 (Bkrtcy.D.Vt.1985). Thus, VNB is unperfected because of Mayo's absent signature on this third financing statement. We conclude that the Boat is not in VNB's marina.

IV. Is Midlantic secured by the Boat under its security agreements with Rodney S. Mayo?

■ We are not inclined to pull out the bilge pumps when a boat is sinking, but the importance of this adversary proceeding, and the likelihood of an appeal, requires that we give the parties and any Appellate Court a complete record. Thus, we also address the issue that even if Mayo's missing individual signature is found to sub-

stantially comply with § 9–402, we hold Midlantic is ahead of VNB in priority.

No one disputes that Midlantic is perfected. Midlantic lent Mayo $250,000 (MB–38) to purchase the Boat. The loan closed on June 25, 1986 (see, MB–31, –32, –33). The financing statements were filed on July 2, 1986 with the Vermont Secretary of State and the Town of Colchester, Vermont. (MB–35, –36). VNB lent Mayo and Vermont Custom Boats, Inc. funds on June 6, 1986. VNB's financing statement was filed with the Town of Colchester on June 6, 1986, and with the Secretary of State on July 1, 1986. (VNB–36).

Vermont law requires that financing statement filings be made in the office of the Secretary of State and in the office of the Town Clerk of the town in which a debtor has a place of business or residence. § 9–401(1)(c). If the interest is a purchase money security interest, filing of the financing statement within ten (10) days [57] of the debtor's possession of the goods will relate perfection back to the date the security interest attached. § 9–312(4).

Midlantic's loan was clearly a purchase money loan. The loan was to enable Mayo to personally purchase the Boat. 9A Vt. Stat.Ann. § 9–312(4) provides:

A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter.

VNB's June 6, 1986 loan cannot be so described. We are not sure if VNB's last loan was to finance inventory or other assets. A finding on this specific fact is not necessary, however. If the June 6, 1986 loan was purchase money inventory, VNB failed to perfect ahead of Midlantic because there is no evidence to show it complied with the purchase money notification requirements of 9A Vt.Stat.Ann. § 9–312(3). [58]

---

**57.** § 9–312(4) was amended in 1987 to provide for a twenty (20) day perfection period. The amendment does not affect this adversary proceeding.

**58.** 9A Vt.Stat.Ann. § 9–312(3) provides:

(3) A purchase money security interest in inventory collateral has priority over a conflicting security interest in the same collateral if

If the loan was for inventory, then there is no relating back under § 9–302(1).[59] Midlantic's July 2, 1986 filings relate back to June 25th because all events necessary to perfect its interest took place within the requirements of Vermont's Article 9.

We find that Midlantic is ahead of VNB in priority on two alternate grounds. First, VNB is unsecured because its June 6, 1986 financing statement did not perfect its interest. Second, Midlantic is ahead of VNB because its purchase money security interest related back and perfected ahead of any interest VNB may have, if any.

V. Did the credit references provided by BWAC or VNB or both provide a basis for equitable subordination of their claims to Midlantic's claim?

In this adversary proceeding, Midlantic also asks, in the event that we find it behind BWAC and VNB in priority, that we equitably subordinate BWAC and VNB to its claim under 11 U.S.C. § 510(c).

 The substantive bankruptcy laws are designed to achieve equality of distribution between and among creditors. *See, Sampsell v. Imperial Paper & Color Corp.*, 313 U.S. 215, 219, 61 S.Ct. 904, 907, 85 L.Ed. 1293, 1298 (1941), *reh'g denied,*

313 U.S. 600, 61 S.Ct. 1107, 85 L.Ed. 1552 (1941); *Moore v. Bay,* 284 U.S. 4, 5, 52 S.Ct. 3, 76 L.Ed. 133 (1931); *Benjamin v. Diamond (Matter of Mobile Steel Co.),* 563 F.2d 692, 698 (5th Cir.1977). Equitable subordination is a long-standing doctrine that enables a Bankruptcy Court, as a Court of equity, to subordinate the claims of one creditor to those of other creditors in circumstances when the creditor charged has engaged in some type of inequitable conduct that has secured for it an unfair advantage or that has resulted in injury to either creditors or the debtor. *See generally, Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

Equitable subordination existed before the Bankruptcy Code, *Sampsell, supra, Pepper, supra.* It is a judicial doctrine that developed within the context of claim review in bankruptcy cases. It was normally raised as an equitable defense to the allowance of a claim. *See, Pepper, supra,* 308 U.S. at 312, 60 S.Ct. at 247. The 1978 Code provided statutory recognition to the doctrine when § 510(c) was enacted, but left its delineation and development to the Courts. 124 Cong.Rec. H 11095 (daily ed. Sept. 28, 1978); S 17412 (daily ed. Oct. 6, 1978); remarks of Rep. Edwards and Sen. DeConcini, reproduced in *Norton Bank-*

(a) the purchase money security interest is perfected at the time the debtor receives possession of the collateral; and
(b) any secured party whose security interest is known to the holder of the purchase money security interest or who, prior to the date of the filing made by the holder of the purchase money security interest, had filed a financing statement covering the same items or type of inventory, has received notification of the purchase money security interest before the debtor receives possession of the collateral covered by the purchase money security interest; and
(c) such notification states that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type.

**59.** 9A Vt.Stat.Ann. § 9–302(1), **When filing is required to perfect security interest; security interests to which filing provisions of this article do not apply,** provides:
(1) A financing statement must be filed to perfect all security interests except the following:

(a) a security interest in collateral in possession of the secured party under section 9–305;
(b) a security interest temporarily perfected in instruments or documents without delivery under section 9–304 or in proceeds for a 10 day period under section 9–306;
(c) a purchase money security interest in farm equipment having a purchase price not in excess of $500; but filing is required for a fixture under section 9–313 or for a motor vehicle required to be licensed;
(d) a purchase money security interest in consumer goods; but filing is required for a fixture under section 9–313 or for a motor vehicle *required to be licensed;*
(e) an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor;
(f) a security interest of a collecting bank (§ 4–208) or arising under the article on Sales (see § 9–113) or covered in subsection (3) of this section.

*ruptcy Law and Practice* (1988–89 edition).

The wisdom of leaving the contours of equitable subordination to the Courts will be seen in the results of this adversary proceeding. Section 510(c) provides:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

From existing case law we can extract these conditions that must be fulfilled before we may exercise our power to equitably subordinate:

(i) The claimant in question must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to a creditor of the bankrupt or conferred an unfair advantage to the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

*Matter of Mobile Steel Co., supra,* 563 F.2d at 700–01 (citations omitted). Criteria one is the most difficult to apply. It has been described as:

[C]onduct which may be lawful, yet shocks one's good conscience. It means *inter alia* a secret or open fraud; lack of faith or guardianship by a fiduciary; an unjust enrichment, not enrichment by *bon* chance, astuteness or business acumen, but enrichment through another's loss brought about by one's own unconscionable unjust, unfair, close, or double dealing or foul conduct.

*In re Harvest Milling Co.,* 221 F.Supp. 836, 838 (D.Or.1963) (emphasis in original).

■ Within this first criteria Courts have struggled with the degree of inequitable conduct between insiders or fiduciaries and non-insiders. As the Court stated in *Teltronics Services,* "The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors." *Anaconda–Ericisson, Inc. v. Hessen (Matter of Teltronics Services, Inc.),* 29 B.R. 139 (Bkrtcy.E.D.N.Y.1983). The degree of misconduct that an objectant must show in the case of a non-insider is difficult to state with any precision. The most obvious offending conduct is outright fraud. Something less than fraud will suffice, however, to bring the doctrine into play. *Machinery Rental, Inc. v. Herpel (In re Multiponics, Inc.),* 622 F.2d 709, 720 (5th Cir.1980). Very substantial misconduct involving moral turpitude or some breach or some misrepresentation where other creditors were deceived to their damage, *Matter of W.T. Grant,* 4 B.R. 53, 75 (Bkrtcy.S.D.N.Y.1980), *aff'd,* 699 F.2d 599 (2d Cir.1983), quoting *In re Bowman Hardware & Electric Co.,* 67 F.2d 792, 794 (7th Cir.1933), or gross misconduct amounting to overreaching, *Matter of Teltronics, supra,* 29 B.R. at 169, have also brought the doctrine into play. The distinction between "inequitable conduct" and "gross misconduct" is difficult to apply in practice. There are few cases in which gross misconduct has actually been applied to non-insiders, and even fewer where inequitable misconduct has caused a claim to be subordinated.

■ The difficulty with the doctrine of equitable subordination is that its application requires rough justice from us. The goal of the doctrine is not to punish the offending creditor for the wrongful conduct, but rather, is to offset the harm done to other creditors. The doctrine is remedial and not penal. *See, i.e., Trone v. Smith (In re Westgate California Corp.),* 642 F.2d 1174, 1178, 7 BCD 705 (9th Cir.1981); *Matter of Mobile Steel Corp., supra,* 563 F.2d at 701. The facts of this adversary proceeding do not require us to bright line the decree of conduct.

Once inequitable conduct has been found, the next criteria is to determine whether the claimant's conduct resulted in either injury to the debtor or other creditors or in an unfair advantage to the claimant. *Matter of Mobile Steel Corp., supra* 563 F.2d at 700–01. Although the standard of "either injury to the debtor or other creditors" or "unfair advantage to the claimant" is much cited, it is not entirely clear whether the standard is in the conjunctive or disjunctive. *Mobile, supra,* articulates a disjunctive test, *In re Westgate, supra,* puts forth a conjunctive test. We hold that the test should be in the conjunctive because of the "no harm, no foul" rule. For one creditor to have achieved an unfair advantage there must have been a benefit. It must then be shown that such unfair advantage hurt the debtor or its creditors. Without the harm there would be no reason to apply equitable subordination to the claim.

The third criteria is simply a warning which acknowledges a Bankruptcy Court's equitable powers. A Bankruptcy Court is not free to adjust a legally valid claim merely because it perceives an equitable result.

In addition to the above criteria there are other general equitable principles which, in some instances, may serve to limit the application of equitable subordination. A principle that comes to mind is that an equitable remedy should not be applied where the result itself will be inequitable.

Midlantic asks that we subordinate the claims of BWAC and VNB if they have prevailed prior to our reaching the equitable subordination issue. We decline to grant this request. We decline to subordinate VNB's claim because it is unnecessary. We have previously found VNB to be unsecured and thus its priority is well behind that of Midlantic's. We decline to subordinate BWAC's claim because the result would be inequitable.

Before we elaborate on why we will not subordinate BWAC's claim, we must address Midlantic's standing to raise the issue presented. As a general rule, a proceeding to subordinate a claim may be initiated only by a trustee or debtor-in-possession unless a Bankruptcy Court authorizes another party in interest to initiate such a proceeding. *M.H. Gordon & Son, Inc. v. Debtor and Committee of Unsecured Creditors,* 62 B.R. 552, 554 (D.Mass. 1986). *But see, Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises, Inc.),* 779 F.2d 901, 904 (2d Cir.1985) (Creditors' Committees have implied qualified right to initiate, with Bankruptcy Court approval, proceedings in the name of a trustee or debtor-in-possession only when they unjustifiably fail to bring suit.). There is one exception to the general rule.

When a trustee or DIP has not objected to a claim, or has no reason to object to a claim, a creditor may maintain a cause of action with the consent of the Court under § 510(c) where the sole purpose of the action is to subordinate the claim to the objectant's claim. This rule makes practical and legal sense. For any number of reasons a trustee or a DIP may not want to subordinate a claim. But an individual claimant may have been harmed by the conduct of another claimant. To bar the wronged creditor from asserting a § 510(c) action would violate the fundamental concept of equality of distribution under the Code. Moreover, Congress has seen fit to devise a system of interests that should, although not always, bring to a Court's attention inequitable conduct which deserves redress. We hold then that Midlantic has standing to raise the § 510(c) cause of action in this adversary proceeding because the trustee has not pursued it and the relief requested only affects its relationships with BWAC and VNB.

As we concluded earlier there is no doubt that BWAC was reckless in its credit reference to Midlantic. Although we have credibility problems with the reference, and the acceptance of the reference taken, there is no doubt a credit reference was given. The reference should either have provided nothing or it should have provided the entire truth.

Common law fraud in Vermont consists of five elements:

1) misrepresentation;

2) scienter;

3) expectation of influencing conduct;

4) justifiable reliance; and,

5) damage

*Darling v. Stuart*, 63 Vt. 570, 22 A. 634 (1891). Reckless disregard of the truth is fraud. In the matter *sub judice* there is no doubt BWAC provided a credit reference which recklessly disregarded the truth about Mayo's financial situation. Bower knew it was misleading and with her experience in the credit industry she knew that her reference about Mayo would influence Midlantic's, via Yegen, conduct. Midlantic is obviously damaged. By virtue of our conclusion, *supra*, that BWAC has the first priority in the Boat, Midlantic is an unsecured creditor and is damaged to the extent of its loan. But to allow BWAC to be subordinated to Midlantic for a three minute telephone conversation (MB–54), and as it relates to Midlantic's careless and unreasonable conduct, would be inequitable.

There is no doubt Midlantic relied upon the credit reference, but such reliance when compared to the total transaction as a whole was unreasonable. Moreover, Midlantic's own actions contributed to its loss and whatever loss it and BWAC will suffer on this loan.

Midlantic's witnesses testified they made independent evaluations of Mayo's ability to repay the Boat loan. We have found they did not properly review the application, nor did they have the ability to review it. Furthermore, Midlantic's conduct, via Yegen, at the Boat closing does not deserve our protection. We will not refloat the facts here, but the mere independent verification of BWAC's lien would have kept Midlantic out of this dance.

**1.** The decision in this trial is under advisement at the time of the writing of this Memorandum Decision.

**2.** On November 25, 1986, Midlantic moved to amend its amended complaint to add Defendant Larkin on the grounds that Larkin asserted an interest in the Yacht through a counterclaim in

We conclude that Midlantic's claim may not be subordinated to BWAC. Our holding also will deny Midlantic's request for a BWAC accounting of the Boat's proceeds. During the trial we reserved decision on a sanction motion against VNB for failure to produce documents. The result indicate sanctions are not warranted.

An appropriate order will be entered.

### ORDER ON PRIORITY AND EQUITABLE SUBORDINATION

The Court having this day entered its Memorandum of Decision in the above referenced adversary proceeding, now ORDERS:

(1) Borg–Warner Acceptance Corporation is the first security holder in § 541(a) proceeds from the 48 foot Chris–Craft Corinthian.

(2) Midlantic National Bank North, N.A. is second security holder in the above mentioned proceeds from the 48 foot Chris–Craft Corinthian.

(3) Vermont National Bank is unsecured as to the above mentioned proceeds from the 48 foot Chris–Craft Corinthian.

(4) Midlantic National Bank North, N.A. cause of action requesting equitable subordination under 11 U.S.C. § 510(c) is denied.

(5) Midlantic National Bank North, N.A. discovery sanctions are denied.

(6) The Clerk of the Court is directed to enter judgment in accordance with this Order.

### APPENDIX A

### MEMORANDUM DECISION DENYING POST–TRIAL MOTION TO AMEND PLEADINGS TO ADD AFFIRMATIVE DEFENSE

One year after the conclusion of an eight day trial,[1] Defendants VNB and BWAC[2]

an adversary proceeding brought by BWAC against Larkin in a companion bankruptcy case. *See, Borg–Warner Acceptance Corp. v. Larkin Adv.Proc. No. 86–0038 (In re Vermont Custom Boats, Inc., Case No. 86–00143).* Midlantic sought a determination that Larkin either had no interest in the Yacht or, in the alternative, a declaration that Midlantic's perfected security

seek leave to amend their answers[3] to add the affirmative defense of statute of frauds in defense to Midlantic's claim for equitable subordination under 11 U.S.C. § 510(c).[4] Midlantic claims *inter alia*, the Defendants allegedly made oral misrepresentations which fraudulently depicted Debtor's creditworthiness as favorable, and wrongfully induced Midlantic to enter into certain financial transactions with the Debtor concerning a 480 Corintian yacht (the Yacht). We deny Defendants' motions because we hold that the statute of frauds defense is an affirmative defense which must be pled under F.R.Civ.P. 8, otherwise it is waived, and because a State statute of frauds defense is not available as an affirmative defense to the substantive Federal law action under 11 U.S.C. § 510(c).

## PROCEDURAL POSTURE

On October 3, 1986, Midlantic filed a complaint against BWAC, VNB and Vermont Federal Bank (VFB)[5] to determine the validity and priority of conflicting security interests in the Yacht.

Midlantic alleges *inter alia*, that it is a creditor with a valid perfected security interest in the Yacht; Defendants BWAC, VNB, and VFB are or may be creditors with conflicting security interests in the Yacht; and, that it is the only creditor with a valid, perfected security interest in the Yacht. On October 1, 1986, we granted Midlantic and BWAC relief from the automatic stay to repossess and sell the Yacht, with the proceeds to be awarded to the creditor with the senior perfected security interest.

Before the filing of any responsive pleading, on October 24, 1986, Midlantic amended its complaint to reflect that BWAC had repossessed the Yacht and had removed it from our District.[6] Additionally, Midlantic amended its prayer for relief to include a request that BWAC make a complete accounting of expenses and proceeds connected with the repossession and sale of the Yacht.

On October 28, 1986, BWAC answered Midlantic's amended complaint. It denied that any other creditor had or has a securi-

---

interest prevails over whatever interest Larkin may have. Midlantic's motion was heard on January 21, 1987 and was granted based on stipulation of all counsel and for lack of objection from Larkin's counsel. *See, Order* February 1, 1987 confirming January 21, 1987 docket entry. Midlantic filed its "Consolidated Amended Complaint" on January 28, 1987. On February 9, 1987, Larkin's counsel filed an "Acceptance of Service" of Midlantic's "Consolidated Amended Complaint;" however, Larkin never filed an Answer to any of Midlantic's pleadings. Midlantic's counsel represented at the beginning of trial that Larkin's counsel had requested a stipulation of dismissal be prepared by Midlantic. See, May 26, 1987 Transcript page 3; docket entry of May 26, 1987. Although no such stipulation has been filed by Midlantic, we consider Larkin dismissed from this proceeding for lack of any interest in the *res*, and a failure to prosecute.

3. We have jurisdiction to hear this adversary proceeding under 28 U.S.C. § 1334(b). This proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(K). This Opinion constitutes findings of fact and conclusions of law under F.R. Civ.P. 52 as made applicable by Rules of Practice and Procedure in Bankruptcy Rule 7052.

4. 11 U.S.C. § 510, **Subordination**, provides in pertinent parts:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

5. After filing an answer and counterclaim, VFB represented through a November 14, 1986 pretrial statement that it "will not further pursue its claim of an interest" in the Yacht. At a November 17, 1986 pre-trial conference, counsel for BWAC, VNB and Midlantic consented to VFB's withdrawal and, on November 19, 1986, we entered an *Order* which dismissed VFB as a party and barred them from asserting any further interest in the Yacht.

6. F.R.Civ.P. 15 **Amended and Supplemental Pleadings,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7015. F.R.Civ.P. 15(a) **Amendments,** provides in pertinent parts: "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served ..."

ty interest in the Yacht. BWAC raised affirmative defenses that: it has a perfected purchase money security interest in the Yacht; Midlantic should have known that its alleged interest in the Yacht was based on a purported sale and loan to Mayo which in turn was based on a forged invoice; moreover, a certified copy of a master builder's certificate, necessary for title, was obtained by deception; Mayo is not a bona fide purchaser for value of the Yacht; Midlantic has no security interest in the Yacht; Midlantic failed to act in a proper and reasonable commercial manner; and, Midlantic acted in a negligent manner in the advancement of funds to debtor. Further, BWAC counterclaimed against Midlantic by incorporating its affirmative defenses and claimed it suffered and continues to suffer damages as a result of Midlantic's actions in connection with the purported sale and loan to Mayo.

On November 12, 1986, Midlantic filed its amended answer to BWAC's counterclaim and denied each of BWAC's incorporated affirmative defenses. It alleged as its affirmative defenses that BWAC's counterclaim failed to state a claim upon which relief could be granted and that any damage suffered by BWAC was caused or contributed to by Midlantic's own negligence.

On February 9, 1987, Midlantic filed a notice of appearance of its new counsel and, on March 12, 1987, sought to amend its complaint to add equitable subordination claims against VNB and BWAC. After a March 12, 1987 telephone conference, we granted Midlantic's motion to amend. *See, Order* dated March 25, 1987 confirming the March 12, 1987 docket entry granting Midlantic's motion to amend its complaint:

> [t]he Court finds that the claim to be added through Midlantic's motion to amend its complaint is a recognizable cause of action under 11 USC § 510(c) and that there is no undue prejudice to any party to this proceeding as a result of amending Midlantic's complaint to add the equitable subordination claim. Accordingly, Midlantic's Motion to Amend its Complaint to Add Equitable Subordi-

nation Claims Against Borg–Warner and Vermont National Bank is granted.

*Id.,* at page 2.

Pertinent to the matter *sub judice,* Midlantic's "Second Amended Complaint" makes the following allegations under "Count II (Equitable subordination Versus Other Creditors):"

11. During the period beginning about May 25, 1986 and ending with the loan, Yeagen on behalf of Midlantic contacted Borg–Warner Acceptance Corporation and Vermont National Bank to obtain information about the creditworthiness of Rodney S. Mayo. In both instances, Midlantic obtained favorable credit report (sic).

12. Borg–Warner Acceptance Corporation and Vermont National Bank both knew or should have known as of the time they gave their credit reports to Midlantic that Rodney S. Mayo was not a good credit risk. Borg–Warner Acceptance Corporation and Vermont National Bank recognized or should have recognized that Rodney S. Mayo was in financial difficulty about late November or early December, 1985. After that date Borg–Warner Acceptance Corporation made almost no loans to Rodney S. Mayo. On information and belief Borg–Warner Acceptance Corporation rejected additional lines of credit for Rodney S. Mayo. Vermont National Bank placed Mr. Mayo's accounts under almost daily scrutiny.

13. Midlantic relied upon the favorable credit reports from Borg–Warner Acceptance Corporation and Vermont National Bank. On June 25, 1985, Midlantic National Bank lent Rodney S. Mayo the sum of $250,000 to finance the Yacht. This loan would not have been made if Borg–Warner Acceptance Corporation and Vermont National Bank provided accurate and complete information about Rodney S. Mayo's creditworthiness.

14. The actions of Borg–Warner Acceptance Corporation and Vermont National Bank are such that if they hold valid security interests in the Yacht, those interests should be subordinated to

the security interest of Midlantic. In addition, Borg–Warner Acceptance Corporation and Vermont National Bank should be made to pay compensatory and punitive damages to Midlantic under theories such as fraud, negligent credit reporting or unjust enrichment.

*Id.,* at pages 3–4. Midlantic's "Second Amended Complaint" also amended its prayer for relief to include:

(b) subordinate the security interests, if any, of Borg–Warner Acceptance Corporation and Vermont National Bank and declare Midlantic's security interest to be the first valid security interest in the Yacht; ...

(g) award Midlantic such compensatory and punitive damages as are just; ...

*Id.,* at pages 5–6.

VNB filed its answer to Midlantic's "Second Amended Complaint" on March 18, 1987 denying *inter alia,* Midlantic's amended claims for equitable subordination, and added in response to paragraph 12 the following:

12. Denied. Specifically, beginning in August, 1985 and through June, 1986, Vermont National Bank, rather than believing that Rodney S. Mayo and/or Vermont Custom Boats, Inc. were in financial difficulty, continued to advance additional funds and credit to Rodney S. Mayo and/or Vermont Custom Boats, Inc.

*Id.,* at page 2. No affirmative defenses were added by VNB's answer.

On April 2, 1987, VNB filed "Vermont National Bank's Motion In The Alternative To Reconsider Grant Of Amendment Allowing Second Amended Complaint Or To Sever Trial On Equitable Subordination Claim Or For A Continuance." On April 3, 1987, we held a telephone conference *inter alia,* on VNB's motion of April 2, 1986 and entered on the docket our denial of VNB's motion to reconsider or sever Midlantic's equitable subordination claim. We did allow additional time for the parties to prepare their cases. *See, Supplemental Final Pre–Trial Order,* dated April 21, 1987, pages 2–3.

On May 4, 1987, VNB filed a "Motion Of Vermont National Bank To Amend Its Answer To Second Amended Complaint Of Midlantic National Bank/North, NA." This Answer sought leave of Court to correct its April 18, 1987 omission of any affirmative defenses by adding the following affirmative defenses:

1. The Second Amended Complaint of Midlantic National Bank/North, NA fails to state a claim for which relief can be granted.

2. Midlantic National Bank/North, NA lacks standing to seek equitable subordination against Vermont National Bank.

*Id.,* at page 2. A May 12, 1987 docket entry reveals that a "drop dead" Order–Notice on VNB's motion to amend its answer was sent to all persons on a mailing matrix requiring that any objections were to be filed on or before June 11, 1987. No objections were received and VNB's May 4, 1987 amendment adding affirmative defenses was granted. *See* May 20, 1987 *Docket Entry* wherein at VNB's request, a telephone conference was held to confirm the absence of objections to VNB's May 4, 1987 amendment; May 26, 1987 *Order Allowing Second Amended Answer of Vermont National Bank* confirming the May 20, 1987 *Docket Entry.*

On May 20, 1987, BWAC filed its "Answer of Borg–Warner Acceptance Corporation To Second Amended Complaint Of Midlantic National Bank, North, N.A.," which mirrored VNB's second amended answer in material respects and likewise asserted the affirmative defenses of failure to state a claim and lack of standing.

On May 28, 1987, we entered a *Supplemental Pre–Trial Order* setting the matter ready for trial and, by agreement of the parties, ordered pre-trial briefs to aid us on the issues of: equitable subordination under 11 U.S.C. § 510(c); whether Mayo was a buyer in the ordinary course; and, Vermont's license lender statute.

During a trial recess, we permitted discovery to be reopened for the parties to redepose certain witnesses. At the end of eight days of trial, and as the result of a newly discovered document (a loan history

sheet), we kept discovery open pending the outcome of additional discovery and a timely request by the parties desiring an additional trial day for the introduction of additional testimony. When VNB's counsel represented to us by letter dated July 20, 1987 that he had not been contacted by Midlantic's counsel with a request for further depositions by noon of July 8, 1987, as ordered by the Court, post-trial discovery was closed.

On July 18, 1987, Midlantic requested a post-trial reconsideration of our denial of introduction of certain evidence during the trial. On July 20, 1987, Midlantic made a second post-trial motion to supplement one of its exhibits.

VNB opposed Midlantic's post-trial maneuvers and requested that the evidence of this adversary proceeding be closed.

We granted Midlantic's July 20, 1987 motion to supplement its exhibit on July 24, 1987. After a September 2, 1987 hearing among the parties, we denied Midlantic's July 18, 1987 motion to introduce additional evidence and, after numerous extensions by the parties for post-trial merits' briefings, the proceeding was finally taken under advisement on November 23, 1987.

Approximately one year after trial and seven months after the close of evidence, VNB and BWAC filed their respective "Motion To Amend And Supplement Answer"

and "Motion To Amend Answer" on July 25, 1988. Both post-trial motions sought leave of Court to add, under Vermont's Statute of Frauds 12 Vt.Stat.Ann. § 182,[7] a third affirmative defense to Midlantic's claim of fraudulent oral credit reference.

## CLAIMS OF THE PARTIES

VNB and BWAC assert that their post-trial requests to add the affirmative defense of the statute of frauds is proper. We abbreviate and paraphrase their contentions for brevity.

1) It is simply a logical extension of its May 6, 1987 amendment adding F.R. Civ.P. 12(b)(6)[8] "[t]o make it clear that no relief can be granted Plaintiff because 12 V.S.A. § 182 requires that an action brought on a representation or assurance concerning the credit of another person must be in writing, and that no writing bearing the signature of any agent of the bank was ever produced, and that, therefore, Plaintiff's action is barred by § 182." (VNB's July 25, 1988 "Motion To Amend And Supplement Answer," page 2);

2) F.R.Civ.P. 15(a)[9] applies because "[e]xtensive discovery and testimony concerning the alleged credit reference giving rise to Plaintiff's claim of equitable subordination was had, and at no time did Plaintiff produce or otherwise enter into evidence any writing signed by an

---

7. 12 Vt.Stat.Ann. § 182 **Representations as to another,** provides:

> An action shall not be brought to charge a person upon or by reason of a representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of another person, unless such representation or assurance is made in writing and signed by the party be charged thereby, or by some person thereunto by him lawfully authorized.

8. F.R.Civ.P. 12 **Defenses and Objections— When and How Presented—By Pleading or Motion—Motion For Judgment on Pleadings,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7012. F.R.Civ.P. 12 provides in pertinent parts:

> **(b) How Presented.** Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the

pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted

...

> **(h) Waiver or Preservation of Certain Defenses.**
>
> . . . . .
>
> (2) A defense of failure to state a claim upon which relief can be granted ... may be made in any pleading permitted or ordered under Rule 7(a), or by motion for judgment of the pleadings, or at the trial on the merits.

9. F.R.Civ.P. 15 **Amended and Supplemental Pleadings,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7015. F.R.Civ.P. 15 provides in pertinent parts:

> **(a) Amendments.** ... Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

agent of the bank. Section § 182 clearly requires that such a writing must be produced before an action on the credit reference may be brought ..." (VNB's July 25, 1988 "Motion To Amend And Supplement Answer," page 2);

3) VNB has not waived the defense allowed to it by § 182 because the issue whether or not a credit reference was given and was accurate was subject to extensive testimony and, therefore, F.R. Civ.P. 15(b) [10] applies. "Since there is extensive testimony concerning the alleged credit reference, and since Plaintiff was given every opportunity to produce and have admitted a writing signed by an agent of the Bank, Rule 15(b) provides a clear basis for allowing the amendment ..." (VNB's July 25, 1988 "Motion To Amend And Supplement Answer," page 3; accord, BWAC's July 25, 1988 "Motion To Amend Answer," pages 1–2); and,

4) Plaintiff is unable to demonstrate prejudice under F.R.Civ.P. 15 [11] by the requested amendment because the amendment should provide the Court with a sufficient basis to rule in its favor based on Midlantic's failure to state a cause of action and by Midlantic having had ample opportunity to produce evidence of writing, but was unable to do so. The requested amendment requires no new evidence to meet this affirmative defense. (VNB's July 25, 1988 "Motion To Amend And Supplement Answer,"

pages 3–4; See also, BWAC's July 25, 1988 "Motion To Amend Answer," page 2).

Midlantic counters on July 28, 1988 with its "Memorandum In Opposition To Motions By Borg–Warner Acceptance Corporation And Vermont National Bank To Amend Answers." We abbreviate and paraphrase their assertions for brevity.

1) VNB and BWAC waived their newly discovered post-trial defense of statute of frauds because such a defense is a waivable evidentiary matter and, as such, was in fact waived either by their untimely failure to plead the affirmative defense or, even if timely pled, no objection was made prior to the Court's receipt of extensive testimony concerning the existence of an oral credit reference. (*Id.*, at pages 3–5);

2) Had the statute of frauds defense been either pled prior to trial or timely interposed as an objection to testimony offered to show that BWAC and VNB had fraudulently misrepresented the creditworthiness of the Debtor, Midlantic would have had the opportunity to have structured its case to have shown: "(1) The fraud committed by defendants (VNB and BWAC) is not within the ambit of the statute (*e.g.* the courts will not apply the statute to shield actual fraud; 73 AM.Jur.2d *Statute of Frauds* §§ 562–569) and (2) the facts of this case preclude the application of the doctrine in the context of the subordination provisions of the Federal Bankruptcy Act (*e.g.*

---

10. F.R.Civ.P. 15 **Amended and Supplemental Pleadings,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7015. F.R.Civ.P. 15, provides in pertinent parts:

 (b) **Amendments To Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues ...

11. F.R.Civ.P. 15 **Amended and Supplemental Pleadings,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7015. F.R.Civ.P. 15(b), provides in pertinent parts:

 (b) **Amendments To Conform to the Evidence.** ... If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The Court may grant a continuance to enable the objecting party to meet such evidence.

the interplay of federal bankruptcy law under 11 U.S.C. § 510(c) and state law) ... will have substantially prejudiced Midlantic in the presentation of its own case. This is precisely what the doctrine of waiver was designed to prevent." (*Id.*, at pages 5–6; parathetical supplied for clarity); and,

3) In the event this Court does not find a waiver by the defendants and is inclined to permit their amendments, Midlantic requests a continuance to review the transcripts, conduct additional research, submit additional memoranda, and, if needed, request the record be opened for the receipt of additional evidence before making a determination on the Defendants' amendments. (*Id.*, at pages 6–7).

A hearing was held, on August 22, 1988, on VNB's and BWAC's motions for amendments and a briefing schedule was set for additional memoranda of law. Upon receipt of the memoranda, the motions to amend were taken under advisement.

Midlantic's "Memorandum In Further Opposition To The Motion By Vermont National Bank And Borg–Warner To Amend Answers" expounded its earlier arguments on waiver and that the statute of frauds may not be used to further fraud, and raised the following summarized additional points:

1) Vermont's statute of frauds, 12 Vt. Stat.Ann. § 182, is inapplicable because VNB and BWAC intended their telephonic credit references to be acted on in New Jersey where it was ultimately received by Midlantic's agent. BWAC called New Jersey from Florida and, though the present record reveals less direct evidence of VNB's intentions concerning where its reference would be acted on, VNB called Vermont knowing the loan practices of Midlantic's New Jersey agent. The law of either New Jersey or Florida provide the appropriate choice of law. Neither Florida nor New Jersey have an equivalent statute to Vermont's statute of frauds. Thus, the proposed amendments are moot because the de-

fense is not available to the Defendants. (*Id.*, pages 1–3);

2) Although there are no Vermont cases construing 12 Vt.Stat.Ann. § 182, other States with similar statutes declare its evidentiary bar to oral credit references to be inapplicable where the person making the representation intended to benefit from making the reference. Other States recognize that statutes like 12 Vt. Stat.Ann. § 182 are to be narrowly construed. The facts of the proceeding *sub judice*, clearly reveal both VNB and BWAC were desirous of having Midlantic finance the Yacht to remove their respective financial difficulties with the Debtor. (*Id.*, at pages 6–7);

3) Midlantic's claim for equitable subordination under 11 U.S.C. § 510(c) is a matter of Federal law. Bankruptcy Courts applying substantive Federal law are not bound by State statutes relating to the manner in which evidence is presented. (*Id.*, at page 7);

4) If the Court were to allow the amendments, Midlantic would be prejudiced in several ways, including: if Midlantic had notice that the statute was to be part of the defendants' case, extensive discovery and presentation of evidence would have been had to demonstrate defendants' knowledge and intent that their references would be acted on in a non-statute State; decisions regarding discovery were not made with the statute's applicability in mind; and, evidence, including expert testimony, would have been presented to better establish the statute's unavailability due to the benefit defendants anticipated from their fraud. (*Id.*, at pages 8–10).

VNB and BWAC respectively, countered with their "Reply Memorandum In Support Of Motion To Amend And Supplement Answer." We abbreviate and paraphrase them for brevity.

1) Either the law of Vermont or Massachusetts (which has a similar credit reference statute) supplies the appropriate choice of law because VNB's reference was made by a telephone call from Vermont to Midlantic's agent (Yeagen Marine) in Massachusetts. There is no evi-

dence that VNB intended its reference to operate or be acted on in New Jersey. Moreover, Vermont provides the applicable choice of law rule because it is the State with the most significant relationship to the transactions, *i.e.,* Vermont is the place where: Midlantic's agent's (Yeagen Marine) loan application and contract with the Debtor was signed; Midlantic's closing took place; and, VNB's references were given. (*Id.,* VNB at pages 1–4; BWAC at pages 3–4);

2) F.R.Civ.P. 15(a) qualifies the waiver provisions in F.R.Civ.P. 8(c) [12] by permitting a party to seek leave of court to amend its pleadings "and leave shall be freely given when justice so requires." F.R.Civ.P. 15(a). To deny the applicability of 12 Vt.Stat.Ann. § 182 would be "[t]o work on (sic) an injustice and ignore the important commercial policy policy (sic) that this State (Vermont) has sought to preserve.... One who relies on oral credit references do (sic) so at his or her own risk; (sic) the courts are not drawn in (sic) the ticklish business of reconstructing potentially complex oral commercial conversations, perhaps years after they occurred (sic) and attaching heavy consequences to their nuances." (*Id.,* VNB at page 5; paratheticals supplied). Midlantic is unable to demonstrate any undue prejudice because the record need not be reopened for further evidence where the evidence that could change the outcome of the statute's application, *i.e.* a written and signed credit reference, does not exist. Lastly, VNB's failure to object to the receipt of evidence should not prevent this Court from permitting an amendment in the absence of prejudice. (*Id.,* VNB at pages 4–8; BWAC at pages 1–3);

3) Vermont's statute of fraud applies to Midlantic's Federal cause of action of equitable subordination because the statute "[e]ither bars or allows a claim and,

thus, is a substantive rule of law. Therefore, the Vermont rule of decision, here 12 V.S.A. § 182, does apply to an equitable subordination action in federal court." (*Id.,* VNB at page 10).

## DISCUSSION

1. F.R.Civ.P. Rules 8(c) and 15.

F.R.Civ.P. 8(c) commands a party to set forth affirmatively any matter constituting an avoidance or affirmative defense which properly defends an action brought against it, and if not pled, the defense is waived and excluded from the case.

> The rule is intended to notify a party of the existence of certain issues, and its mandatory language has impelled us to conclude that a party's failure to plead an affirmative defense bars its invocation at later stages of the litigation.

*Doubleday & Company, Inc. v. Curtis,* 763 F.2d 495, 503 (2d Cir.1985), *cert. dismissed on other grounds,* 474 U.S. 912, 106 S.Ct. 282, 88 L.Ed.2d 247 (1985), *citing Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) ("Failure to plead an affirmative defense in the answer results in 'the waiver of that defense and its exclusion from the case.'" *Id.,* citing 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1278, at 339 (1969)).

> If an affirmative defense is not pleaded it is waived to the extent that the party who should have pleaded the affirmative defense may not introduce evidence in support thereof, unless the adverse party makes no objection in which case the issues are enlarged, or unless an amendment to set forth the affirmative defense is properly made. Where the court makes a pretrial order preserving an affirmative defense, the failure to plead the defense will not be a waiver.

2A *Moore's Federal Practice* § 8.27(3), at pages 8–182–8–188 (2d Ed.1985) (footnotes omitted).

**12.** F.R.Civ.P. 8 **General Rules of Pleading,** is made applicable to this proceeding by Rules of Practice and Procedure in Bankruptcy Rule 7008(a). F.R.Civ.P. 8(c) provides in pertinent parts:

**(c) Affirmative Defenses.** In pleadings to a preceding pleading, a party shall set forth affirmatively ... statute of frauds ... and any other matter constituting an avoidance or affirmative defense.

The rule that a party must plead an affirmative defense or risk losing it is indispensable to the concept of fundamental procedural due process which is embodied in the Federal Rules of Civil Procedure. Parties must give fair notice to their adversaries of their claims and defenses to provide them with a meaningful opportunity to meet and defend those actions. Such notice is requisite to the design of a full discourse of all meritorious matters before the matter is taken under advisement, or decided by a jury.

Of course, if a party expressly pleads a claim or an affirmative defense, the claim or affirmative defense is properly part of the case irrespective of whether competent evidence is received with or without objection in support of either. If a party does not expressly plead a claim or an affirmative defense and competent evidence is received without a sustained objection, a later amendment may conform the pleading to the evidence. If a party fails to raise an affirmative defense in response to a properly pled claim supported by evidence produced at trial, the unpled affirmative defense is lost and may not be raised by subsequent post-trial motion. Likewise, if an unpled claim enters the case and is supported by competent and unobjected evidence, the claim becomes part of the case. Any affirmative defenses to the unpled claims are lost if the defense is not timely raised and supported by evidence.

Moreover, if either a claim or an affirmative defense is not pled and no evidence is received or its objection is sustained, a Court may not raise it, *sua sponte* or after a trial on the merits, without the consent of all parties. Indeed, in *Doubleday, supra,* the Second Circuit reversed the District Court for transgressing this fundamental rule when it raised an affirmative defense *sua sponte* in the absence of implicit consent from the parties that the defense was part of the trial:

> Among the cardinal principles of our Anglo–American system of justice is the notion that the legal parameters of a given dispute are framed by the positions advanced by the adversaries, and may not be expanded sua sponte by the trial judge. The dismissal of Doubleday's claim based on an issue never pleaded by Curtis—or even implicitly raised at trial—is inconsistent with the due process concerns of adequate notice and an opportunity to be heard.

*Id.,* 763 F.2d at 502. *Accord, Davis v. Bryan,* 810 F.2d 42, 44 (2d Cir.1987) ("If a defendant fails to assert the statute of limitations defense, the district court ordinarily should not raise it *sua sponte.*"); *Satchell v. Dilworth,* 745 F.2d 781, 784–785 (2d Cir.1984) (a general denial will not permit a Court to dispose of proceeding on an affirmative defense *sua sponte* ); *Jackson v. Seaboard Coastline R.R. Co.,* 678 F.2d 992, 1010–11 (11th Cir.1982); *In re J.B. Lovell Corp.,* 88 B.R. 459, 463 (Bkrtcy.N.D. Ga.1988) *citing* 5 C. Wright & A. Miller, *Federal Practice & Procedure,* § 1278 at 343 (1969). Thus, although this Court was aware of 12 Vt.Stat.Ann. § 182, it is clear we could not raise it *sua sponte.*

If the unpled affirmative defense in question is actually tried by implicit consent of all the parties, it may be later made to conform. F.R.Civ.P. 15(b).

Failure of a party to make a timely objection to the Court's receipt of evidence may give rise to an implied consent of the parties that the unpled issue is properly before the Court:

> Usually consent to the trial of an unpleaded issue is implied from a party's failure to object *at trial* to the introduction of evidence relevant to the unpleaded issue.

*Usery v. Marquette Cement MFG. Co.,* 568 F.2d 902, 906 (2d Cir.1977) (emphasis in original). *Accord, Dalbec v. Gentlemen's Companion, Inc.,* 828 F.2d 921, 929 (2d Cir.1987).

> Failure to plead matter which constitutes an affirmative defense does not, however, preclude a party from taking advantage of the opposing party's proof, if such proof establishes the defense.

2A *Moore's Federal Practice* § 8.27(3), at page 8–189 (2d Ed.1985) (footnotes omitted). But we think such an advantage is

available only if the proof goes to a substantive issue and not to a procedural one.

Like the failure to timely object to the receipt of evidence giving rise to a claim or an affirmative defense, implicit consent by all parties to the actual disposition of the unpled defense must be a knowing one before a Court may properly find a waiver to an objection that the defense may not be raised had occurred. This waiver must be based on true consent and is not to be lightly inferred from the mere fact that certain evidence relating to the issues raised in the pleadings and pretrial order may have been relevant to the omitted defense. The evidence must have been intended by the parties to go to the claim or affirmative defense:

> In any event, whether parties have implicitly consented to trial of an issue not presented by the pleadings depends on whether they recognized that the issue had entered the case at trial.

*Luria Brothers & Co., Inc. v. Alliance Assurance Co., Ltd.,* 780 F.2d 1082, 1089 (2d Cir.1986). *Accord, Doubleday, supra* 763 F.2d at 502; *Jackobsen v. Massachusetts Port Authority,* 520 F.2d 810 (1st Cir.1975) (mere receipt of some evidence relevant to an unpled defense as well as to other issues in the case is not sufficient to permit a late Rule 15(b) amendment).

> Although leave to amend pleadings should be freely given when justice requires, the trial judge's discretion is broad and its sound exercise usually depends on the presence or absence of such factors as 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, etc.' *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 ... In a motion under rule 15(b) to amend the complaint to conform to proof, the most important question is whether the new issues were tried by the parties' express or implied consent and whether the defendant 'would be prejudice by the implied amendment, i.e., whether he had a fair opportunity to defend and whether

he could offer any additional evidence if the case were to be retried on a different theory.' 3 Moore's Federal Practice § 15.13[2], at 993 (2d ed. 1966); ... The purpose of Rule 15(b) is to allow the pleadings to conform to issues actually tried not to extend the pleadings to introduce issues inferentially suggested by incidental evidence in the record....

*Browning Debenture Holders' Committee v. Dasa Corp.,* 560 F.2d 1078, 1086 (2d Cir.1977) (citations omitted).

We are asked to decide whether a negative inference, created by the evidentiary absence of a written credit reference, will give rise to the implicit consent exception under conforming Rule 15(b), and thus excuse the Rule 8(c) requirement that the affirmative defense of statute of frauds be pled in response to a properly pled claim.

We are inclined to answer the question in the negative simply because we believe defendants' untimeliness requires it as a matter of procedural due process. Moreover, we believe the amendment unduly prejudices Midlantic. We heard the evidence and read the pleadings and memoranda of law, and we have no doubt that Midlantic framed its position(s) in reliance upon the pleadings of its opponents. Nowhere in the record do we see a defense based upon a writing. And although the Federal Rules reflect a trend towards liberal pleading, they do not presage the requirement of reasonable notice about major issues to be raised. In this instance, Midlantic had no reason to know the issue of a written credit reference would be raised because, as the parties know, and the evidence shows, there was no written reference. In our view as the trier of fact, the raising of the requirement of a writing is of such fundamental importance to the conduct of this litigation that both Midlantic and the Court should not be forced to forego the advance notice required under F.R.Civ.P. 8(c). A procedural waiver of a State law defense is a question of Federal law. Clearly, the total record in this case shows VNB and BWAC waived it. They waived it not only in their pleadings, but also during the trial.

We have other reasons for our denial of VNB's and BWAC's motions. Our analysis below shows that Vermont's common law, by analogy to Vermont's Statute of Fraud, 12 Vt.Stat.Ann. § 182, is a rule of evidence. It does not interfere with the substance of the credit representation, but rather, it throws a roadblock onto the evidence highway.

Our other and final reason for denial goes to the cause of action raised by Midlantic—equitable subordination. Waiver of a State law defense is a question of Federal law under F.R.Civ.P. 8. Clearly, the total record in this case shows VNB and BWAC waived it. They waived it not only in their pleadings, but also during the trial. And further, the defense, even if it was available, would not encompass the lower standard of inequitable conduct required to be shown to prove an equitable subordination count.

To ensure an understanding of our holding, we must analyze in the nature of the cause of action and its relationship with the statute of frauds, *i.e.,* is it a necessary element to the cause or is it a mere affirmative defense. We also have to decide the applicable State choice of law to determine whether a credit representation is actionable and if it need be in writing, and if so, whether that State policy regarding this writing requirement is a mere rule of evidence and waivable as a matter of procedure, or substantive and therefore a nonwaivable and necessary element to the cause of action.

2. The Cause of Action and the Statute of Frauds.

A false recommendation about a third person's credit, with knowledge that it is untrue, and with intent to gain credit for the third person, is fraud for which the party giving it may be held liable:

No individual can be held responsible for a statement of facts, however injurious they may be to an individual or company. But when there is a misstatement of facts in regard to the pecuniary ability of an individual or company, and especially

if this be done through interested motives or fraudulent intent, by reason of which a credit is given and the debt is lost, the facts which conduce to establish the liability must, as in this case, be outside of the writing. And if these facts may not be established by parol evidence, there can be no remedy in such cases, however gross the fraud or ruinous the consequences may be.

*Iasigi v. Brown,* 17 How. 183, 58 U.S. 183, 15 L.Ed 208, 212 (1855).

A positive assertion of a third person's solvency with intent to induce a prospective creditor to extend credit by a maker who either holds himself out as having such knowledge or, by reasons of the maker's position with the third person, ought to have known, and was fairly supposed by the creditor to have known the third person's true financial condition, renders the maker liable. *See, Clopton v. Cozart,* 13 Smedes & M. 363, 368–69 (Miss.1850). It is not necessary that the misrepresentation be the sole inducement of the extension of credit, nor is it necessary that the person giving the false affirmation gained a benefit:

Liability grows out of the fact that the plaintiff has been misled to his prejudice, and not that the plaintiff has profited by his wrong. An actual motive to do injury to the plaintiff is not essential, but if a false representation is made with knowledge of its falsity, the intent to deceive is presumed.... It is not necessary to show that the defendant acted from motives of personal advantage ... and the fact that he actually gains nothing by the deception is not controlling....

*McDonald v. McNeil,* 92 Vt. 356, 358, 104 A. 337 (1918) (citations omitted). *See,* 77 ALR3d 6, *Liability of Bank, To other than Party Whose Financial Condition is Misrepresented, For Erroneous Credit Information Furnished By Bank or its Directors, Officers, or Employees,* § 4(a) at page 35 (Supp.1988).

As explained by the Third Circuit in *Cooper Process Co. v. Chicago Bonding & Ins. Co.,* 262 F. 66 (3d Cir.1920), there are two types of fraud by concealment, one active

and the other passive. Passive concealment requires that there be some affirmative duty to disclose facts to another to which the latter is entitled to know:

> Fraud may be committed by the suppression of truth as well as by the suggestion of falsehood.... But the law distinguishes between passive concealment and active concealment, the distinction being that in active concealment there is implied a purpose or design. As a general rule, to constitute fraud by concealment or suppression of the truth there must be something more than mere silence, or a mere failure to disclose known facts. There must be some occasion or some circumstance which imposes on one person the legal duty to speak, in order that another dealing with him may be placed on an equal footing. Then a failure to state a material fact is equivalent to concealment of the fact and amounts to fraud equally with an affirmative falsehood.

*Id.*, 262 F. at 73 (3d Cir.1920). *Accord, Sutfin v. Southworth*, 149 Vt. 67, 539 A.2d 986 (1987); *Cushman v. Kirby*, 148 Vt. 571, 536 A.2d 550 (1987) (negative deceit as a fraud occurs where one has assumed a duty to speak and conceals material facts); *Crompton v. Beedle*, 83 Vt. 287, 75 A. 331 (1910); *Commercial Nat. Bank of Peoria v. F.D.I.C.*, 131 Ill.App.3d 977, 87 Ill.Dec. 107, 111, 476 N.E.2d 809, 813 (3d Dist. 1985).

In the absence of contractual privity, an individual is not bound to answer inquiries from a prospective creditor about the solvency of a third person, but having undertaken to do so, the law will imposes a duty to speak truthfully and to express all material facts within that party's knowledge concerning a customer's creditworthiness:

> It is well settled that where the other requisite elements of actionable fraud are present, false and fraudulent representations made to one contemplating business transactions or negotiations with a third person, concerning the financial status, solvency, or credit of such third person, constitute misrepresentations which may form the basis for actionable fraud. While one of whom inquires as to the financial standing or reputation of a third person are made has his option to answer or not and may refuse to give any information on the subject, yet if he undertakes to do so, he must answer according to the truth as far as he knows.

37 Am Jur 2d *Fraud and Deceit*, § 137 at 187 (1968) (footnotes omitted).

Once undertaken, the duty to speak is complete, and one professing to have an answer to an inquiry can not pick and choose to disclose only those facts which are likely to result in the extension of credit, because:

> To tell half a truth has been declared to be equivalent (sic) to the concealment of the other half. A partial and fragmentary disclosure, accompanied by the willful concealment of material and qualifying facts is not a true statement, and is as much fraud as an actual misrepresentation, which, in effect, it is.

*Jackson Co. v. Faulkner*, 55 Ala.App. 354, 315 So.2d 591, 600 (1975) *quoting American Bonding Co. of Baltimore v. Fourth National Bank*, 206 Ala. 639, 641, 91 So. 480, 482–83 (1921).

The English case of *Hedley Bryne & Co., Ltd. v. Heller & Partners, Ltd.*, 2 All E.R. 575; 3 W.L.R. 101; 107 Sol.Jo. 454; 1 Lloyd's Rep. 485 (1963), dealt with a negligent answer by a banker to an inquiry about the creditworthiness of a customer and the duty to speak once a relationship is established in which the banker knows that the inquirer is relying on the fact that the banker has superior information. Lord Reid commented:

> A reasonable man, knowing that he was being trusted or that his skill and judgment were being relied on, would, I think, have three courses open to him. He could keep silent or decline to give the information or advice sought: or he could give an answer with a clear qualification that he accepted no responsibility for it or that it was given without that reflection or inquiry which a careful answer would require: or he could simply

answer without any such qualification. If he chooses to adopt the last course he must, I think, be held to have accepted some responsibility for his answer being carefully (sic), or to have accepted a relationship with the inquirer which requires him to exercise such care as the circumstances require.

*Id.,* 2 All E.R. at 583.

History provides the rationale for the passage of a specific statute of frauds requiring such misrepresentations be in writing. The English case of *Pasley v. Freeman,* 3 T.R. 51, 100 Eng.Reprint 450, 12 ERC 235 (1789), is credited as the genesis of the common law tort of misrepresentation of another's creditworthiness.

The decision in *Pasley v. Freeman,* 3 Term R. 51, ... in that case that a false affirmation made by the defendant concerning the credit of another with intent to deceive and defraud the plaintiff is the ground of an action on the case in the nature of deceit, and that it is not necessary that the defendant's purpose should have been to benefit himself. This was supposed by some to be an evasion of the statute of frauds, in that it permitted actions upon verbal representations while prohibiting actions upon verbal promises to pay another's debt.

*Nevada Bank of San Francisco v. Portland Nat. Bank,* 59 F. 338 (Circuit Court D.Or.1893).

In *Pasley,* Justice Ashurst (Justice Gross, having led with an opinion for the defendant; the other judges gave full and separate opinions) in replying to the argument that an action for the tort of misrepresentation as to financial condition or credit of third person might be brought against anyone for telling a lie by the crediting of which another sustained damage, said:

'No; for in order to make it actionable, it must be accompanied with the circumstances averred in the count, namely: that the defendant, intending to deceive and defraud the plaintiff, did deceitfully encourage and persuade them to do the act, and for the purpose made the false affirmation, in consequence of which they did the act.' And Lord Kenyon said two grounds of the accusations concur: 'The plaintiffs applied to the defendant, telling him that they were going to deal with Falch, and desiring to be informed of his credit, when the defendant fraudulently, and knowing it to be otherwise, and with a design to deceive the plaintiffs, made the false affirmation which is stated on the record, by which they sustained a considerable damage.'

*Iasigi v. Brown,* 17 How. 183, 58 U.S. 183, 15 L.Ed 208, 213 (1855) (Justice Campbell dissenting *quoting Pasley v. Freeman,* 3 T.R. 51).

The passage by the English Parliament of Lord Tenterden's Act, forerunner of the present day statute of frauds' bar to liability for false or fraudulent oral representation as to another's credit, was said to be in direct response to the criticism of the *Pasley* decision as it was then perceived to have had created a loophole in the writing requirements of the suretyship provisions of their statute of frauds by permitting the evasive practice of pleading the tort of oral misrepresentation:

It soon became a matter of course for lawyers to camouflage a suretyship claim as a deceit action in order (sic) take advantage of the *Pasley* case doctrine. To put an end to this practice, Parliament enacted the amendment introduced by Lord Tenterden to the statute of frauds.

*Brock & Davis Co., Inc. v. Charleston Nat. Bank,* 443 F.Supp. 1175, 1179 (S.D.W. Va.1977), *citing, W.B. Anderson & Sons v. Rhodes,* 2 All E.R. 850, 862 (1967) (Liverpool Assizes).

By Lord Tenterden's Act it was declared that representations concerning the credit of another should not be actionable unless in writing, and signed by the party making the same:

It is well recognized at common law that misrepresentations by the defendant as to the financial standing or credit of a third person may render him liable in an action for fraud and deceit for the damages resulting to the plaintiff who in reliance on such misrepresentations ex-

tends credit to such third person. Dissatisfaction with this rule led in England to the enactment in 1828 of the Act of Geo. IV, c. 14, generally known as 'Lord Tenterden's Act,' section 6 of which provided that 'no action shall be brought after the first of January, 1829, to charge any person, upon or by reason of any representation or assurance made or given, concerning or relating to the conduct, credit, ability, trade or dealings of any other person, to the intent or purpose that such other person may obtain credit, money or goods (there) upon unless such representation or assurance be made in writing signed by the party to be charged therewith....' The provisions are designed to prevent frauds, and should be so construed as to accomplish that purpose, but by the same token they are to be strictly construed to prevent them from operating as a protection to fraud....

72 Am Jur 2d § 172 *Statute of Frauds, Representations as to Character or Credit, Generally,* at pages 700–701 (1974) (Supp.1988) (footnotes omitted). *See,* 32 ALR2d 743 *Construction of statute requiring representations as to credit, etc., of another to be in writing,* § 1 at 745.

Seven years after the passage of the Lord Tenterden's Act and presumably prior to the passage of 12 Vt.Stat.Ann. § 182, the Vermont Supreme Court followed the English *Pasley* decision in the case of *Ewins v. Calhoun,* 7 Vt. 79 (1835).

*Ewins* involved a plaintiff who had a conversation with the defendant and the prospective buyer of plaintiff's horse. Plaintiff, not knowing the buyer's circumstances and whether he had the ability to pay the full $200.00 for the horse, refused to trust the buyer with the horse or take a promissory note of $70.00 in part payment unless he was assured the buyer possessed a sufficient ability to pay the sum owing. The defendant, knowing the buyer did not have sufficient financial ability, was wholly insolvent, and never intended to pay the plaintiff, falsely and fraudulently represented to the plaintiff that the buyer was a person of interest; had sufficient ability to pay the sum; and, that plaintiff need not be afraid to extend credit. Based on the representations of the defendant, plaintiff gave partial credit to the buyer. The buyer absconded with the horse.

The *Pasley* cause of action for deceit became part of Vermont's Common Law when in *Ewins:*

In the case of *Pasley vs. Freeman,* 3 T.R. 51, which was very like this case, ... To the objection there taken, that the action was new, Ashurst, J., (English) said it was not new in the principle, but only in the instance; and to the objection, that to support the action of deceit not only one party must lose but the other make, he says it is the more diabolical to lie without the temptation of gain, and the gist is the injury done to the plaintiff; and he thought that one great reason why actions had not before been brought against those not interested in the fraud was, that others would not be likely to be concerned in such practice; and it may be added, if they were interested, it would in most cases be impossible to prove it. That case was, we think decided upon the soundest principles of justice and common honesty, ... we adopt it as the law of this land, and for the reasons I refer to the case (*Pasley*) in the Term Reports.

*Id.,* 7 Vt. at 82–83; (parentheticals supplied for clarity).

During the same term as *Ewins,* the Vermont Supreme Court followed *Ewins* and again *Pasley* in *Weeks v. Burton,* 7 Vt. 67 (1835). In *Weeks,* also involving a sale of a horse in exchange for a note, the Court upheld a trial court's instruction to the jury that defendant's declaration that the buyer's note was good was tantamount to saying the buyer was amply responsible. The Weeks' Court stated the elements like this:

To maintain it, the plaintiff must have proved the representations made by the defendant in relation to the note against Baker (buyer), the falsity of those representations, the knowledge of the defendant in relation to the falsity, and that

the plaintiff sold the horse and took the note on the faith of those representations, and was thereby deceived.

*Id.*, 7 Vt. at 70; (parenthetical supplied for clarity).

Thus, the elements of this cause of action are:

> Generally, a plaintiff seeking to maintain a cause of action for fraud or deceit against the bank must allege and prove the following factors: (1) a misrepresentation or an omission of a (2) material (3) fact; (4) knowledge or belief on the part of the bank (or those of its personnel for whom the bank is deemed legally responsible) that the representation is false, misleading, or incomplete; (5) an intention to induce the plaintiff to act or refrain from acting in reliance on thee representation; and (6) justifiable or reasonable (7) reliance to the plaintiff's (8) detriment. For a cause of action based upon negligent misrepresentation, the scienter element (factor four, supra) becomes speaking about the other party's creditworthiness in a reckless or negligent manner.

77 ALR3d 6, *Liability of Bank, To other than Party Whose Financial Condition is Misrepresented, For Erroneous Credit Information Furnished By Bank or its Directors, Officers, or Employees,* § 2(a) at page 14 (Supp.1988).

The question we face is whether there is a requirement that VNB's and BWAC's representations be in writing, and if so is it a rule of evidence and waivable, or is it a substantive modification of the common law requiring a writing signed by the party to be charged as one of its essential elements. The determination of which State's policy, or if a State without a similar statute of limitations, will govern here, is a matter of conflict of laws.

### 3. Choice of Law and Conflict of Laws.

When faced with issues invoking the interplay of State substantive law and Federal procedural rules in regard to the scope of affirmative defenses, applicable State substantive law determines whether a particular defense is, an affirmative defense, but concomitantly, the Federal Rules of Civil Procedure determine its procedural applicability, that is, is the defense required to be pled affirmatively, timely raised, amendable to a prior answer, or waived. *See, Santos v. District Council of New York City, etc,* 619 F.2d 963, 967 (2d Cir.1980) ("A District Court is obliged to look to the Federal Rules of Civil Procedure to determine whether defenses to an action have been raised in a timely manner ...."); *Taylor v. U.S.,* 821 F.2d 1428, 1432–33 (9th Cir.1987) *cert. denied* 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988); *Troxler v. Owens–Illinois Inc.,* 717 F.2d 530, 532 (11th Cir.1983) (nature of defenses in diversity suit determined by State law); 2A *Moore's Federal Practice* § 8.27[3], at pages 8–182–8–183 (2d Ed.1985) (footnotes omitted).

The components of actionable fraudulent oral misrepresentation of another's creditworthiness are a matter of substantive law and are to be determined by State law where the Federal Court presides. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). This includes the conflict of laws' principles that would have been applied by the State in determining whether the laws of a sister State should apply. *See, Klaxon v. Stentor Electric Mfg. Co., Inc.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

The prevailing view is that the statute of frauds, like a parole evidence rule, is a substantive rule of evidence for choice of law and *Erie* purposes. 19 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 4512 at 195 (1982). *See, Lehman v. Dow Jones & Co., Inc.,* 606 F.Supp. 1152, 1156 (S.D.N.Y.1985) *aff'd in part and rev'd in part,* 783 F.2d 285, 289–90 (2d Cir.1986) (Second Circuit implicitly agreed with District Court's holding that the statute of frauds is substantive when they approved of the District Court's application of State choice of law rule to determine which State's statute of frauds applied).

In *Iasigi v. Brown,* 17 How. 183, 58 U.S. 183, 15 L.Ed. 208, 213 (1855), the Supreme Court was confronted with a Massachu-

setts statute similar to Vermont's § 182 and reversed a Massachusetts District Court's jury instruction that evidence of a New York defendant's false representation about the credit of a third party made to a Massachusetts' plaintiff was insufficient as a matter of law.

In *Montello Oil Corp. v. Apex Oil Co.*, 571 F.Supp. 389, 390 (E.D.Mo.1983), the Missouri District Court applied the choice of law of New Jersey as the place where the plaintiff had originally filed its action for oral misrepresentation of valid credit risk, and, held New Jersey's governmental interest approach to choice of law problems required the more stringent law of Missouri be applied to prohibit the action for lack of writing because "Missouri was the State where the alleged misrepresentation took place, as well as the principal place of business and state of incorporation of the alleged wrongdoer." *Id.*, 571 F.Supp. at 391.

In *Tenna Mfg. Co. v. Columbia Union Nat. Bank*, 484 F.Supp. 1214, 1219 (W.D. Mo.1980), the Court applied Missouri's statute of frauds as the applicable choice of law where an Ohio seller telephoned a Missouri bank and obtained false credit information of another because "[u]nder such circumstances the parties 'could reasonably expect Missouri law to apply.'" *Id.*, 484 F.Supp. at 1219; (citation omitted). Further supporting the choice of Missouri law was the fact that the Ohio party contacted the Missouri party by telephone, thus using the telephone as a substitute for coming to Missouri to seek credit information. Under such circumstances the parties could reasonably expect Missouri law to apply.

In *Emery Corp. v. Century Bancorp., Inc.*, 588 F.Supp. 15, 17–18 (D.Mass.1984), a case not dissimilar to our own, as a result of a telephone call from Pennsylvania to Massachusetts, a Pennsylvania seller brought action against a Massachusetts bank for oral misrepresentation about the creditworthiness of the bank's customer. On the bank's motion to dismiss under a Massachusetts' statute of frauds similar to Vermont's § 182, the District Court held Massachusetts law applied in the absence of facts establishing the defendant would benefit from making the representation when *inter alia:*

> The party making an unsolicited phone call is generally in a better position to discover and compensate for variations in state laws than the party receiving the call. This is particularly true in cases such as this one where the plaintiff's *agent* contacted the defendant, and the residency of the principal may or may not be clear to the defendant.

*Id.*, 588 F.Supp. at 19. (Emphasis in original).

Although stipulated by the parties in *Emery*, the *Emery* Court found the *Restatement (Second) of Conflict of Laws*, § 148(2) choice of law to be inconclusive. This section states:

> When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:
>
> (a) the place, or places where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which the subject of the transaction between the parties was situated at the time, and
>
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*Restatement (Second) of Conflict of Laws*, § 148(2).

Applying the Restatement to the matter *sub judice*, factors (a) and (b) could either be Massachusetts where Midlantic's agent made the phone calls or New Jersey where Midlantic resides; factor (c) for VNB was Vermont and for BWAC it could be either Florida where it has offices and where the representations were made or Illinois as its principal place of business; factor (d) for VNB is Vermont, for BWAC it is either Florida or Illinois, and for Midlantic it is either New Jersey as its place of business or Massachusetts where its agents made the calls; and factors (e) and (f)—Midlantic's agent's negotiations, execution of agreements, place of collateral, loan transactions point to Vermont as the place where Midlantic was to perform and, most importantly, reliance on the creditworthiness of a Vermont Debtor induced Yeagen Midlantic's agent to enter into a contract in Vermont. The application of the Restatement analysis, like *Emery*, results in an inconclusive effect as to BWAC, but certainly points to Vermont as the proper choice of law for VNB.

Vermont's statute of frauds would otherwise apply to the transaction *sub judice*, at least as to VNB, and assuming it applies to BWAC because this is what they ask of us, we believe BWAC and VNB waived it by their failure to timely assert it prior to the close of the evidence and by their failure to object to their agent's testimony that they gave such references. There remains however, a further study of Vermont's policy to determine whether it is indeed a waivable defense.

The policy evidenced by some States from such statute of frauds is to protect a citizen from being improvidently drawn into third party conflicts without documentary evidence that such representations were made and properly relied upon. *See e.g., Tenna Mfg. Co. v. Columbia Union Nat. Bank, supra*, 484 F.Supp. 1214, 1219 (W.D.Mo.1980). Other States permitting an action for this kind of oral misrepresentation have a more liberal policy of protecting its citizens from fraudulent misrepresentation. *See e.g., Montello Oil Corp. v.*

*Apex Oil Co.*, 571 F.Supp. 389, 390 (E.D. Mo.1983) (interpreting New Jersey law permitting an action for oral misrepresentation). Although the applicable policy has not been decided in Vermont, we believe Vermont falls into the latter camp. *See, Plummer v. Lederle Laboratories*, 819 F.2d 349, 355 (2d Cir.1987) *cert. denied* 484 U.S. 898, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987) (a Federal Court sitting in diversity should follow the law directed by the Supreme Court of the State whose law is found applicable, and if there is no direct decision, the Federal Court should determine what it believes that State's highest Court would find if the issue were before it).

As to VNB, a Vermont entity, we believe Vermont is the interested State where the application of its statutory defense to the facts in issue will foster its policy of protecting a party from being liable to one for a misrepresentation of another's credit, unless it is in writing, and to prevent its citizens from being drawn improvidently into third party conflicts without documentary evidence to prevent perjury. Conversely, permitting a cause of action against VNB without a writing would directly impair that policy. VNB, however, does not dispute that it gave an oral credit reference and, in any case, failed to timely object to its introduction. A strong argument can be made that even if we were to assume Vermont's policy is to prevent perjury, that policy would not be furthered under the evidentiary and procedural waivers before us. Especially when, as Midlantic claims, VNB stood to and intended to benefit directly from its misrepresentations. Nevertheless, we agree with the *Emery* Court's conclusion, *supra*. Midlantic, a New Jersey principal, was dealing through its Massachusetts' agent. At the time of the allege misrepresentation, Yeagen may even have been dealing on its own behalf because there was evidence at the trial which indicated they were thinking about placing the commercial paper with someone other than Midlantic. The evidence is clear that at the time VNB made its oral representation, it was to go to a Massachusetts entity. In any event, under

such circumstances, it is more fair to place the responsibility of knowing a States' particular statute of frauds' requirements on the party placing the unsolicited phone call.

As to BWAC, its claim that Vermont's statute of frauds should apply to its alleged telephonic misrepresentation made from Florida or, if extended to its corporate headquarters, Illinois, is less clear. We conclude, however, that Vermont law applies because it is the state with the most significant contacts, namely, BWAC was doing business in Vermont and its credit reference concerned a Vermont resident.

Whether Vermont's 12 Vt.Stat.Ann. § 182 is an affirmative defense within the meaning of F.R.Civ.P. 8(c) is determined by looking to the relevant substantive law of the State where the Federal Court sits. *Funding Systems Leasing Corp. v. Pugh,* 530 F.2d 91, 95 (5th Cir.1976). In *Funding Systems,* the Fifth Circuit considered a Georgia statute similar to Vermont's § 182 and decided that although there were no Georgia State Court precedents for this particular statute, nevertheless it was an affirmative defense:

> The Georgia courts have not explicitly considered whether section 105–303 is an affirmative defense; it should be regarded as clear by analogy, however, that this is the case. Section 105–303 protects a defendant from unfounded allegations of deceit, much as the Georgia Statute of frauds.... In a sense, section 105–303 provides the defendant with an extra measure of protection since it is an exception to the general rule that the statute of frauds can be circumvented by pleading actual fraud or deceit on the part of one's opponent.... We believe that section 105–303 is an affirmative defense under Georgia law that must be set forth in a responsive, pleading or be waived.

*Funding Systems Leasing Corp. v. Pugh,* 530 F.2d at 95–96 (5th Cir.1976).

The doctrine set forth by *Pasley, Ewins* and *Weeks, supra, i.e.,* where one acts on a third party's false representations of another's solvency and is damaged thereby, he has a cause of action against the person making the same if the latter knew or should have known them to be false, has been followed in some States despite their adoption of the equivalent of the Lord Tenterden's Act. *See, Nevada Bank of San Francisco v. Portland Nat. Bank, supra,* 59 F. at 344 (Circuit Court D.Or.1893). *Brock & Davis Co., Inc. v. Charleston Nat. Bank, supra,* 443 F.Supp. 1175, 1179 (S.D.W.Va.1977) is an excellent case for its summary of the various jurisdictions where Courts were confronted with the collision between the common law right to enforce liability on one who fraudulently misrepresents the credit of another and the applicable States' statute of frauds:

> The reported American cases involving statutes similar to Lord Tenterden's Act can be divided into two general groups. The first consists of those jurisdictions which make no exception for a fraudulent statement that results in an extension of credit to another.... The second group consists of cases from six jurisdictions where actions involving the fraudulent misrepresentations are allowed notwithstanding the absence of a writing. This second group can be subdivided into two categories. There are two jurisdictions where the mere fact that the representation was fraudulently made is sufficient to avoid the statute of frauds.... The remaining four jurisdictions in this group recognize an exception for a fraudulent misrepresentation only where there is also either a fiduciary relationship between the plaintiff and the defendant ... or some evidence besides the misrepresentation which corroborates the fraud....

*Id.,* 443 F.Supp. at 1179 (citations omitted) (in the absence of a ruling from the State, the Federal Court compromised between the statute and the common law by requiring independent evidence which corroborates the fraud [choosing the second category from the second group], to avoid recognizing an exception which might otherwise engulf the rule and nullify the statute).

To be sure, Vermont enacted what is presently § 182 after the *Ewins* and *Weeks*

decisions, and since its passage, the Vermont Supreme Court has not been called upon to interpret it. Although the *Ewins* decision precedes § 182 and though arguably *dicta* to the proceeding *sub judice*, the *Ewins* decision is instructive on how a present day Vermont Supreme Court could view the same problem under the scope of § 182. The *Ewins* Court acknowledged that although the English Parliament had enacted Tenterden's Act to abolish the very action plaintiff sought against defendant, it nevertheless felt compelled by "the soundest principles of justice and common honesty" to: adopt the English cause of action as Vermont's Common Law; reject defendant's attacks on the plaintiff's cause as a mere circumvention of the statute of frauds; and, reject any negative inference that may have been created from Tenterden's Act:

> It has been urged, that no action of this sort should be sustained, that the attempt is a modern innovation upon the common law, and in fraud of the very statute of frauds, and has lately been abolished by act of parliament.... If this action has been destroyed by an act of Parliament, it only shows, that although it was not of ancient growth, it was so firmly rooted that it required that powerful engine to uplift it. If, as stated by counsel, (for I have not seen the act (Lord Tenterden's Act)), it requires the fraudulent representations to be in writing, it is singular, and it would seem must be intended to prevent any redress in those cases.... Great practices of perjury may have required this act in England, but merely the fear of it here should not prevent us from acting upon the great principle upon which the act is founded, unless our legislature also interferes. But the theory of the requirement of the act, unless it was intended to expunge all remedy in such cases, is as singular as to require swindling or *crim. con.* to be proved by a memorandum in writing.

*Id.*, 7 Vt. at 82–83; (parentheticals supplied for clarity).

Although Vermont's highest Court has not spoken on the statute of frauds under § 182, Vermont's general policy towards the statute of frauds is evidenced from its long standing rules governing the waivability of the statute of frauds. For example, the statute of frauds may be waived if parole evidence is offered and received without objection to prove the existence of a contract. *Gramatan Home Investors Corp. v. Whittemore*, 147 Vt. 648, 518 A.2d 32 (1986); *Taplin v. Hinckley Fibre Co.*, 97 Vt. 184, 187, 122 A. 426, 427 (1923) (as a rule of evidence it may be waived where proof of a contract by parole evidence is received without objection). Under Vermont Statutes and Rules, the statute of frauds is an affirmative defense and must be pled or it is waived. *See, Couture v. Lowery*, 122 Vt. 239, 243–45, 168 A.2d 295, 298 (1961) ("Therefore, under this statute an affirmative defense cannot be put in issue by an objection to the evidence, and it follows that mere failure to object, if the statute is pleaded, is not a waiver."); *Frigon v. Whipple*, 134 Vt. 376, 378, 360 A.2d 69 (1976) ("V.R.C.P. 8(c) does make the Statute of Frauds an affirmative defense, and requires it to be pleaded in response to a preceding pleading.... Where, as here, the plaintiff failed to file a required responsive pleading, thereby under V.R.C.P. 8(d) admitting the averments ... and further failed to seek leave to amend his pleadings ... we have no hesitancy in affirming the conclusion of the trial court that the particular defense was not available...." Court not only found the statute not available but also inapplicable).

Other Courts have likewise followed the rule that the statute of frauds must be pled or it is waived. *See, e.g., Funding Systems Leasing Corp. v. Pugh, supra,* 530 F.2d at 95–96 (5th Cir.1976) (statute of frauds similar to Vermont's § 182 was waived for failure to plead an affirmative defense prior to entry of a F.R.Civ.P. 16 pre-trial order); *Automated Med. Lab. v. Armour Pharmaceutical*, 629 F.2d 1118, 1123 n. 4 (5th Cir.1980) (failure to preserve statute of frauds defense when not incorporated into the parties' pre-trial stipulation and when it was raised for the first time in

a memorandum filed shortly before trial); *Michael–Regan Co., Inc. v. Lindell,* 527 F.2d 653, 660 (9th Cir.1975) (cannot assert the statute of frauds for the first time on appeal); *Wineberg v. Park,* 321 F.2d 214, 218 (9th Cir.1963) (even if the waiver by failure to plead an affirmative defense is overlooked, evidence in the record overcame the statute).

### CONCLUSION

Even if we were to hold Vermont's statute of frauds applies, we do not think any implied or express consent to try the affirmative defense of § 182 existed here. We seriously doubt the parties had any idea of its existence, but rather, Defendants simply overlooked or failed to timely discover the defense until well after the conclusion of trial and close of the evidence. Defendants should have alerted the Plaintiff and this Court of this affirmative defense prior to trial and certainly should have moved to amend to add it well before the end of trial if they had any intentions for the application of the defense in the proceedings *sub judice.*

We hold that the negative inference created by the absence of evidence of a written credit reference will not give rise to the implicit consent exception under conforming Rule 15(b) to excuse the Rule 8(c) requirement that this affirmative defense of statute of frauds be pled in response to a properly pled claim.

We do not read F.R.Civ.P. 15(b) to require Plaintiff to demonstrate its prejudice to prevent an affirmative defense amendment when Defendants have failed to demonstrate proper grounds which would otherwise give rise to a permissible conforming amendment to add an affirmative defense; namely, any implied or express consent to try the affirmative defense or, any objection to the receipt of evidence establishing a claim that should have been objected to on the basis of the affirmative defense.

Moreover, even if we were to permit such a defense, the extensiveness of evidence on the point of the oral credit reference and the Defendants' failure to object would make the amendment an exercise of futility, let alone result in substantial prejudice to Midlantic. Lastly on this point, we are not persuaded that the availability of the defense is so obscure that it excuses the Defendants' tardiness. *See, Jakobsen v. Massachusetts Port Authority,* 520 F.2d 810, 815–16 (1st Cir.1975).

Accordingly, IT IS ORDERED that the post-trial motions of BWAC and VNB to amend their answers to add affirmative defenses are DENIED.

Dated at Rutland, Vermont, this 28th day of February, 1989.

(s) Francis G. Conrad
Francis G. Conrad
U.S. Bankruptcy Judge